**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

CORY LLOYD,

Defendant.

Case No. 25-CR-80015-DMM

**CORY LLOYD'S SENTENCING**
**MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**

Defendant, Cory Lloyd ("Cory"), through undersigned counsel, hereby submits his sentencing memorandum and motion for downward variance from the United States Sentencing Guidelines (the "Guidelines") based on the statutory sentencing factors enumerated in 18 U.S.C. § 3553(a) and *United States v. Booker,* 543 U.S. 220 (2005).

**I.      PRELIMINARY STATEMENT**

Blind adherence to the Guidelines in this case would condemn Cory—a devoted family man, a pillar of his community, and a first-time offender at age 48—to a lifetime of imprisonment for a non-violent offense. Such an outcome would not serve justice; it would disregard both the person before the Court and the circumstances surrounding the offense.

Over two decades, Cory built Fiorella Insurance from a small, family-run agency into a company that, at its pinnacle, employed hundreds and helped hundreds of thousands of Floridians obtain insurance. Fiorella did not become a success through shortcuts. Cory worked long hours—nights, weekends, and holidays—for years to build the business. And while this case focused on the sale of Affordable Care Act ("ACA") insurance generated from leads provided by Steven

1

Strong, that business only accounted for about 13% of Fiorella's revenue. *See* [Trial Tr. Nov. 12, 2025 at 168:11-16]. As a result, the Court saw only a narrow slice of Fiorella's operations and a curated subset of Cory's communications.

The Court did not see the full measure of Cory as a person. More than 25 individuals—friends, family, employees, and members of the community—now write to the Court to describe Cory's character and his good deeds that they have witnessed firsthand. The letters reveal a man defined by generosity and a commitment to helping others. Cory is a loving husband and father. Cory has been married for over 22 years to Stephanie. Together, they have raised their children, Lucas (sixteen) and Alexis (fifteen), to value community and understand the importance of helping those in need. "Over the years Cory has shown great compassion for anyone in need, both friends and mere acquaintances." [Ex. A at 20] (T. Lloyd Letter). When a teenage friend of Cory's daughter needed stable housing, Cory welcomed her into the family home and helped support her. When one of Cory's employees could not afford the co-pay for her husband's surgery, Cory paid it immediately, without hesitation or any expectation of repayment. When a close friend suffered catastrophic injuries, Cory immediately rallied others to provide both financial and emotional support. Cory "consistently exemplifies compassion, patience, and a genuine desire to help others succeed." [*Id.* at 36] (Jones Letter).

Cory's commitment to others extends well beyond isolated acts of kindness. He dedicates substantial time to helping underprivileged children participate in a community soccer league, personally driving children who lack transportation to practices and tournaments, quietly paying registration fees, and purchasing equipment for those who cannot afford it. He encourages the children to believe in their potential and provides constant support, whether cheering from the sidelines, mentoring players, or even attending school graduations.

Against this backdrop, the Guidelines—driven almost entirely by the loss table—suggests an outcome oppressive in severity and untethered from reality: a life sentence, a punishment typically reserved for the most serious violent crimes. Indeed, the average sentence imposed for murder in the State of Florida is 24.4 years.[1]Even in some of the largest and most reprehensible fraud cases in the nation, including those involving Samuel Bankman Fried (FTX) and Elizabeth Holmes (Theranos), courts have rejected the imposition of Guidelines sentences because of their excessiveness. Mechanical application of the loss table here obscures the person before the Court: a man with decades of law-abiding conduct, a lifelong dedication to helping others, and no risk of recidivism. Therefore, for the reasons discussed in this memorandum, Cory respectfully requests that the Court impose a sentence substantially below the Guidelines range in this case.

