**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-80015-CR-MIDDLEBROOKS**

**UNITED STATES OF AMERICA,**

**vs.**

**CORY LLOYD, and**
**STEVEN STRONG,**

      **Defendants.**

_____/

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, through undersigned counsel, respectfully submits this Sentencing Memorandum in advance of the sentencing of defendants Cory Lloyd ("Lloyd") and Steven Strong ("Strong"). Defendants' egregious conduct as the architects of the largest Affordable Care Act ("ACA") fraud scheme ever brought to trial warrants a substantial prison sentence.

Lloyd and Strong masterminded a scheme that deliberately targeted and preyed upon some of the most vulnerable populations in this country—people experiencing homelessness, people experiencing mental health disorders, and people experiencing opioid addiction, among others—to steal millions of dollars from a critical social safety net. This fact places their conduct above and beyond other large fraud cases involving huge economic losses.

The Defendants were the orchestrators of this scheme, and they each supplied a key ingredient to make the scheme possible and profitable: Lloyd supplied a stable of licensed insurance brokers trained to persuade unwitting consumers to agree to a "magic number" that locked in federal subsidies and guaranteed commissions for the Defendants; Strong supplied a steady stream of thousands of consumers acquired through deceptive street marketing campaigns. Lloyd ran the insurance brokerage and put into place protocols that flouted ACA program

requirements at every turn—from directing employees to "bump up" incomes from zero to the minimum amount required for a subsidy, to directing employees to submit fabricated Medicaid applications in droves, to directing employees to thwart regulator's attempts to verify key information on applications.

At the outset of the scheme, even after Strong was warned by federal regulators that his conduct breached program requirements and stripped of his federal insurance registration, he persisted in this scheme to circumvent those program requirements and take advantage of desperate populations. Both Defendants had concerns about the risks and knew what they were doing was wrong. But for years, the Defendants relied on untrained and unlicensed street marketers—some convicted felons—that the Defendants knew took advantage of disadvantaged populations, bribed consumers to enroll, fabricated enrollment information, and stole consumers' identities.

The Defendants took steps to conceal the fraud and make it appear legitimate. Both Defendants responded to regulatory inquiries; Lloyd hired an attorney, who Strong also dealt with; the Defendants led employees to believe that what they were doing was okay. But behind closed doors, the Defendants revealed their true intentions: profit, greed, and self-preservation. Defendants' motives were not to help consumers, but rather to use these consumers to help themselves. The Defendants caused the submission of ACA applications resulting in $233.2 million in subsidies improperly awarded (of which approximately $180.6 million was paid), and each Defendant was paid millions from the fraud.

The total adjusted offense level (43) speaks to the severity of the offense. In fashioning a sentence from these guidelines, the United States urges the Court to consider the seriousness of this offense, the need to deter these Defendants and others who believe they are above the law, the need to curb health care related fraud in South Florida and nationwide, and the need to promote

respect for the law. In the face of overwhelming evidence, the Defendants continue to deny their guilt. Instead, the Defendants blame the program they victimized, the attorney they privately joked about, the employees who reported to them, and the cadre of street marketers they assembled. The Defendants flouted the law at every turn. Now, having been convicted, the law provides no cover. Instead, the law provides a means for the Court to fashion a sentence that reflects the seriousness of the Defendants' offenses, guards the rule of law, and—critical in a case of this magnitude—deters these Defendants and others from committing crimes that target vulnerable consumers and jeopardize public programs.

In light of all of this, the United States submits that a just sentence for these Defendants should be measured in decades, not merely months or years.

## I.      THE DEFENDANTS CONDUCT WAS EGREGIOUS.

The Defendants' extraordinary crimes resulted in the largest ACA enrollment fraud case ever tried. During the conspiracy period, the Defendants caused the fraudulent enrollment of 35,019 consumers and a total of 86,905 fraudulent policies, for a total of $233.2 million in awarded subsidies ($180.6 million of which was actually paid out by the government). The scheme touched consumers across the state of Florida and even expanded to Oklahoma and other states. The scheme preyed on the most vulnerable of populations and put them at risk of serious health and financial consequences, including hospitalization, life-threatening infectious diseases, and relapse or overdose from opioid addiction.