## II.        LEGAL STANDARD

Title 18, section 3553(a), requires the Court to fashion a sentence "sufficient, but not greater than necessary, to serve the purposes" of sentencing. Although the Guidelines provide the starting point for the calculation of an appropriate sentence, a district court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Instead, the Court "must make an individualized assessment based on the facts" of each case, recognizing that a within-Guidelines sentence may be greater than necessary to serve the purposes of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 91 (2007); *see also United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006) ("[I]f *Booker* is to mean anything, it must be that the district courts are obligated to impose a reasonable sentence, regardless of the guidelines range, so long as the

---

[1] *See* [Ex. B at 42]. Florida Department of Corrections, *Florida's Criminal Punishment Code: Assessment and Analysis* (Oct. 2025).

guidelines have been considered."). This requires the Court to consider the following factors before imposing a sentence:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed —
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for —
>
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .
>
> (5) any pertinent policy statement . . . ;
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## III.  THE 3553 FACTORS WARRANT SUBSTANTIAL LENIENCY FOR CORY

### A)  The history and characteristics of Cory warrant substantial leniency.

#### 1.  This is Cory's first offense in nearly five decades.

For nearly five decades, Cory has lived an exemplary and law-abiding life. Cory built Fiorella into a successful insurance agency through two decades of hard work. As the Government has recognized, Fiorella was a legitimate insurance agency that offered multiple lines of insurance, including commercial, property, and health coverage. Cory joined Fiorella in 2003 and grew the

company steadily and without any compliance issues for years as the offense conduct did not begin until 2018. Until this case, Cory had never been arrested or accused of any crime. Although the Guidelines normally account for a defendant's criminal history (or lack thereof), the Guidelines do not do so here because the adjusted offense level is a 43. In that circumstance, the Guidelines suggest a sentence of life, with no regard to the defendant's criminal history. Regardless of the seriousness of the offense conduct in this case, an appropriate sentence should recognize Cory's decades of law-abiding conduct.

### 2.  Cory's unwavering dedication to helping others.

Cory's life has been defined by his unwavering dedication to helping others. Those who know Cory describe him as someone who intervenes when he sees someone struggling. The Court should consider this lifetime of generosity. In moments of crisis, Cory has repeatedly stepped in and helped friends, family members, co-workers, and others less fortunate than him.

When the mother of Cory's teenage nephew suddenly died, Cory immediately offered to raise his nephew. [Ex. A at 13-14] (B. Moore Letter). Similarly, when Cory learned that ten-year-old Ky'Leah Crespo, a friend of Cory's daughter, did not have a stable home, Cory opened his family's home to Ky'Leah. For over six months, Ky'Leah lived with the Lloyd family until Ky'Leah's mother could get back on her feet. Cory not only created a stable living environment, but he also helped Ky'Leah with her schoolwork, provided emotional support, and treated Ky'Leah as one of his own children. [*Id.* at 15] (K. Crespo Letter). Five years later, Cory and his wife remain listed as Ky'Leah's guardians with her school and continue to support Ky'Leah. There have been times where, without notice, Cory has dropped what he was doing to pick Ky'Leah up from school when she was sick and her mother could not leave work. [*Id.* at 1] (S. Lloyd Letter). When Cory's friend suffered a catastrophic diving accident that left him paralyzed from the chest down, Cory

assumed responsibility—organizing financial assistance, coordinating support, and remaining a constant source of emotional care for the friend and his family. [*Id.* at 35] (Robinson Letter). When a friend was hospitalized in the ICU shortly before her wedding, Cory took charge of last-minute preparations so she could still participate in her ceremony. [*Id. at* 48] (E. Lipson Letter). When Cory learned that one of his employees could not afford the co-pay for her husband's cancer surgery, Cory immediately paid the co-pay himself, without hesitation or expectation of repayment. [*Id.* at 38-39] (M. Blakeslee Letter).

Regardless of the nature of the crisis, Cory routinely steps in to help others. Cory "checks in on people who feel forgotten, encourages those on the verge of giving up, and invests his time in helping others find their footing again." [*Id.* at 44] (J. Kramm Letter). "[O]ver the years I have seen [Cory] welcome more people than I can count to family events, holidays, even Christmas, when they didn't have family to spend it with or were just going through a hard time." [*Id.* at 1] (S. Lloyd Letter). Acts like these were not performative or transactional—they reflect Cory's ingrained belief that when someone is in need, he will do whatever he can to help.