The scheme relied on Strong's corrupt street marketing practices to entice consumers to place calls to Lloyd's call center, where Lloyd's licensed insurance brokers were trained to use their industry knowledge and special skill to pressure and manipulate consumers into agreeing to income numbers that were not true. Approximately 90% of Florida Care consumers were enrolled

using the exact same income numbers—brazen lies designed to maximize subsidies and commissions. GX 26. These consumers were led by licensed insurance brokers to believe that the income numbers they agreed to were appropriate under the ACA program's guidelines. They were never told that the information would be submitted under penalty of perjury. There was no attempt to enroll the consumers into Medicaid or even a more affordable ACA plan—Lloyd and Strong were selling one plan, and one plan only. They sold the plan that made them money, no matter what it cost others. They brought dozens of employees into the scheme—whether street marketers out of prison trying to turn a new leaf, or young and newly minted insurance agents trying to learn the business—and marred their careers and livelihoods by involving them in a massive fraud.

The Defendants were not new to this business; they committed their crimes as licensed insurance agents with years of experience. They did this even as complaints, regulatory inquiries, and warning signs accumulated, and even after becoming aware of a DOJ Civil investigation. They only stopped when they were fired. The Court should consider the seriousness of the Defendants' scheme in assessing the nature of the offense, the need for the sentence to reflect the seriousness of the offense, and the need to justly punish the offense. 18 U.S.C. §§ 3553(a)(1)-(2)(a).

**A. The Defendants Orchestrated an Extraordinary Fraud.**

The Defendants were the architects of this scheme in every sense of the term. Lloyd was the COO and President of Fiorella. Strong owned Florida Care. In August 2018, at the beginning of the conspiracy, Lloyd and Strong privately hatched their plan to target low-income populations, sell them only the "free bronze" plan, and manipulate the ACA program's income requirements (GX 386):

> Strong: I'm thinking the lower income of the state of Florida….I'm gonna hire close to 75-300 marketers. Minimum. I need to make sure we have our stuff together.
> Lloyd: For sure. All free bronze!

> …
> Lloyd: Just give me a heads up before you flip on the machine
> Strong: You crack me up. I don't think you understand what's about to happen. Your agents are trained on how to sell income requirements, the Strong package… Ect [sic].
> Lloyd: Please…that's childs play. Unemployed "projectors" are our specialty.

The next month, in September 2018, Strong confirmed the "[e]ngine is starting" and "I'm training 75 guys," and Lloyd confirmed "[a]ll the soldiers are in place." *Id.* Without Strong's cadre of street marketers, and Lloyd's army of licensed insurance brokers applying their seal of approval to every application submitted, and without Lloyd and Strong's shared willingness to lie, this fraud could never have happened at all.

The Defendants also approved the Medicaid denial process, whereby Fiorella employees generated fake Medicaid applications designed to get unsuspecting consumers denied from Medicaid and used those denial letters to fabricate ACA special enrollment periods ("SEPs"). The Defendants did this so that they could carry out their scheme year-round, not just during the narrow annual open enrollment period. The Defendants knew this was wrong, and privately joked about its riskiness as early as October – December 2018 (GX 386):

> Strong: Hey what's the chances we will be able to run Health insurance year round.
> Lloyd: I guess the answer is, is it worth the risk. The commissions are lower too.
> …
> Strong: Are you interested in sep calls?
> Lloyd: Man, I don't think so. I just don't think it's worth the risk and the commission is much [smaller].

Despite acknowledging the risks at the outset of the scheme, the Defendants quickly changed course. In January 2019, Strong asked Lloyd, "What is the best way to get Medicaid denial letters?" Lloyd instructed, "Go to the Medicaid site and apply. Gives you an immediate denial." *Id*. Lloyd also discussed with his then-CEO, "If renewal comp is high, why don't we turn on leads and start ducking the shot out of seps…F*cking the sh*t." The CEO agreed, "Yes we

5

should f*ck up SEPS." Sentencing Exhibit 1.[1] The abuse of Medicaid denials and SEPs took the scheme to a new level—evidence at trial showed that 56% of the Florida Care policies were applied for during an SEP and, of those, 80% used a Medicaid denial as the basis for the SEP. GX 23.

**B. The Defendants Deliberately Targeted and Preyed Upon Vulnerable Populations and Stole from a Critical Social Safety Net.**

The consequences of Lloyd and Strong's conduct are staggering. The Defendants were responsible for $233.2 million in subsidies awarded on fraudulent enrollments over the course of four years. GX 21. The Defendants' egregious conduct did not just expose the ACA program, a critical social safety net, to exorbitant losses. This conduct also confused vulnerable consumers, put them at risk of losing access to critical treatments and suffering health and financial consequences, and confounded their doctors.