### 3. Cory's dedication to service.

Throughout Cory's life, Cory has demonstrated a sustained commitment to serving others, particularly those with limited resources or support. That commitment began early. As a high school student, Cory spent six weeks on a service trip to the Dominican Republic, where he helped rebuild a small village. [*Id.* at 37] (E. Craig Letter). As a young adult, Cory volunteered with Broward House, Broward County's only substance abuse treatment center for individuals living with HIV, providing support to some of the community's most vulnerable residents. [*Id.*]. For his entire adult life, Cory has also been an active member of his church, participating in and leading service initiatives through the church. When Cory was in his 20s, he not only volunteered to help

6

with his church youth group, but he also obtained his Commercial Driver's License so he could drive the children to events in the church's van. [*Id.* at 1] (S. Lloyd Letter).

But Cory's most profound and sustained impact has been through his long-standing service with the Hobe Sound Soccer Club (the "Club"). The Club is a volunteer-supported organization dedicated to providing soccer opportunities to players of all ages, regardless of financial means. Cory's support and leadership has helped the Club achieve its mission of turning "no children or families away," ensuring access for any child who wants to participate in the Club. [*Id.* at 42] (J. Helmsley Letter). For the families who lack transportation, Cory drives the children himself, often traveling hours out of his way. For those who cannot afford to participate, Cory pays program fees, purchases equipment, and provides other financial assistance. Cory is not just a beloved coach to these children, "but for many a father figure and trusted adult they could look to for guidance." [*Id.* at 47] (J. Erickson Letter).

Cory has shown these children that they can succeed not just on the field, but in school and in their entire lives. Cory attended the middle school graduation for a boy who had never had a father figure show up for his milestones. Cory remains an active presence in that young man's life. Today, the boy is a stronger student and a member of his school's varsity soccer team. [*Id.* at 17-18] (T. Lloyd Letter). Letters from children and parents participating in the Club show that Cory has inspired so many children to believe in themselves and that his influence extends far beyond the soccer field. Michelle de Cuba described how Cory helped her daughter overcome a fear of the ocean and coached her through scuba diving training. Cory taught her daughter more than technical skills—he helped her build the confidence and belief that she could accomplish anything she set her mind to. [*Id.* at 8] (M. de Cuba Letter). These examples highlight a life defined by service to others—expressed consistently, quietly, and without expectation of recognition. This pattern of

7

sustained compassion and mentorship, repeated over years and across relationships, speaks far more powerfully about Cory's character than the offense conduct in this case.

**B) The nature and circumstances of the offense warrant substantial leniency.**

    **1. The offense conduct occurred within a small part of Fiorella, a successful and legitimate insurance agency.**

A fair assessment of the nature and circumstances of the offense must begin with what sets this case apart from the many healthcare fraud cases that arise in this District. Unlike typical healthcare fraud cases prosecuted in this District—where the business exists solely to extract money from the government—Fiorella was a legitimate, functioning company with real employees, real customers, and real lines of business. Fiorella began as a small insurance agency over 40 years ago. Cory joined the company in 2003 and worked his way up through the company, eventually becoming its Chief Operating Officer. Fiorella was not an overnight success. Rather, Cory grew the company over two decades through hard work and dedication. For instance, one former employee recalled Cory working long hours through the night while his infant son slept next to him. [*Id.* at 38] (M. Blakeslee Letter). As Chief Operating Officer, Cory oversaw multiple divisions, including commercial, property, and health insurance teams.