For example, the jury heard from Dr. Colleen Bell, a psychiatrist who works at Sulzbacher, "the largest homeless provider in Jacksonville, Florida," and treats "a lot of vulnerable individuals who are unhoused as well as [] people who are not able to access or maybe not welcome to access other health care systems." 11/5/25 Trial Tr. at 45:1-4. Through her work at Sulzbacher, Dr. Bell encountered E.H., the consumer who is the subject of Count 2, when E.H. was living "in the woods behind a Walmart" in 2018. *Id.* at 47:3-8. Dr. Bell diagnosed E.H. with "schizoaffective disorder depressive type," a condition so serious that, according to Dr. Bell, E.H. "thought ducks were talking to him" and that "he was getting messages through stairwells." *Id.* at 47:21-22. In January 2020, two years into treating E.H., Dr. Bell and her team were able to get E.H. enrolled in Medicaid. Dr. Bell viewed this as "a big win because it's hard to get" someone qualified for

---

[1] Sentencing Exhibit 1 is GX 373, and it includes excerpted texts between Lloyd and Fiorella's then-CEO. It was marked as GX 373 pre-trial, but the Government ultimately did not seek to admit it. The text message is from Lloyd's phone, and the defense previously stipulated to authenticity of such messages. The government will provide this exhibit at the sentencing hearing.

Medicaid in Florida and E.H.'s caseworker spent nearly "30 hours with him helping him apply" and "getting all of the records together" showing his qualifying disability. *Id.* at 50:9-21. As a result, E.H.'s long-acting injectable medication to treat his schizoaffective disorder would be covered by Medicaid, which "can cost around $2,000 a month otherwise," and which Sulzbacher had been providing E.H. through "patient assistance programs and samples." *Id.* at 51:13-17.

Absent the intervention of Dr. Bell to ensure that E.H. continued to receive his medication, E.H. could have decompensated, been hospitalized, or been arrested.[2] Shortly after getting E.H. enrolled into Medicaid, Dr. Bell learned that E.H. had become enrolled in an ACA plan. In March 2020, Dr. Bell emailed her supervisor the following message, which ultimately made its way to Lloyd via Insurer 1:

> Ran into this situation again we had a patient who had Medicaid (that Traci fought hard to get him, one of our homeless SOAR clients). He has severe psychosis and needs his long acting injectable medication for it. Found out today someone must have signed him up for one of those high deductible plans with [Insurer 1] which kicked [him] off his Medicaid. He needed his injection today but cannot get it, I did prior auth for Florida Blue and they denied his medication! Medicaid usually does not require it for the long acting injectables. So now we have to work with him to drop the [Insurer 1] plan and sign up for Medicaid again which will take time. In the meantime he will not get his injection, could decompensate, and wind up hospitalized as he has in the past (which will cost everyone more money including [Insurer 1]).
>
> I don't know how to say it otherwise but this is wrong. It is unethical to do this. Medicaid would be far better for him. They are not even checking if they have insurance.
>
> GX 287, 288, 289.

E.H.'s enrollment was terminated after Lloyd received this email, and Dr. Bell testified that she was able to bridge the gap in E.H.'s treatment by using samples. Sample injectables are limited

---

[2]   As Dr. Bell testified, "[W]ithout the medicine, the risk is someone will end up back in the psychiatric hospital. Oftentimes, too, people that are acting different reach the attentions of law enforcement. So it's key for them to remain on their medication." *Id.* at 52:9-12.

in number and giving a sample to E.H.—when E.H. could have received the medication through Medicaid but for Fiorella enrolling him in an ACA plan—"meant that [there] was one less [sample] if someone else needed it." 11.5.25 Trial Tr. at 64:11-15. This should have been the Defendants' last interaction with E.H. But a short six months later, in September 2020, the Defendants caused E.H. to be enrolled in an ACA plan again. The enrollment used the "magic number" of $13,000 per year for E.H.'s income, resulting in a fully subsidized plan. Fiorella's internal tracking system showed that the lead was referred by Florida Care, Strong's company. *See* GX 2A, 2C. As Dr. Bell put it, this conduct was nothing short of "predatory" because it took "advantage of people who have nothing." 11.5.25 Trial Tr. at 86:2-6. E.H. was not the only Sulzbacher patient this happened to, and Dr. Bell and other Sulzbacher employees had to chase predatory marketers off the Sulzbacher campus. *Id.* at 86:12-14.

The jury also heard from Joseph Miller, a consumer who was victimized by the Defendants' scheme. Mr. Miller testified that he was "living on the street" and was "a drug addict" and "an HIV patient." 11.6.25 Trial Tr. 45:20-25, 46:24. Mr. Miller was offered money to sign up for health insurance and, "since we are homeless or on drugs we say, yeah, I want money to get drugs." 11.6.25 Trial Tr. 45:20-25. Mr. Miller testified that he could not afford the co-pays associated with the ACA plan, *id.* at 49:21, but he wanted the money to "get high or get food." *Id.* at 53:3-4.