The Government only alleged fraud involving a portion of Fiorella's business—ACA insurance that came from Steven Strong's leads. Even within the team of agents selling this insurance, those employees testified that they believed they were acting lawfully. *See, e.g.* [Trial Tr. Nov. 5, 2025 at 142:18-21] (Q: [Y]ou weren't aware of any large volume of fraud at Fiorella, right? A: Correct) (Peter Lala testimony); [Trial Tr. Nov. 10, 2025 at 35:6-8] (Q: Daniela Leiva, in 2020, you would not have stayed if you thought you were putting your family at risk, right? A: I would have not.) (Daniela Leiva testimony). Federal agents heard the same thing from multiple employees throughout the investigation. The Government may argue that the beliefs of these

8

employees are irrelevant to the jury's determination. But that would miss the point that, overall, that Fiorella was a legitimate company providing honest services. Indeed, Fiorella's financial data confirms this reality. Revenue from ACA plans that came from Steven Strong's leads constituted only 13% of Fiorella's business. *See* [Trial Tr. Nov. 12, 2025 at 168:11-16]. In other words, the overwhelming majority of Fiorella's operations involved lawful services provided over many years without a single compliance issue.

Further distinguishing this case from typical healthcare fraud cases is that Fiorella's ACA customers used their ACA insurance. The Government's expert determined that 49% of Florida Care consumers had medical claims submitted through their insurance. [*Id.* at 41:16-24]. That submission rate is consistent with data reported by CMS regarding ACA Bronze plan enrollees in Florida. Between 2019 and 2024, 32% and 50% of Florida ACA Bronze plan members had no medical claims—meaning that a substantial portion of ACA enrollees do not use their coverage each year.[2]   Against that backdrop, Fiorella's customers used their insurance at rates comparable to other Floridians insured through the ACA. Regardless of the Government's contention that these policies should not have been paid for, the critical point remains: Fiorella's ACA customers were real people who sought health insurance, received it, and used it. This case therefore bears no resemblance to the fraud cases courts in this District routinely confront, where program beneficiaries receive valueless or nonexistent products and services. These critical distinctions warrant the Court's consideration in fashioning a just sentence.

---

[2] *See* CMS, *2019-2024 Enrollees Without Claims by State Market Metal Level* (Aug. 8, 2025).

2. **Because of their extreme focus on loss amount, the Guidelines are completely unhelpful in fashioning a just sentence.**

Regardless of the loss amount that the Court finds that the Government has proven under U.S.S.G. §2B1.1, the Court should decline to impose a sentence primarily driven by the loss calculation. In fraud cases, the loss amount serves as the principal determinant of the adjusted offense level and corresponding Guidelines range. Courts have recognized that the Guidelines often go too far in fraud cases by placing an "inordinate emphasis . . . on the amount of actual or intended financial loss." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006); *United States v. Emmenegger,* 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("The Guidelines place undue weight on the amount of loss involved in the fraud."); *see also United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018) (observing that courts have "expressed strong reservations" about the effects of the Guidelines); *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *4 (E.D.N.Y. April 26, 2018) (describing the loss enhancement as a "grievous wrong" and noting "the rigidity of the loss amount overriding the diverse reality of complex financial crimes [and] the lack of any consideration of danger to society[]").

Sentencing data shows that courts across the country agree. The Sentencing Commission's data reflects an "increasing divergence between the average Guidelines minimum and the average sentence actually imposed as loss amount grows."[3] For example, from 2020 to 2024, of the 31 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 43, and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure, **the average length of imprisonment was 158 months and the median length of**

---

[3] Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 22 (2013).

**imprisonment was 138 months**.[4] These courts likely recognized that "in a great many, perhaps most, cases . . . the amount of the loss does not fairly convey the reality of the crime or the criminal." Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*, 29 Fed. Sent'g Rep. 226, 227 (2017).

Moreover, the cumulation of substantially overlapping Guidelines enhancements, "when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance . . . not adequately considered by the Commission . . . ." and creates an even greater overstatement of an appropriate sentence range. *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003), *as amended* (Nov. 25, 2003), *adhered to on reh'g*, 362 F.3d 160 (2d Cir. 2004), *cert. granted, judgment vacated*, 543 U.S. 1097 (2005). Consider the "sophisticated means" enhancement. The enhancement applies in virtually all fraud cases and further increases the offense level by two levels. *See* U.S.S.G. §2B1.1(b)(10). Likewise, the loss amount and mass-marketing enhancements compound similar facts in this case because the loss amount was driven by the marketing of ACA plans to numerous customers. This accumulation of offense levels "represents . . . the kind of 'piling-on' of points for which the guidelines have frequently been criticized." *Adelson*, 441 F. Supp. 2d at 510. Therefore, the Guidelines in this case do not represent a just sentencing range for the Court to consider.