Dr. David Serota, an infectious disease and addiction medicine doctor who treats Mr. Miller and other patients victimized by the Defendants, testified about the impact this ACA plan had on Mr. Miller's care. Dr. Serota "see[s] patients at a syringe exchange" and at "Jackson Memorial Hospital" in Miami, Florida. 11.12.25 Trial Tr. at 68:9-12. Dr. Serota's patients are typically "experiencing homelessness, and most of them have addiction" and HIV and their care is often funded through federal programs, county programs, or Medicaid. *Id.* 68:15-69:11. Dr. Serota

testified that, after Mr. Miller became enrolled in the ACA plan, Medicaid no longer covered his medications. Because he was enrolled in the ACA plan, Mr. Miller was unable to get his HIV medication or his cocaine addiction medication, which resulted in Mr. Miller's viral load for HIV becoming "extremely high" and Mr. Miller being hospitalized "for cocaine induced psychosis." *Id.* 71:1-17. Dr. Serota had to intervene to get Mr. Miller off the ACA plan and back on Medicaid to start covering these medications.

Dr. Serota described additional patients he treated that evidence showed were enrolled in ACA plans through the Defendants' scheme. For example, patient M.Z. "was living with HIV and had opioid abuse disorder as well." *Id.* at 72:18-22. M.Z. was receiving treatment for free. *Id.* at 73:11-16. Dr. Serota was treating M.Z. with Biktarvy (for HIV) and Suboxone (for opioid use), which reduces "someone's chance of dying from an overdose." *Id.* at 72:21-73:6. Suboxone is "really both critical and life sustaining" and "any lapse in that treatment could [lead] to relapse and death." *Id.* at 73:3-4. In M.Z.'s case, "she was stabilized on Suboxone and lost access to it due to being signed up for [the ACA plan]." *Id.* at 73:4-6. Dr. Serota was able to use grant money and samples to bridge the gap in M.Z.'s medication, which meant one less sample for someone else and less grant money for others. *Id.* at 74:1-10.

Likewise, Dr. Serota treated patients S.T., M.A., and J.C., all of whom were victimized by this scheme. In a complaint that was ultimately summarized in an email sent to Lloyd, Dr. Serota complained that these three patients were paid to sign up for an ACA plan, and as a result were worse off than if they had no insurance because of the high co-pays associated with their medication. *Id.* at 74:18-75:9; GX 310. Patient M.A. had Medicaid prior to being enrolled in an ACA plan. He had been admitted to the hospital and was ready for discharge when Dr. Serota learned that he had been enrolled in an ACA plan. "It is very important when people are leaving

9

the hospital to continue their treatment for their life-threatening infection [and] confirm that they have access to their antibiotics as well as other medications they're going to get." *Id.* at 77:3-9. But when Dr. Serota prescribed the medications for M.A. to be discharged, he learned that Medicaid would not cover the medications and instead the medications had to be sent to an outside commercial pharmacy and would have a co-pay. "[T]o get him out of the hospital safely, I prescribed the medicine through Walgreens across campus, I picked it up, paid his 25-dollar copay and brought medications back to him so he could leave the hospital with medications." *Id.* at 77:17-21. Because of the Defendants' scheme, if Dr. Serota had not paid for and picked up M.A.'s medications, M.A. would have had to stay longer at the hospital until his medications could be covered, or would have been discharged without the appropriate life-saving treatment he needed.

The Defendants put vulnerable patients at risk of overdose, worsening HIV infections, psychiatric episodes, and other significant health consequences. The Defendants intentionally targeted vulnerable populations and even joked about it multiple times:

August 2019 (GX 386)

Strong:  You think its cool to set up marketers in all hurricane shelters?  Lmao I
            might…
Lloyd:  It's a killer idea, if we could pull it off!
Strong:  We have a hurricane coming. We find out shelters I'll set up marketers.
Lloyd:  I want to rake the shelters!
Lloyd:  Rape
Strong: Haha I'm not kidding
Lloyd:  Me either…let's f*ck em up

October 2019 (GX 386)

Strong: [sending Lloyd list of places to market, including] "low income hospitals"
            and "Aids clinics."

February 2020 (GX 380)

Fiorella employee:  I would look for people huddled around a steel barrel with a fire going.
                They will need insurance.