**C) The Court should avoid unwarranted sentencing disparities between Cory and defendants convicted of similar crimes.**

The Court has an independent duty under section 3553(a)(6) to avoid unwarranted sentencing disparities among criminal defendants convicted of similar crimes, including co-

---

[4] *See* [Exhibit C] (true and accurate screenshot of United States Sentencing Commission Judiciary Sentencing Information related to defendants sentenced pursuant to §2B1.1 with a Final Offense Level of 43 and Criminal History Category I (an excluding defendants who received §5K1.1 substantial assistance departure).

conspirators. *See United States v. McQueen*, 727 F.3d 1144, 1160 (11th Cir. 2013); *United States v. Lazenby*, 439 F.3d 928, 934 (8th Cir. 2006) (reversing sentence where district court did not give enough weight to the disparities in sentences imposed on similarly situated conspirators). Sentences imposed in this investigation and other significant fraud cases demonstrate why the Court should reject a Guidelines sentence as unjust and unwarranted.

### 1.   Dafud Iza

Dafud Iza stands as the most apt comparator to Cory. Although Iza cooperated and received a Guidelines reduction of 50% pursuant to USSG 5K1.1, Iza admitted to the same conduct for which Cory was convicted. Iza served in a senior leadership role of the company as "Fiorella's executive vice president and operations manager during much of the relevant time period . . . ." *United States v. Iza*, Case No. 24-cr-80154-RS (S.D. Fla.), ECF No. 45 at 4 (Government Sentencing Mem.). Iza played a key leadership role in the offense conduct. At trial, the Government introduced evidence of WhatsApp chats that allowed Fiorella employees to communicate in real-time regarding operations, including many of the issues in this case. Iza was the highest-level employee on most of those chats. *See, e.g.*, [GX 362] (customers service WhatsApp chat); [GX 363] (digital team WhatsApp chat); [GX 364] (Florida Care WhatsApp chat). And if there is any doubt that Iza's culpability was virtually identical to what the Government has accused Cory of, Iza's plea agreement dispels that. *See* [Ex. D at 15-19] (Iza Plea Agreement)].

As part of Iza's guilty plea, the Government offered certain benefits in his plea agreement that allowed him to reduce his Guidelines. For example, the Government allowed Iza to avoid a role enhancement despite his leadership role at Fiorella. Without cooperation, and with the Government's concessions, the Guidelines range for Iza was 70 to 87 months. *See Iza*, Case No.

24-cr-80154-RS, ECF No. 45 at 7 (Government Sentencing Mem.). The Government later recommended, and Iza received a sentence of 35 months of incarceration. *See id.* at 10; *id.* at ECF No. 48 (Judgment). Sentencing Cory to a term nearly fourteen times longer than the sentence Iza would have faced absent cooperation—or nearly thirty times longer than Iza's actual sentence—would create a stark and unwarranted sentencing disparity. Such a result would be antithetical to 18 U.S.C. § 3553(a)(6), and cannot be justified by the relative roles or conduct in this case.

### 2. Sentences of defendants in other healthcare fraud cases

Sentences in far more egregious healthcare fraud cases also demonstrate that imposing anything near the Guidelines would create an unwarranted sentencing disparity. Perhaps the largest healthcare fraud in this District involved Philip Esformes, who caused nearly *$2 billion* in fraudulent billings to Medicare, resulting in losses exceeding $800 million. *See United States v. Esformes,* Case No. 16-cr-20549-RNS (S.D. Fla.), ECF No. 1374 at 9 (Government Sentencing Mem.). Esformes' fraud spanned over 18 years. *See id.*, ECF No. 200 at 8 (Second Superseding Indictment). And when criminal charges arose, Esformes obstructed justice by trying to cause a co-conspirator to flee the District to make him an unavailable witness. *See id.*, ECF No. 1374 at 1]. Despite Guidelines that called for a life sentence, the Court imposed a sentence of 20 years. *See id.*, ECF No. 1459]. Courts in recent healthcare fraud cases with astronomical loss figures have likewise sentenced defendants to substantially below-Guidelines sentences. For example:

- In December 2025, the CEO of a healthcare company received a sentence 15-year sentence, following a five-week trial, for defrauding Medicare of over *$1 billion* in medically unnecessary devices and medications. *United States v. Cox*, 23-cr-20271-DSL (S.D. Fla.), ECF No. 203 (Judgment); *id.* at ECF No. 301 at 2 (Government Sentencing Mem.).

- In May 2025, a doctor received a 10-year sentence, following trial, for falsely diagnosing his patients so that he could bill over $99 million in false claims. *United States v. Zamora-Quezada*, 18-cr-00855-S, (S.D. Tex.), ECF No. 826 (Judgment); *id.* at ECF No. 718 (Government Mot. for Money Judgment).

- In February 2024, the operator of multiple medical companies received a 12-year sentence, following trial, for billing over $700 million in false claims. The defendant also made thousands of calls where he impersonated patients or patients' relatives to induce insurance companies to pay or reconsider claims. *United States v. James*, 19-cr-391-JS (E.D.N.Y.), ECF No. 269 (Judgment); *id.* at ECF No. 245 at 1-2 (Government Sentencing Mem.).[5]

- In January 2024, two defendants who used home health companies to bill for $93 million in services that were not rendered, and who used lists of stolen patient identities, received sentences, after trial, of 100 months and 70 months of incarceration. *United States v. Felipe et al.*, 21-cr-20303-DPG (S.D. Fla.), ECF Nos. 401, 403 (Judgments); *id.* at ECF No. 389 at 2 (Government Sentencing Mem.).

- In November 2023, the Chief Compliance Officer of a pharmacy company that unlawfully billed Medicare for over $50 million of unnecessary medication and testing supplies, received a 52-month sentence following trial. *United States v. King*, 19-cr-20652-DML-DR (E.D. Mich.), ECF No. 335 (Judgment); *id.* at ECF No. 326 at 2 (Government Sentencing Mem.).

---

[5] The Second Circuit later vacated the defendant's sentence and remanded to the district court for improperly enhancing the defendant's sentence because of his eligibility for the First Step Act. *See United States v. James*, 151 F.4th 28, 42 (2d Cir. 2025)

Imposing a sentence that is out of step with these far more egregious healthcare fraud cases, many involving significantly greater loss amounts, would therefore create an unwarranted sentencing disparity that the Court should avoid.

### 3. Sentences in the FTX and Theranos cases, two of the largest fraud cases ever brought in the United States

Sentences in the fraud cases of Samuel Bankman Fried and Elizabeth Holmes also demonstrate the inappropriateness of a Guidelines sentence. Bankman Fried committed one of the largest frauds in American history, misappropriating more than $8 billion of customer money and victimizing tens of thousands of customers across multiple continents. Bankman Fried also made over $100 million in illegal campaign donations to over 300 politicians and political action groups, made $150 million in bribes to Chinese government officials, and tampered with witnesses following his arrest. *See United States v. Bankman Fried*, Case No. S6 22 Cr. 673 (LAK) (S.D.N.Y.), ECF No. 410 at 4 (Government Sentencing Mem.). Like Cory, Bankman Fried faced a Guidelines sentence of life imprisonment despite having no prior criminal history. The sentencing court, recognizing the gravity of Bankman Fried's conduct, nonetheless imposed a sentence of 25 years in prison. *See id.* at 424 (Judgment).