10

Lloyd:           I believe the Red Neck term for that is a Burn Barrell
Strong:         Hahaha…Can we use your address for a physical address?!
Fiorella employee:  Main street barrel 5, Oklahoma city Oklahoma
Strong:         Perfect.  I'll let the guys know.  You think couple hundred to that address?
Fiorella employee:  If u get me a couple hundred there I'll build a shed on it with a mailbox
Strong:         Call your guy, it's gonna happen!

**C. The Defendants Profited Enormously and Were Solely Motivated by Greed.**

The Defendants did all of this for one reason: greed. In total, Lloyd received approximately $15 million in net payments from Fiorella, approximately $2.7 million of which are fraud proceeds, while Strong received approximately $7 million in net payments from Fiorella, approximately $6.5 million of which are fraud proceeds. GX 41, 42.[3] Lloyd sold Fiorella for nearly $90 million, partly driven by the volume of business generated by Strong. *See* GX 40. Both Defendants purchased luxury homes, Lloyd purchased an 80-foot yacht, and Strong purchased a new Tesla. GX 43, 44, 6-9. Throughout the scheme, Defendants consistently made clear that money was their focus. They frequently goaded each other to make more money, sexualized and idolized the amount of money they made, and bragged about their volume of sales and accumulated wealth:

August 2018 (GX 386)

Lloyd: as long as you get []10k policies :-)
Strong: Haha. 20k I said.
Lloyd: That would give me a tiny b*ner.
…
Strong: If that's true, we both bu[y] another house. I own 2, you'll own 9! Wtf
…
Strong: Sounds awesome….I told my team were [sic] serious. And I put up 200k to start. My ass just puckered.
Lloyd: Let the party begin. Just need to be careful, if they already have bcbs we don't get paid.
Strong: I totally understand… Let's play.
Lloyd: No…let's f*ck em up
Strong: Haha…K. I'm about to push hard, don't be scared[.] It will only hurt for a second.

---

[3]     As financial analyst Pamela Martin testified at trial, approximately 18% of Lloyd's receipts were tied to the Florida Care fraud.

Lloyd: I'm simply scared you'll be a p*ssy and not leave it all on the field

August 2019 (GX 386)

Strong: [G]etting the phones ringing is MONEY!
Lloyd: You know it
…
Strong: At this rate we might both run out of money…Lol
Lloyd: I hope so. That's the kind of problem I want to have.
Strong: That wasn't really my goal but, what the hell. We'll get it back in truck
          loads!

Lloyd also bragged about his wealth and described exorbitant purchases in text messages with his long-time friend and then-CEO of Fiorella. The pair purchased a limo together and put their money towards numerous sports bets. *See* Sentencing Ex. 1. Lloyd's descriptions of how much money he made, including after he sold the business for nearly $90 million, speak volumes:

CEO: I was supposed to get 150k Friday and I'm still waiting. Think I get tomorrow
Lloyd: Do you feel like that's a lot of money or no big deal?
CEO: No big deal
Lloyd: Me too…that's what I'm really concerned about
CEO: When we can say a million is no big deal…that's when we made it
Lloyd: You are 1,000% correct. But $1m doesn't sound like a crazy amount to me
          anymore…
…
Lloyd: F*ck dude…$100 million f*cking dollars
…
CEO: Just GOT PAID
Lloyd: F*ck yeah we did! … Dude… did you roll around in cash yet?

This obsession with profit explains why, despite innumerable warnings and despite acknowledging the risks, the Defendants were willing to continue using corrupt street marketers and lying on ACA plan applications for years. In 2018 and 2019, Strong and his wife had their CMS registrations terminated for engaging in the exact same conduct that Strong was ultimately convicted of. GX 160, 164. Strong and Lloyd also privately discussed the risks. In August 2018, at the very beginning of this scheme, Strong and Lloyd privately acknowledged the riskiness of their scheme (GX 386):

12

Strong: One slip I lose a lot. Fyi

…

Lloyd: We all do

In March 2020, after complaints had piled up, including complaints about street marketers bribing people and enrolling people using the same personal information, Strong suggested that they should "shut it down for a couple months and restart without a watch dog." *Id.* During the frenzy of the COVID-19 pandemic, Strong told Lloyd, "If we help thousands of people during this time we should get a f*cking metal from the DFS!" Lloyd bemoaned, "For real!!! But instead we will probably get an inquisition." And in February 2021, despite knowing all of the problems with the street marketing and which marketers in particular were the root of the problem, the Defendants persisted in their scheme: Strong told Lloyd, "I'm thinking of taking the marketers back…You think the system is fool proof?" Lloyd replied, "I do…bring em back."[4]

In addition to discussing concerns with Strong, Lloyd confided his concerns to his friend and then-CEO of Fiorella on multiple occasions. In November 2018, as Strong and his wife were being suspended and later terminated from CMS, Lloyd said,

> Sounds like there's some sh*t coming down on [Strong's wife]. [Insurer 1] just called me and said she is ineligible to sell on the marketplace and alluded she will likely never be able to get appointed with any carrier again anywhere in the country. Sounds f*cking bad. … I'm just guessing, but last year she wrote all that business and I'm guessing it wasn't legit.