Similarly, Elizabeth Holmes defrauded thousands of investors of hundreds of millions of dollars by falsely promoting the technological capability of her company's testing device. During the fraud scheme, "women received wrong tests about their pregnancies, Theranos generated wrong results for cancer tests, and one victim was led to believe she had the virus that causes AIDS." *United States v. Holmes*, Case No. 18-CR-00258 (EJD) (N.D. Cal.), ECF No. 1643 at 1 (Government Sentencing Mem.). The Guidelines also called for a life sentence despite Ms. Holmes' lack of any criminal history. *Id.* at 15. Nonetheless, the sentencing court imposed a sentence of 135 months of incarceration. *Id.* at ECF No. 1660. The sentences in the Bankman Fried

and Holmes cases reflect that despite the significant financial losses caused, sentencing courts recognized that Guidelines sentences in these circumstances are draconian and unwarranted.

> **D) The purposes of specific and general deterrence have been accomplished in this case.**

The Court must also ensure that the sentence imposed is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, foster specific and general deterrence, and protect the public. 18 U.S.C. § 3553(a)(2). The Eleventh Circuit has stressed that a sentencing court must "consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend." *United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007). At nearly fifty years old, Cory has lived a law-abiding life. No matter what sentence the Court imposes, Cory will never re-offend. In fact, for a person with no criminal history points, like Cory, such individuals "have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point." U.S.S.G. Manual, Amendment 821, "Reason for Amendment," (eff. Nov. 1, 2023) (citation omitted). A first-time conviction by itself also imposes serious punishment. Cory will now suffer the routine yet harsh "collateral consequences" of a felony conviction. The ability to obtain employment, bank, borrow, travel, and vote, among other things, will be impacted.[6] The conviction will also bar Cory from the insurance industry, an additional punishment that guarantees he poses no further risk. *See Emmenegger*, 329 F. Supp. 2d at 428 (finding that risk of recidivism eliminated by the fact that the offense at issue

---

[6] Courts frequently consider collateral consequences at sentencing. *See, e.g.*, *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant lost his job and income).

was "particularly adapted to [the defendant's] chosen career," "[t]hat career is over, and his potential to commit this particular type of crime has been eliminated").

Other factors further support the conclusion that Cory will never recidivate. College graduates like Cory are among the demographic groups least likely to commit a new offense.[7] Cory's family support will also play a significant role in ensuring that he lives a law-abiding life following his sentencing. Research shows that offenders with family support are more likely to maintain employment, develop strong social ties, and avoid re-offending.[8] As demonstrated by the numerous character letters, Cory's extensive support network of friends and family members stand ready to assist him through this difficult time. Their unwavering support of Cory should give the Court confidence that Cory will never find himself before another criminal court. And with respect to the deterrent effect of a sentence, "[s]tudies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect."[9] Accordingly, a lengthy term of imprisonment is unnecessary to protect the public or deter future misconduct, as Cory presents an exceptionally low risk of recidivism.

## IV. <u>CONCLUSION</u>

Cory respectfully requests that the Court carefully consider the factors above, and impose a sentence substantially below the Guidelines range.

---

[7] *See* U.S. Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive Overview (March 2016). https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenderscomprehensive-overview (last accessed Dec. 12, 2025).

[8] *See* Eckland-Olson, S., Supancic, M., Campbell, J., & Lenihan, K. (1983). Postrelease depression and the importance of familial support. Criminology, 21, 253–275.

[9] National Institute of Justice, Five Things About Deterrence (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence (last accessed Dec. 19. 2025).

Date: February 10, 2026

Respectfully submitted,

**STUMPHAUZER KOLAYA**
**NADLER & SLOMAN, PLLC**
Two South Biscayne Boulevard, Suite 1600
Miami, FL 33131
Tel.: (305) 614-1400
By: */s/ Matthew DellaBetta*
   MATTHEW DELLABETTA
   Florida Bar No. 1031216
   mdellabetta@sknlaw.com
   RYAN K. STUMPHAUZER
   Florida Bar No. 0012176
   rstumphauzer@sknlaw.com

   *Counsel for Cory Lloyd*

**CERTIFICATE OF SERVICE**

I certify that on February 10, 2026, I electronically filed this document with the Clerk of

the Court using CM/ECF, causing a copy to be served on counsel of record.

/s/ *Matthew DellaBetta*
MATTHEW DELLABETTA