Sentencing Exhibit 1.

And in September 2021, around the time that Lloyd became aware of the DOJ Civil investigation, Fiorella's former CEO asked, "How worried 1-10 are you?" and Lloyd responded, "9" and commented that dealing with the civil investigation was "like a daily ass raping." *Id.* Yet Lloyd continued the scheme for another year.

---

[4]     The evidence at trial showed that the problematic marketers were not truly fired and that they accounted for significant portions of the business. *See* GX 38.

The scheme did not stop when the Defendants received complaints of problematic marketing where consumers were bribed, targeted at homeless shelters, and signed up with fake information. It did not stop when Strong was terminated from CMS for the very conduct he was later charged with. It did not stop when the Defendants acknowledged risks and concerns, and even "watch dogs" and an "inquisition." It did not stop when Lloyd learned of a DOJ Civil investigation. Ultimately, it only stopped when Florida Care's contract with Fiorella was terminated by Fiorella's new parent company in September 2022. The consequences of their conduct never mattered enough to the Defendants to stop it; the only thing that mattered was the pursuit of profit.

## II.    SENTENCES IN OTHER HEALTH CARE CASES WARRANT A SUBSTANTIAL TERM OF IMPRISONMENT.

The undersigned believe this is the first federal ACA enrollment fraud case of its size. In other large health care fraud cases that went to trial in this district, defendants at or near the top of the scheme have received substantial jail sentences measured in decades. The Minal Patel case is closely comparable. *United States v. Patel*, 19-cr-80181-RAR (S.D. Fla.). Patel owned a laboratory that submitted approximately $463 million in false bills to Medicare, of which approximately $187 million was paid. The paid amount in the *Patel* case was nearly identical to the $180.6 million paid in Lloyd/Strong's scheme, and Judge Ruiz applied the paid amount in calculating the guidelines. Like Lloyd and Strong, Patel orchestrated the scheme and contracted with patient recruiters to solicit Medicare beneficiaries through deceptive telemarketing to receive cancer genetic tests that they did not need, and billed those tests to Medicare. The defendant received a leadership role enhancement, a sophisticated means enhancement, and a mass marketing enhancement, among other enhancements. The scheme lasted approximately three years (less than Lloyd and Strong's scheme), and in that time the defendant solicited approximately 27,000 beneficiaries for cancer genetic tests (8,000 fewer than at issue in Lloyd and Strong's scheme). In August 2023, Judge Ruiz

14

sentenced the defendant to 27 years' imprisonment—one year for every one thousand beneficiaries who the defendant involved in his scheme. *Patel* D.E. 544.

Lloyd and Strong stole approximately the same amount of money from a federal program, but their scheme was worse than Patel's scheme on nearly every other level: Lloyd/Strong's scheme lasted a year longer than did Patel's scheme, Lloyd/Strong's scheme affected 8,000 more people than did Patel's scheme, and, critically, the population targeted by Lloyd/Strong's scheme was even more vulnerable and endured worse impacts than did the population targeted by Patel. In *Patel*, Medicare beneficiaries received unwanted telemarketing calls that pressured them into accepting cancer genetic tests, which are taken at home through an oral cheek swab. This was horrific conduct, but the beneficiaries were not put at risk of losing their Medicare benefits altogether or foregoing critical treatments. Moreover, the beneficiaries in *Patel* were not bribed. There were no Joseph Millers who were enticed with a few dollars that they would use to purchase drugs. In Lloyd/Strong's case, people with drug addictions were offered money that would likely be used to purchase drugs from which they could overdose. People with serious mental health disorders were offered money to agree to enroll in a plan that put their access to medical care— and even their ability to live outside an inpatient hospital setting—at risk. Consumers were put at risk of going without critical HIV, opioid, and mental health medication and losing access to affordable health care. On top of that, medical professionals fighting for these vulnerable people spent scarce time and resources—and in one instance even their own money—to undo the consequences of the Defendants' crimes. None of that happened in *Patel.* The *Patel* case is a lodestar for this case in terms of economic injury to a public program, number of patients involved, and role of the defendant, but the impact of Lloyd/Strong's conduct on vulnerable populations sets this case far apart from *Patel*. Lloyd and Strong should be sentenced accordingly.

15

Other large health care fraud cases that involved vulnerable victims resulted in comparably substantial sentences. In the Biscayne Milieu case, Judge Scola sentenced defendant Antonio Macli to a total of 360 months' imprisonment and Jorge Macli to 300 months' imprisonment. *United States v. Moran*, 778 F.3d 942, 953-55 (11th Cir. 2015). That case involved a $57.7 million health care scheme involving a partial hospitalization program for mental illness. A. Macli was the CEO and J. Macli was the day-to-day manager. *Id.*[5] In the Hollywood Pavilion cases, Judge Martinez sentenced defendant Karen Kallen-Zury to a total of 300 months' imprisonment in a $67 million health care fraud case where Kallen-Zury co-owned and operated Hollywood Pavilion. *United States v. Kallen-Zury*, 629 F. App'x 894, 896, 912 (11th Cir. 2015).[6] Here, the Defendants' scheme was more prolific in terms of loss than these two other schemes combined, and even more sophisticated. And, unlike most of the cases cited in Defendants' sentencing memoranda, these cases involved patient harm and are thus far more comparable to Defendants' case.

The undersigned are aware of one other federal ACA fraud case that proceeded to trial. In *United States v. Copeland*, the defendant was convicted at trial of wire fraud stemming from his submission of approximately 1,300 ACA plan applications in a roughly one-month period (January 27, 2015, through March 1, 2015). The consumers at times did not know they were being enrolled in ACA plan applications, and the defendant directed employees to fabricate information for the applications, including to input $12,000 as the income level. 17-cr-84, M.D. La., D.E. 193 (Superseding Indictment). The defendant was sentenced to 120 months and his conviction was upheld by the Fifth Circuit. 17-cr-84, M.D. La., D.E. 259 (Judgment); 2021 WL 6102489 (5th Cir.

---

[5]     The Eleventh Circuit affirmed the guidelines calculation that included enhancements for sophisticated means, mass marketing, vulnerable victims (+4 for large number of victims), and role (+4).

[6]     The Eleventh Circuit affirmed the guidelines calculation that included enhancements for sophisticated means, mass marketing, vulnerable victims (+4 for large number of victims), and role (+4). *Id.* Kallen-Zury's prison sentence was commuted by executive order after she had served approximately 11.5 years.

Dec. 23, 2021) (per curiam). Remarkably, Lloyd and Strong's scheme affected nearly _twenty-seven times_ as many consumers as Copeland's scheme did, and the Defendants' scheme lasted _forty-eight times_ as long as Copeland's scheme did.

Lloyd suggests that he should receive a sentence near Dafud Iza's pre-5k guidelines. There is no doubt that Iza is culpable and his conduct warranted the sentence he received; but there is equally no doubt that Lloyd and Strong are nowhere near comparably situated. Iza did not participate in texts where Lloyd and Strong celebrated making money off vulnerable populations. Iza was not in charge. Iza did not become a licensed agent until 2021. Iza did not concoct the plan. Iza made less money than these Defendants. And there is no dispute that, had Iza never met Lloyd, he would not have been involved in this.

The other Southern District of Florida cases to which the Defendants cite likewise are not comparable and serve only to highlight the severity of the Defendants' crimes. In _Esformes_, the jury hung on the health care/wire fraud conspiracy; not so here. In _Cox_, the defendant was 79 years old and made less money than either Lloyd or Strong. In _Felipe/Quicutis_, the defendants were the lowest level participants who had no involvement in significant aspects of the operations, and one of them made $45,000 from the entire scheme. And significantly, there was no comparable patient harm in _Cox_ or _Felipe/Quicutis_.

## III.    DEFENDANTS' SENTENCES MUST PROVIDE DETERRENCE.

As this Court is aware, it must consider deterrence—both specific deterrence of the Defendants, and general deterrence—to keep others from committing similar offenses. In determining how much weight to give this factor, the Court can consider the Defendants' "complete lack of remorse and unwillingness to accept responsibility." _United States v. Joseph_,

700 F. App'x 918, 923 (11th Cir. 2017) (affirming defendant's 660-month sentence). The Defendants' unwillingness to express remorse or to accept responsibility supports the notion that a substantial jail sentence is warranted. Indeed, throughout the trial and still in their post-conviction pleadings, Defendants malign the ACA program and cast blame on others.[7]

Furthermore, both Defendants had other income sources and, in particular, Lloyd had a booming insurance business before partnering with Strong. Lloyd now claims this is a reason for leniency, but the opposite is true. Lloyd drove a long-standing insurance business into the ground. Fiorella is no longer operating. People lost their jobs. Lloyd did not need Florida Care to make money; but he corrupted the entire operation by building out a segment of the company that profited based on lies. Neither Defendant needed to commit this crime to make money. They *chose* to lie for money. And they did so repeatedly. This crime was not something they did once in a misguided fit of passion. Instead, they lied repeatedly, thousands and thousands of times, each time their employees submitted a fraudulent ACA plan enrollment. They did this for years, for tens thousands of consumers and tens of thousands of applications, across the state and even outside state lines, and to the tune of hundreds of millions of dollars. They simply did not care to do the right thing.

Moreover, the evidence at trial showed that, while not charged, the fraud in Fiorella's Florida Care department infected other segments of its business, including the Digital department. As text messages and testimony admitted at trial showed, Lloyd implemented some of the fraudulent practices *throughout* Fiorella's ACA business, including the practice of "bumping up" income in calls with consumers and using fake Medicaid denials to fabricate SEPs. *See, e.g.,*

---

[7]     Strong clings to the appearance of legitimacy created by the presence of an attorney in Fiorella's operations. As the Defendants made clear in private texts, there is a reason neither Defendant asserted an advice-of-counsel defense at trial. In June 2020, Strong told Lloyd, "I call Kodey for entertainment.  He knows less about insurance then [sic] my daughter."  Lloyd responded, "Lol…that's true, but he's a gatekeeper."  Sentencing Exhibit 2.

11/6/25 Tr. 108:6-112:3; 116:21-23 (Medicaid denial process used in both Digital and Florida Care enrollments); *id.* at 113:3-116:4 (Digital team manager instructing agent to put client at minimum income when he has no income); *id.* at 117:4-118:8 (renewal management chat covered both Digital and Florida Care enrollments); *id.* at 121:24-122:11 (Lloyd instruction that "even if it says zero for income, we can raise it to the minimum"). For his part, Strong expanded his street marketing operation into other states beyond Florida, including Oklahoma (as described in the text messages above). Defendants' willingness to expand their fraudulent practices underscores the need for specific deterrence.

The Court should also sentence the Defendants in a manner that deters other ACA and health care fraud schemes. As the Court is aware, and as the above-cited cases make clear, South Florida is plagued by fraudsters that use deceptive marketing and sophisticated schemes to bilk federal health care programs and prey on patients. This scheme was carried out by two Defendants who had everything—adequate livelihoods, tremendous family and community support, and fulfilling lives—but just wanted more. This greed and indifference to using others for personal gain is what drives these schemes. Without insurance brokers like the Defendants who are willing to find a way to steal from government programs, crimes like this simply could not happen. As one of the first federal prosecutions of ACA enrollment fraud—and one involving sophisticated actors who tried to pass their scheme off as legitimate, thus making it all the more difficult to detect and prosecute—this case presents a critical deterrence opportunity. Only a substantial prison term will adequately deter would-be fraudsters from committing other crimes of greed and convenience.

## CONCLUSION

For the foregoing reasons, the United States requests that the Court sentence each Defendant to a substantial prison term measured in decades.

19

The United States further recommends that the Court order restitution, which is mandatory. In this case, restitution totals $180,600,000, the amount of fraudulently obtained subsidies paid out by the federal government during the conspiracy. *See* GX 21. Finally, the United States recommends that the Court order a forfeiture money judgment in the amount of $2,706,912.75 for Lloyd, which is 18% of Lloyd's net payments from Fiorella. GX 41. The United States recommends that the Court order a forfeiture money judgment in the amount of $6,516,457.15 for Strong, which is the net amount Fiorella paid to Strong and his companies during the conspiracy period. GX 42.

Dated: February 12, 2026

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

LORINDA LARYEA, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

By:   */s/ Jamie de Boer*
Jamie de Boer
Florida Special Bar No. A5502601
Assistant Chief

D. Keith Clouser
Florida Special Bar No. A5502882
Trial Attorney

United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20005
Tel.: (202) 304-6801 (de Boer)
Tel.: (202) 256-0867 (Clouser)
Jamie.deBoer@usdoj.gov

20

David.Clouser@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on February 12, 2026, I served and filed the foregoing document with the Clerk of the Court via ECF.

By: */s/ Jamie de Boer*
Jamie de Boer
Florida Special Bar No. A5502601
Assistant Chief