**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-CR-80015-MIDDLEBROOKS

**UNITED STATES OF AMERICA,**

Plaintiff,

vs.

**CORY LLOYD** and **STEVEN STRONG,**

Defendants.

West Palm Beach, FL
February 18, 2026

SENTENCING PROCEEDINGS
BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

**D. KEITH CLOUSER**
**JAMIE de BOER**
**U.S. Department of Justice**
**Criminal Division Fraud Section**
1400 New York Avenue N.W.
8th Floor
**Washington, DC 20530**
202-256-0867

**DAREN GROVE, AUSA**
**United States Attorney's Office**
**99 NE 4th Street**
**Miami, FL 33132**

**FOR THE DEFENDANT: LLOYD**

**RYAN K. STUMPHAUZER, ESQ.**
**MATTHEW M. DELLABETTA,** ESQ.
**FRANCIS D. MURRAY, ESQ.**
**Stumphauzer Kolaya Nadler & Sloman, PLLC**
**2 S. Biscayne Boulevard**
Suite 1600
**Miami, FL 33131**
305-614-1400

FOR THE DEFENDANT: STRONG

DAVID A. HOWARD, ESQ.
David A. Howard, PA
25 SE 2nd Avenue
Suite 1100
Miami, FL 33131
786-360-6056

JOHN E. BERGENDAHL, ESQ.
Law Offices of John Bergendahl
25 SE 2nd Avenue
Suite 1100
Miami, FL 33131
305-536-2168

Official Court Reporter:

Pauline A. Stipes
West Palm Beach/Ft. Pierce, FL
HON. DONALD M. MIDDLEBROOKS
561-803-3434

THE COURT: Good afternoon, please be seated.

This is a sentencing in the case of United States versus Cory Lloyd and Steven Strong. The case number is 25-80015. Can we please have appearances.

MS. de BOER: Good afternoon, your Honor, Jamie de Boer for the United States.

MR. CLOUSER: Good afternoon, your Honor, Keith Clouser for the United States.

MR. GROVE: Your Honor, Daren Grove for the United States.

MR. STUMPHAUZER: Good afternoon, your Honor, Ryan Stumphauzer and Matt Dellabetta on behalf of Cory Lloyd who is seated between us. I also want to recognize my colleague in the back, Frank Murray. There was not enough room up here.

THE COURT: It is a little crowded today. Good afternoon.

MR. HOWARD: Good afternoon, your Honor, David Howard on behalf of Steven Strong along with John Bergendahl.

MR. BERGENDAHL: Good afternoon, your Honor.

THE COURT: Good afternoon.

Okay. Well, let me make sure I have seen everything that everyone has filed.

I have reviewed in Mr. Lloyd's case the Pre-Sentence Investigation Report, Mr. Lloyd's objections. There is a sentencing memorandum which had a number of letters and other

attachments, there was a Government response.

Does that cover the filings?

MR. STUMPHAUZER: Yes, for Mr. Lloyd it does, your Honor.

THE COURT: With respect for Mr. Strong, the pre-sentence investigation, objections, a sentencing memo, letters, a Government response and the Government's sentencing memo.

That covers everything?

MR. HOWARD: Yes, it does, your Honor. I would like to briefly address the Court regarding an ancillary matter before we begin.

THE COURT: A what matter?

MR. HOWARD: A matter that does not relate directly to sentencing. That is on Friday and Saturday the Government served notice of some additional discovery, some of which we have not yet -- I think we received yesterday a tranche of discovery and we did over the weekend or on Friday.

We have not had an opportunity to review it thoroughly enough to see if there are any disclosures that pertain to sentencing in any way.

We did not think it was proper to seek to continue the sentencing without making that representation, but we wanted to alert the Court to the fact that we received discovery. It may or may not pertain to sentencing, I want to alert the Court to

that circumstance.

THE COURT: Okay. You have requested a fair amount of time. Let me ask the parties, what do you intend to do? Are you going to have witnesses, people speak, in addition to argument?

Ms. de Boer, anything beyond argument from the Government?

MS. de BOER: Just argument from the Government, your Honor.

THE COURT: Mr. Stumphauzer, what do you plan to do?

MR. STUMPHAUZER: I think it will be argument or one particular area where we have limited testimony about the claims paid out. Aside from that, the only other thing we would be seeking to present today is a short sentencing video, well under 15 minutes, that we hope your Honor will consider.

THE COURT: All right.

MR. HOWARD: With respect to Mr. Strong, we just have argument and we will be presenting a few supporters to make statements to the Court prior to the imposition of sentence.

THE COURT: All right. Well, why don't we take argument on the objections first, although I note the Guidelines are so high that these objections may not have much impact, but we are obligated to determine those.

You make a lot of objections, both Defendants, as to non-guideline issues. You take issue with some of the

statements in the PSI that the Government says you are re-arguing the case and it does look like there is some of that.

Is there some reason we should take any of that up?

MR. STUMPHAUZER: Your Honor, from Mr. Lloyd's perspective, I did want to make clear, you are correct, the first 12 pages of our objections are on factual issues where we thought information should have been in there about the defenses presented at trial, however, as you said, none of it impacts the Guideline range.

I don't feel any need to argue the first 12 pages, the record stands for itself. I was hoping that the PSI would have been corrected to include some of the defense points that were elicited at trial, but I will let the record stand for itself.

The reason we put forth PSI objections was not mere,y to re-argue everything at trial, but to make sure we preserved everything for appeal. Mr. Lloyd exercised his right to trial and will likely have an appeal stemming from these proceedings, so it was really just to preserve our objections in the record.

MR. HOWARD: Same, your Honor, we have no intention of arguing the factual discrepancies that we noted.

THE COURT: I will deny the objections. I am basically relying on what happened at trial as opposed to the description of the case in the factual section of the PSI.

Let's move to loss amount. Let me hear from both

sides on that, although I know what the Government says on loss amount. The Defendants, although you don't like the Government's loss amounts, I didn't hear one from your side.

Let's start with the Government. What loss amount should I use? And specifically let me ask you: Why is the loss amount in Mr. -- the -- I forgot the pronunciation of his name, the co-defendant who pled guilty. You used a different loss amount in his plea agreement and I was curious why.

MS. de BOER: We did, your Honor. The methodology for calculating Mr. Iza's loss amount was the same methodology that was used in calculating these Defendants' loss amount. The difference was Mr. Iza and the Government reached a plea agreement around June of 2024, so not quite a year before this indictment come down against these Defendants, but a significant amount of time before these two individuals were indicted in February 2025.

At the time that we reached agreement with Mr. Iza on the loss we had a more limited data set consisting of the enrollment data from CMS that showed the policies that the Florida Care Department enrolled, and showed the subsidies paid out on those policies.

We used the same methodology to calculate the loss, we simply had a more limited data set and through ongoing investigation ultimately obtained additional data and were able to match more policies and thus the loss number has gone up for

these Defendants.

THE COURT: The figures you are using for these Defendants, it looked like an intended loss amount of 230 million and an actual loss in terms of subsidies paid by the Government of $180 million. Is that right?

MS. de BOER: That is correct, your Honor, and that derives from Government Exhibit 21 and Ivan Kirov's testimony, the summary witness from Analysis Group who calculated those analyses.

THE COURT: Which should we use? Neither one affects the Guidelines as I understand it, both are above the Guidelines.

MS. de BOER: Correct. Neither one will affect the guidelines calculation, however, 233.2 is the correct measure of loss, that is the intended loss, and the Guidelines direct the Court to the greater of intended or actual loss.

THE COURT: Why is that the intended -- I am more familiar usually in the context of a healthcare fraud when bills are submitted and there seems to be a likelihood they are going to be paid. There are some instances when they are not.

Here it seems a bit more speculative than the actual -- than the actual subsidies paid because there are a variety of reasons why the subsidies might not be paid or why a contract might be canceled. So, I guess, tell me why the intended loss is the accurate number to use.

MS. de BOER: For several reasons, your Honor, and I actually think here it is much less speculative than in a traditional healthcare fraud context where you are talking about claims -- bill versus paid. The reason you would use the intended loss here, the 233 million, is because that is the actual dollar value that CMS calculated that should be paid out on -- subsidies should be paid out on plans that we allege were fraudulently enrolled.

All of that money would have been paid out except, as Emily Pedneau testified, in the instance of recision. So if a plan was rescinded, then not all of the money was paid out and that is where you get to the 180 million.

Those plans actually enrolled at one point, those plans were allocated subsidies, there was a determination made by CMS. So this is distinct from the Medicare context where a provider might bill for something and not know if it is going to be paid at all, and CMS determines, no, we are not going to pay it. This was a determination by CMS in the subsidy context we are going to pay it, and it was only recouped through other means because plans were rescinded.

THE COURT: What are the commissions paid on?

MS. de BOER: The subsidies are paid from CMS to Florida Blue, and the commissions are paid from Florida Blue to Fiorella and then from Fiorella to Strong.

THE COURT: So would the commissions and then the

payments be on the 230 or the 180?

MS. de BOER: According to the contract that Florida Blue had with Fiorella there was a clawback provision. So, some of the commissions could have been clawed back if the plan cancels too early.

I don't know that it is a one to one because -- the way it works with CMS, what Emily Pedneau testified to is there is recoupment sort of after the fact so it is not -- I don't know that it is a clear one to one, and then the commissions from Fiorella to Strong, there may have been some clawbacks, but it was not as clear that money was being clawed back from Strong as it was from Fiorella to Florida Blue.

THE COURT: Thank you. What is your position on loss?

MR. STUMPHAUZER: Your Honor, do you mind if I speak from the podium?

THE COURT: Wherever you can be heard, probably here in the courtroom.

MR. STUMPHAUZER: Your Honor, I like that you brought up for intended loss purposes a more traditional Medicare fraud case where a claim is submitted and presumably when you submit a claim for payment, it is with the hope you will get paid and paid on the whole amount, so therefore it is intended loss.

There are situations where it is a little more nuanced. Let's say you are a person involved in a Medicaid fraud scheme for three years. The first time you submit a

claim you might think the whole thing is going to be paid, but what if after a period of a year every claim that goes in you learn there is a 20 percent copay, so Medicare only pays 80 percent, and then Medicare denies 25 percent of the claims. By the time you see a pattern of denials and things like that you're no longer intending to collect the full amount. How does that relate to the situation here?

Ms. de Boer just described that 233 million would have been the total advance premium tax credit paid out had the policy gone on for the entire year of coverage, but what you heard at trial was ample testimony from Dr. Kirov, you heard it from Dafud Iza, you heard it from Kimberly Garcia, everyone in this company knew that there were going to be cancellations. And by the way, it is not the money is being clawed back, is is that the money was never paid out to begin with.

Let's say that after 60 days the person does not submit proof of their citizenship, the ATTC is canceled and no money is paid out. It didn't go out the door to begin with. There was an initial determination that would be covered, but it didn't actually go out the door.

Likewise, if there was a situation where there was a projected income and the marketplace tried to validate that income against trusted data sources, but was unable to do it, they would issue a letter. This all came out at trial. They would make a request to the insured to say you have to submit

proof of your income. If the person didn't do that, again, the ATTC was canceled and no more money was paid out.

This was so well known within Fiorella -- we have to go to Mr. Lloyd's subjective intent, did he think or intend that full amount would be paid out. Of course he didn't. According to the Government's own case, there was a whole group within Fiorella, a processing group, and one of their roles was to deal with precisely this.

All year long, every single year there would be people who were going to lose their subsidies. The subsidy loss is what counts for the distinction between the 230 million and the 180, so they had the subsidy fix department to try to save the ATTC when they could.

Mr. Lloyd knew over time that 20 to 25 percent of these subsidies would drop. He had no intention, nobody in this business has any intention that they will be able to collect the full ATTC.

The best example of this to tell you how well known this was by Mr. Lloyd and people much further down the chain, you heard one of the marketers testify, Mark Cutter, and he expressed frustration. Even he knew about the charge backs if people couldn't be validated and understood that he wasn't going to earn commission on those.

To answer your question, your Honor, the commission is paid based on the actual amount collected, the 180; it is not

based on the 230. That much is absolutely clear.

So, at least that is one of the points I wanted to make as to intended loss, is that the starting point should be not the gross advanced premium tax credit calculated at 233 million, but instead we should start with the net ATTC of 180 million.

And again, I do have other arguments I want to present. I don't know if you few want to break it into pieces, and I will walk you through some calculations that I think could be used instead, although it is the Government's burden to prove the intended loss.

THE COURT: Is your number 180 million or something else?

MR. STUMPHAUZER: It is something below that and I can explain why.

THE COURT: I am supposed to approximate a loss amount, so if you have argument beyond the 180, tell me what it is.

MR. STUMPHAUZER: Okay.

THE COURT: If you have a number, tell me what you think the loss amount is.

MR. STUMPHAUZER: All right. I will skip out of order and I will tell you that I think the maximum that the loss amount could possibly be is 82 million, and I will explain to you why. There may be some dispute on this point.

We filed a notice this morning, some supplemental authorities from CMS' own website. If you recall Ms. Pedneau's testimony, she said if somebody makes an income projection and the marketplace goes to verify it either against IRS tax records or like Equifax data, like a credit report, and basically if they are unable to validate the income that it will not issue a data matching consistency.

That directly contradicts the information on CMS' website. CMS' website says we are going to try to validate the income. If we can't validate the income because we have no information on record, a DMI is issued. Why is that important here?

According to the Government's evidence at trial, Government Exhibit 24, they show only 51 percent of the applications for Florida Care resulted in a data match inconsistency. Of that, only 87 percent were for income. That was the biggest part of the Government's case, that these guys allegedly fudged income. So, only 45 percent had income related data match inconsistencies.

For the rest of them, the 55 percent, what is clear, based on what is on CMS' website, they took that projected income, checked it against IRS records, they checked it against Equifax records and were able to validate it. Because they were able to validate it, there was no data match inconsistency that was generated.

To me, 180 million ought to be the starting point for the calculation, but it ultimately ought to be multiplied times the 55 percent, which is the only percentage of ones that were not validated through CMS' own process. This is a process that is detailed in the statute, that the marketplace is required to verify these figures, and we submitted information from CMS' own website that shows if they didn't have any supporting data and couldn't validate the income a DMI would be issued. We know if a DMI was not issued, then the income was validated.

The most it would be is taking 180 million times 55 percent, and that yields a figure of 82 million. In my mind even that is high because it presumes every single one of the 35,000 policies that come through Florida Care, every single one of them was fraudulent. I don't think the Government submitted anywhere near ample proof to show that that was the case.

THE COURT: Why did they pay 180 million then? Doesn't that disprove your number?

MR. STUMPHAUZER: No, I don't think so, your Honor. Again, the 180 million reflects what actually went out the door, so that would be for people that were validated who were going to get presumably a whole year of coverage, or if it was for people that couldn't be validated, depending on the reason they weren't validated, the subsidy would have been removed in 30 days or 90 days. That is necessarily already included in

those numbers.

The 180 million is only for people that were validated or that got the first 60 or 90 days of coverage without validation, but that is already in the mix, for lack of a better description.

So, aside from the data match issue, your Honor, there are a couple of other reasons that the Government's loss calculation is not accurate and is over stated.

So, you know, aside from the data match issue, another issue goes to the quantum of proof. The Government for very strategic reasons decided only to call three actual consumers at this trial. They also called two doctors who testified in large part about the consumers that had been called, a couple of others.

But they didn't offer any proof across the board to show you which one of these applications were fraudulent and which wasn't, who had enough income to qualify for ACA and who didn't. What did they do instead?

As shorthand for that process what they did is they showed that income was packed very close around the Federal poverty limit, to show that in most circumstances it was within a certain percentage of the Federal poverty limit, and therefore, your Honor, you ought to infer this was just a made up number and bumped up, but it is not that simple.

The reality of it is, even if you want to assume there

was this bump up instruction and they intended to deceive the marketplace, the next question was: Was it in fact fraudulent and would the policy have been issued anyhow?

What I find coincidental about that is two of the Government's own witnesses if you recall -- I will go by the initials. PB testified. There was another woman that testified by the initials MR. They had both applied for Obama Care coverage subsequently and had it.

That is my way of saying that they would have to go application by application to show which ones were false and which ones would not have been eligible. They didn't do that. Instead, what they did is show what I would describe as pattern evidence, look at how many people were packed around the same income level, but that is not to say that they didn't end up with sufficient income to be covered. I think we heard that from the people who testified.

For that reason as well, I think the Government should not allow the Government to stand up and tell you all 32,000 policies are bad. They speak in generalizations, nobody wanted or needed this coverage, they only signed up because they paid five dollars. The Government's own witness disagreed with that. Mr. Cutter testified on this point. He said, I didn't pay money to everybody, some people wanted the insurance. The Government wants to go with this throw out the baby with the bath water approach, but I think the Sentencing Guidelines

require more.

What they say is it doesn't have to be a scientific calculation, it has to be a reasonable estimate. I don't think the Government has submitted enough proof where this is a reasonable estimate where we can conclude that all 35,000 policies are invalid.

One final point, I think this goes also to 3553 arguments, so I think it relates to loss and both.

This whole argument is premised on the fact that but for these fraudulent applications the Federal Government would have paid zero. That is just not true. Their own witnesses proved it is not true. Why is that not true?

Well, the Government showed that, unbeknownst to Mr. Lloyd, some of these people already had Medicaid coverage, or in other circumstances had Medicare coverage. It is pretty well known and understood that Medicare is also funded by the Federal Government. Medicaid in the State of Florida is also funded, over 60 percent, by the Federal Government. The notion that the Government would not pay have paid any of this money out is a complete and total fallacy.

Again, we think that the loss amount is over stated for that reason as well.

Likewise, if these folks didn't have ACA coverage or Medicare or Medicaid, as you know, in this country it doesn't mean that people go untreated. In reality, people show up at

Jackson Hospital every day uninsured with injuries and they are treated and cared for. That is also under a State program that is in large part funded by the Federal Government.

Again, we think the Government's proposal regarding loss is more hypothetical than real, it is not supported by adequate evidence, and it doesn't take into account that CMS in fact validated a large percentage, almost 50 percent of these policies. We'd ask you to rely on the language on the CMS website.

I understand the Government objects to us relying on that or asking you to rely on it, but it comes from the victim client's website. They say it themselves, if there is no data there we should issue a DMA; if we are able to validate it there is no DMI, and there was not DMI in 55 percent of these cases.

For all these reasons, your Honor, we think the high water mark would be 82 million. That is based on the 180 million figure multiplied by the percentage I just told you that was unvalidated. That figure would necessarily be based on the premise that all the policies were fraudulent. I don't think it is necessary to cut down further because at that point the loss bands are so wide I think any other arguments would essentially be moot. That is why I think you should use the $82 million figure as the cap.

THE COURT: All right. Thank you.

MR. HOWARD: Your Honor, our positions are virtually identical. I don't want to re-argue what was said except to reiterate that we recognize that the Court is permitted to reach a reasonable estimated amount for loss amount, but the operative word is reasonable, not just estimate.

Because this task is so arduous and tedious, we recognize, it still has to be done. It can't be pattern evidence upon which the Government predicates a loss amount that has such severe consequences, and their failure to do so means that the Court should err on the side of the Defense.

THE COURT: All right. Thank you.

Ms. de Boer, what is your response to his 82 million figure and his invalidation argument?

MS. de BOER: Your Honor, with respect to the validation argument, that is simply not what Ms. Pedneau testified to and not even a correct term to use. CMS does not validate the information that the applicants are submitting. CMS trusts and relies on the information that applicants are submitting and that was the testimony of Ms. Pedneau. There is a data matching process that can generate an inconsistency, but the absence of an inconsistency does not equate to validation. So there was no validation that CMS was doing.

Moreover, that is a classic blame the victim defense. Even if CMS could have through these efforts identified some amount of fraud, that does not warrant reducing the loss amount

by any amount, and as the testimony and evidence presented at trial showed, the Defendants took every step to interfere with CMS' validation processes.

So, when a data matching inconsistency would be generated a letter would be sent to the consumer, but it was really Fiorella that would access this information and they would do the subsidy fix where they would go in and pretend they are the consumer, the processors would log into the consumer's application, change something in the application and kick out the deadline.

CMS implies, hey, we think there is a inconsistency, please verify your income, Fiorella goes in and changes something in the application that causes that request deadline to be kicked out and the subsidies to remain intact. Fiorella took every effort to interfere with the Government to even attempt to validate this information.

In addition, what Mr. Stumphauzer leaves out is that the validation process is based on querying things like the past year's tax data, but the income represented on an application is projected income for next year, for the planned year, the year of coverage.

So, even if information in a prior tax year suggested something within the range of what was represented on a current application that does not mean the current application is not fraudulent. That does not in any way justify or validate

the income projection and inflation bumping up that Fiorella was engaging in.

In addition, another thing Mr. Stumphauzer did not address is the use of the Medicaid denials to generate a special enrollment period. Even suppose one of these consumers could have met the income threshold, they were -- Fiorella was improperly applying these individual to Medicaid to get a denial that they would then use to improperly enroll these people outside of the open enrollment period. So many of these applications, putting aside the income question, were not permissible simply because of the time in which they were enrolled.

Mr. Stumphauzer also brought up the quantum of proof and suggested that the Government needs to go application by application, consumer by consumer, for 35,000 consumers and prove individually that each one of these are fraudulent.

That is not what the Sentencing Guidelines call for in coming up with a reasonable estimate of loss. The Government proved that the practice at Fiorella was to bump up income from even as low as zero to the minimum necessary to get a subsidy.

We had witnesses like Daniela Leiva and others come in and testify that most of the time people called in and represented that their income was zero, that they were not working, and that was then bumped up to the minimum. That was written into the call scripts. That was the practice and that

was, frankly, undisputed.

The process by which we calculated loss was directly tied to that practice, so we did not include every Fiorella policy. The digital side is completely excluded from the loss calculation. We did not even include every Florida Care policy. We only included policies for single family member households and policies where the income was reported within five percent of the Federal poverty line. So if someone came in and offered a real income projection, a real number, that simply would not have been included in how we calculated the loss.

Finally, Mr. Stumphauzer suggested there should be some deduction based on what Medicaid might have paid out. He didn't quantify what that deduction should be in his arguments. I am happy to address that in any detail the Court wants, but that is one hypothetical at best because many of these people would not have qualified for Medicaid and that was largely undisputed at trial. There was a lot of discussion about the Medicaid gap.

So we don't know which of these people would have qualified for Medicaid or which wouldn't. We don't know what Medicaid would have paid out and that is not possible to calculate in a vacuum, and Mr. Stumphauzer hasn't made an effort to calculate what Medicaid would have paid out.

In any event, Medicaid is a separate pot of money, so

he is basically inviting the Court to take the role of Congress and say because a different component of the Government that Congress has allocated money to might have paid out hypothetically, we are not going to credit the full loss that IRS, that the Treasury sustained with respect to the subsidy program, which is a tax credit program, it is a tax credit funded by the Treasury.

For those reasons, your Honor, we believe that the intended loss amount of 233 million, which was the amount of subsidies calculated by CMS and awarded on fraudulent Florida Care policies, is the appropriate measure of loss for the Sentencing Guidelines calculation.

THE COURT: Thank you. I don't see any merit to the 82 million figure, and I don't think the validation argument is consistent with the information that was presented at trial by the witnesses.

I do think probably the best estimate is the 233 million, so I am going to find that to be the intended loss.

A more conservative perhaps figure, although it has some infirmities, would be the 180,600,000 figure actually paid out by the Government, but I note that even were I to adopt that number, that doesn't affect the guidelines at all. So, for purposes of guideline calculation, I am going to use the 233 million figure as the intended loss in this case.

The other arguments for Mr. Lloyd -- do you want to argue -- there was also the vulnerable victim and mass marketing.

Is your argument a -- there were terribly vulnerable victims here, we heard from several of them. Is it your argument that only the Government can be considered the victim? Is that basically what you're arguing?

MR. STUMPHAUZER: That is part of it, that is certainly not all of it though. There are multiple subsidiary questions in the vulnerable victim argument.

Yes, your Honor would have to first decide who was the victim. Clearly the primary financial victim, there is no doubt about it, is the IRS and the Federal Government. They were the ones that extended these advanced premium tax credits.

THE COURT: Aren't the beneficiaries, the people who were trying to secure the insurance and either were then denied Medicaid coverage they already had or ended up with a policy they couldn't pay for, they couldn't pay the copays?

Why aren't the consumers victims as well?

MR. STUMPHAUZER: I think you have to look at the Government's proof and what they argued at trial. The Government said repeatedly, incorrectly in my opinion, that these people were paid bribes. What they said over and over in front of this jury from opening to closing was that none of these people wanted insurance, the only reason they signed up

for it is because they were paid a five dollar bribe.

I don't agree with bribe, but if you accept the Government's theory, they are not victims, they are coconspirators.

By the way, this is a little bit different because I think, first of all, we learned about a very small number of patients that lost their Medicaid coverage. Even in those instances there was no proof that Mr. Lloyd knew they had Medicaid coverage.

THE COURT: It seems like one of them Florida Blue wrote him about, didn't they, the guy in Jacksonville that was living behind the Wal-Mart?

MR. STUMPHAUZER: That is correct. There were some interesting parts about that particular guy, but in his circumstance he had applied before and he applied again after. The other point is, they are being asked to conclude whether there is a large number of vulnerable victims.

Your Honor pointed out Joseph Miller. I agree with you, if you look at someone like him obviously suffering from drug addiction, he has chronic illness and disease, not everyone that is in a homeless shelter is in that condition. I don't think it is fair to say that everyone in a homeless shelter is necessarily vulnerable. You heard a phone call from one of the beneficiaries where he sounds completely rational. He makes it clear that he has been shopping around for

insurance. He asked questions about copays and deductibles. This is another circumstance where the Government is asking you to pile inference on inference.

We heard from Joseph Miller, Natalie Roberts, those people -- Joseph Miller was coherent. Natalie Roberts was completely cogent on the witness stand and they told you that they applied for Affordable Care Act insurance afterwards.

There are two parts to this enhancement. One is whether there is a victim and the victim is vulnerable, and the other one is whether there is a large number. I think especially on the second point they absolutely did not submit adequate proof as to how many of these people were addicted to drugs, how many of them suffered from chronic diseases, how many they thought were so impaired that they didn't have the capability to determine whether they needed coverage or what kind.

And finally, they not only didn't prove how many people had these conditions, they certainly didn't prove how many Mr. Lloyd knew about or that were reasonably foreseeable to him.

Stepping back to the first element, whether the victim was vulnerable, I would ask you to hold the Government to its trial proof. They said to the jury and submitted proof that the insureds, the consumers, which is what they referred to at trial, didn't want or need the insurance, but agreed to sign up

because they needed the five dollars. If that is the case they are a conspirator, not a victim.

THE COURT: I think the Government did show a large number of vulnerable victims.

I don't agree with you that -- perhaps there are some people in homeless shelters that are not vulnerable. I think the vast majority are. The individuals who testified at trial in terms of drug addiction and mental illnesses, we heard from the doctors that also people who had their Medicaid applications summarily denied by the inclusion of false data.

We don't know how many of those people could have qualified for Medicaid by reason of that practice of submitting applications to obtain prompt denials of Medicaid to open up the ability to take applications year round other than during the qualifying period.

With respect to both Defendants, I am going to deny the objection to vulnerable victim.

How is there not mass marketing here? You had the quotas and the people on the street. I don't see how that is anything but mass marketing.

MR. STUMPHAUZER: I am sorry, were you calling on Mr. Bergendahl?

THE COURT: I'm sorry. Either one of you, whoever wants to speak to the mass marketing issue.

MR. STUMPHAUZER: Your Honor, there it was a textual

argument. We didn't say this was not mass marketing in the sense that street marketing can qualify. I think there is Eleventh Circuit case law that says that could count as mass marketing as well, just like a call center or something like that.

If you look at the actual language of the enhancement, what it refers to is, it refers to the methods of marketing, which we don't disagree with, telephone, mail, the internet, or other means, but there is more to the definition, which is to induce a large number of persons to -- I think the only element that could apply is soliciting someone to purchase goods or services.

Again, I think the Government should be held to its theory that it argued in opening and closing and the evidence they presented. What they were basically saying is fundamental to the scheme at -- the alleged scheme at Fiorella is these had to be policies where the ATTC covered the full premium. Why? If these consumers had to pay even a dollar or ten dollars, they wouldn't have agreed to be enrolled and they wouldn't have been able to satisfy the copay.

I don't agree with them in all circumstances. The point is, if the Government's theory is they were never liable for any part of the annual premium and it was all covered by the Government, I don't know how it could be said that these consumers were purchasing anything. It was a Government

benefit. They weren't being solicited to purchase goods or services.

That is an argument that is based purely on the text of the Sentencing Guidelines. Aside from that, I agree with you that people on the street in large numbers could fall under the other element, but not because of that.

THE COURT: Your argument is they weren't purchasing insurance by this -- by signing up for the coverage?

MR. STUMPHAUZER: That is right. I think it was a Government benefit.

THE COURT: Weren't they on the hook in terms of the tax credit potentially, plus the copay, and if they needed to use the insurance, they would have to pay the copays, wouldn't they?

MR. STUMPHAUZER: I'm sorry, the last part, your Honor?

THE COURT: If they needed to try to use the insurance, if they were sick and tried to use the insurance they would be on the hook for the copay.

If they filed a tax return, wouldn't they get hit for the tax credit?

MR. STUMPHAUZER: It depends, not in all circumstances. That would only be if they didn't validate what CMS asked them to validate. In terms of them being on the hook for a copay, that doesn't go to whether or not they were paying

for the insurance or paying for some service. That is different.

Once you have the coverage and you seek medical care you are liable for a copay or a deductible there, but that is the case with every any insurance, Medicare, Medicaid, commercial coverage. I don't think that should be determinative.

The question is whether the coverage -- they are involved in purchasing the coverage, and the answer is no. The Government made clear that they weren't seeking people that would even be on the hook to pay ten dollars of their own premium, they all had to be people that were going to pay zero.

THE COURT: I think their argument was that they were trying to maximize subsidies. I don't know that it was that they were not purchasing coverage.

Ms. de Boer, what is your response to this argument as to marketing?

MS. de BOER: Yes, your Honor. I agree with the Court that they are selling insurance. In fact, to engage in the conduct that Fiorella was engaged in they had to be licensed to sell insurance. These individuals -- to the extent some kind of financial liability can be read into the mass marketing enhancement, which I think is far from clear, but let's credit that argument for argument's sake, they do have financial liability in many ways.

One, the subsidy could go away, and they could be on the hook for the premium. Two, they have deductibles, they have copays. Three, as your Honor pointed out, they could be liable for a tax credit depending on the circumstances, have to repay some of the tax credit at the end of the year. So there are lots of ways in which they would have potential and actual financial liability.

In addition, this is not any different than a Medicare case where the enhancement has been applied, for example, in the Patel case and in the Moran case where Medicare is being billed through mass marketing efforts, call centers and other mass marketing efforts. Medicare is being billed and pays out the lab test, or whatever the service is being fraudulently billed.

Medicare pays for it. The Medicare beneficiary doesn't have any responsibility for that particular test, yet Courts have applied the mass marketing enhancement, and that has been upheld on -- at least it hasn't be rejected by the Court of Appeals when those cases went up on appeal.

THE COURT: Thank you. Mr. Howard, do you want to add to this argument at all?

MR. HOWARD: No, sir.

THE COURT: I will deny the mass marketing. I think the victims in this certainly included the consumers, and I think the use of the street marketers and the call center fall

within the confines of the enhancement for mass marketing.

You've got a sophisticated means argument, Mr. Howard.

MR. HOWARD: Yes, your Honor, thank you.

The sophisticated means enhancement appears in paragraph 79 of Mr. Strong's PSI. It is predicated on Section 2B1.1(b)(10)(C) of the Guidelines and requires that the specific defendant against whom this enhancement is sought to be applied must have himself engaged in conduct that constitutes sophisticated means.

The three factual predicates that the Government and the PSI advance are, first, the Medicaid denials. Mr. Strong was not involved in any way in that process, and in fact that process at Fiorella predated his engagement with them.

THE COURT: Didn't he discuss it? I thought he discussed the Medicaid denial scheme in one of -- in his emails with Mr. Lloyd.

MR. HOWARD: Discussing it doesn't mean you are involved. To the extent that he asked how is this being done and he received an answer for his education does not mean he was involved in the actual process.

THE COURT: Well, the street marketers were signing up people outside of the period within which -- the period for when you could apply for the Obama Care, and he knew that the reason was because of the Medicaid denial. Isn't that the

case? Why is that not participation?

MR. HOWARD: I am not quite sure how the Court is getting to his actual participation in the effort.

THE COURT: Well, he knows that one of the reasons that they can operate outside the qualifying period, special eligibility -- SEP or whatever it is --

MR. HOWARD: SEP.

THE COURT: They can do this year round, and the reason why they could do it year round is the Medicare denials, and he communicated to Mr. Lloyd about that and he continued to operate his street marketing operation year round. Why is that not participating in a sophisticated scheme under the Guidelines?

MR. HOWARD: His actual participation in that process -- granted, he was convicted of participating in the scheme in its entirety. That component of the scheme, which he was aware of and did not participate in, and to the extent that he didn't participate in it --

THE COURT: Your argument is he would have to be involved in actual submitting the Medicaid application for immediate denial as opposed to having a street marketer selling the policy?

MR. HOWARD: To the extent that the Government would have to establish he was aware of some form of sophistication in that process itself. The mere fact that there are special

enrollment periods that apply to people who are denied Medicaid and he comes into the information that that is why these people are eligible does not necessarily lead to the conclusion that he was aware and knowingly involved in a fraudulent process of obtaining these Medicaid denials.

They would have to cross that bridge in order to implicate him in actually participating in the sophisticated component of the overall scheme. The fact that he knows about it does not mean he knew that it was being achieved in a fraudulent manner to the extent that it was at all, but he wasn't in possession of that information.

He just knew this was an eligibility requirement and therefore those people who he was seeking as enrollees would qualify under that component, but he doesn't know that was being achieved in some form of fraudulent manner, nor was there any evidence to suggest that he was aware that this was being achieved in a fraudulent manner.

There is a way to get denied Medicaid coverage that is totally legitimate, applying for it and being denied. That is the extent of the knowledge the Government can prove he had and there is nothing sophisticated about it, nor is he involved in the process.

The other factual predicate, the fact that he had a board, a board that tracked the name of the potential enrollee, the name of the marketer and a date. How that can be construed

as something sophisticated, keeping track of a name, a date, and a person responsible for the referral, I don't know what to say to that.

How is that sophisticated in any way? That is a typical chart that you'd see at a nine year old girl's soccer game. If you see a score board there, and the reason I know is because my daughters played soccer, and the score board and the tabulation and the keeping tabs of which team is doing what is a simple matter of keeping record. It is not sophisticated in any way. Having a chart that indicates name, date, and person who referred is not sophisticated. I think arguing that is disingenuous.

And finally, the notion that he qualifies because he had his license to -- his registration to engage in CMS was suspended and he thereafter continued to engage. There is this, I guess, an argument, and I am not quite sure how that argument actually is logically constructed.

The notion is that because he was doing -- he was the middleman between potential enrollees and insurance agents, and his mere station as a middleman does not define his role as sophisticated nor as a managerial role, but the notion that he was doing it with the aid of agents and operating in a perfectly otherwise legal role of being a referral agent, a middleman essentially, that that by its very nature because he had had his CMS registration suspended constitutes

sophistication and concealing detection of the fraud, there is no logical connection to that. It is a declarative statement that has not been established through any kind of reason.

And so, we could -- primarily, the Medicaid denials that the Court is focusing on, unless they can prove that he was aware -- that the process itself was both fraudulent and sophisticated in its measure, then he cannot be -- if the -- the sophisticated means enhancement can't be imputed to him based on that predicate.

THE COURT: Thank you. Ms. de Boer, Mr. Strong's end of the business was not very sophisticated in terms of the street marketing, so why does this apply to him? It seems like most of the sophistication was on the Lloyd side of the enterprise. Why is Mr. Strong subject to a sophisticated means adjustment?

MS. de BOER: A lot of the conduct was on the Lloyd side of the enterprise in the sense that Lloyd's employees were the ones pressing the button and clicking send on the Medicaid applications and on other applications, the applications to CMS, but Mr. Strong along with Mr. Lloyd set the ball in motion. This was their program, they designed it.

As we cited in our sentencing memorandum, in December 2018, it was Steven Strong who was egging Mr. Lloyd on to do enrollments outside of open enrollment and Mr. Lloyd was the one pushing back saying it is risky, it is risky. And then the

next month, in January 2019, Steven Strong is asking Mr. Lloyd how do you do the Medicaid denials. Mr. Lloyd informs him how to do it. There are other text messages that were presented in Government Exhibit 386 where Steven Strong is talking about having his employees do Medicaid denials.

So there is no doubt that he knew what that process was and that that process was happening and that he wanted it to happen. The fact that he is not the one pressing send and that it is Lloyd's employees pressing send is of no moment. That is how this scheme was designed and that is why this scheme could succeed on the scale that it did.

In addition, as the text message exhibits regarding the out of state business showed, they were trying to do Medicaid denials for the out of state business as well. Steven Strong, when he was referring through his street marketers to Fiorella they were attempting to do Medicare denials in those states as well.

The second basis for the sophisticated means enhancement as applied to Mr. Strong is that at the beginning of the scheme Mr. Strong gets his CMS registration revoked for the same conduct, and rather than stopping the conduct, he simply now is doing the same thing under Mr. Lloyd and Mr. Lloyd's employees' CMS licenses.

So, that effort to continue the conduct and make it harder for CMS to detect who is at the heart of it, because his

license does no longer apply to the fraudulent enrollments, that in and of itself is sophisticated, so it is an independent basis to apply the enhancement.

THE COURT: All right. Thank you.

The guideline involves the offense otherwise involves sophisticated means, and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means, and sophisticated means is especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense.

I find the overall scheme was certainly sophisticated in its encouragement or the use of people to gain this Obama Care through targeting a particular aspect of the population that would result in significant subsidies.

Mr. Strong did -- first, he knew about the Medicaid denials. As counsel points out, he did encourage it initially over the objection of Mr. Lloyd, and he knew how that allowed the Obama Care open enrollment period to be extended on a yearly basis. I think for those reasons he is subject to the sophisticated means enhancement.

I think the result is -- go ahead, Mr. Howard.

MR. HOWARD: The Court has already ruled on that. I just reiterate that the process of Medicaid denials predated Mr. Strong's involvement with Fiorella. So the notion that he helped to construct and design the plan --

THE COURT: Well, there is that email where he is encouraging the use of Medicaid denials to evade the open enrollment period. I think she is right, Lloyd responds, yeah, but that is risky.

MR. HOWARD: I know, and that may be taken out of context because the commissions -- and I think the statement itself kind of alludes to the risk that he was referring to, which was a financial risk because the commissions are low, and the enrollments are also low.

What he is saying is we are spending too much in order to achieve a low profit, that was the risk. The Government construes that to mean he thought it was risky in terms of criminal exposure, and I think the statement itself belies that contention because he is talking about the commissions.

I understand the Court has ruled.

We do have one -- we did make one other objection with respect to his role.

THE COURT: That is right. I am sorry, go ahead.

MR. HOWARD: That is a 3B1.1(a) enhancement, and the role enhancement requires that he organized, leads, supervise other participants, other participants being defined as those criminally implicated, not unwittingly involved. In the Government's own response and in the PSI itself the references that are being made to are Mr. Lloyd and Mr. Dafud, Dafud Iza.

He did not supervise, instruct, or organize, or lead

any of those people, and to the extent that everybody under his purview were unwittingly involved, and therefore not criminally complicit, then those people over whom he may have had some supervisory role -- it is clear he had no leadership or organizational role, but those people over whom he had any supervisory purview were not criminal participants, and that is a requirement of 3B1.1(a).

We need to identify the criminal participants that he supervised. None have been identified, and so therefore we object.

THE COURT: All right. Ms. de Boer, who are the participants with respect to Mr. Strong's activity?

MS. de BOER: Your Honor, the Sentencing Guidelines do not require Mr. Strong to have supervised other criminal participants. What it requires is that Mr. Strong be an organizer of criminal activity that is otherwise extensive.

There is no dispute that it was Mr. Strong and Mr. Lloyd who together organized this criminal activity. They planned it out throughout their text messages, as the Court saw, and throughout their interactions. There is no credible argument that this criminal activity was not otherwise extensive.

It involved tens of thousands of applications, tens of thousands of consumers, an immense street marketing operation, a huge number of employees at Fiorella that Mr. Strong knew

were working on his behalf to accomplish his goals of the criminal activity that he organized, many of whom he interacted with on a daily basis.

The fact that he was not in the org chart their direct supervisor does not in any way take away from the fact that he together with Mr. Lloyd, who is not disputing this enhancement, organized the criminal activity and the criminal activity was otherwise extensive.

THE COURT: So you are not relying on the five or more participants at all?

MS. de BOER: No, because I am not contending that Mr. Strong directly supervised five criminal participants.

THE COURT: If he was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. I don't think there is any doubt that he was an organizer and leader of the activity, but the question is which of these two prongs involve five or more participants. Do the street marketers count, do you think?

MS. de BOER: Look, your Honor, we immunized one of them for his testimony. We haven't charged any of the street marketers. I am not prepared to say they are criminally involved in this. There were three individuals who have been charged in this as criminally involved. So, I think the soundest conclusion here is through the otherwise extensive application of the role enhancement, and there is really no

credible dispute or any actual dispute at all that this operation was otherwise extensive.

I would point the Court to the application notes in 3B1.1, application note 3 which defines otherwise extensive. In assessing whether an organization is otherwise extensive all persons involved during the entire course of the offense are to be considered. Thus, a fraud that involves only three participants, but used the unknowing services of many outsiders, could be considered extensive.

I don't see how this is anything other than what the guideline notes are describing.

THE COURT: All right. I do think it does fairly fall within application note three of otherwise extensive. In assessing whether an organization is otherwise extensive all persons involved during the entire course of the offense are to be considered. Thus, a fraud that involves only three participants, but used the unknowing services of many outsiders, could be considered extensive.

Even if you just count the three charged, I think this would fall within it. I also think there were certainly others who probably could have been charged in terms of the activities that they were involved in, but in any event, there were at least three Defendants in this case and a large number of participants in the enterprise.

All right. I think with that, I have denied all of

the objections for the reasons stated.

I will point out I also looked at it to see what the impact of that would have been on the Guidelines, and the Guidelines would have remained the same unless -- well, they would basically remain the same.

One of them -- if Mr. Lloyd benefited -- no, if Mr. Strong got the benefit of two of the depreciations it would have taken him down to a level 41, which would have been 324 to 405 months if he had -- but basically these enhancements don't significantly impact the Guidelines.

In the advisory guideline it is level 43, criminal history category I, 1,020 months.

I can hear your recommendations now or present the information. You wanted to present a video and some other things. Should we do that first and then I will hear from the lawyers about what your recommendations are or do you want to argue first? Tell me what you want to do.

MR. STUMPHAUZER: Your Honor, I am here to do whatever is most helpful to you. If you want to hear the video first, that is fine with me. I don't know if the Government has a preference. We can play that and I can give argument after.

THE COURT: Why don't we hear from anybody who wants to speak and somebody, I think -- somebody had a witness they might want to call. I don't know if we are going to do that.

Let's hear from witnesses, people who want to speak,

and the video and then we will have the argument.

MR. STUMPHAUZER: We don't think we need to call anyone to speak at this point. The purpose of the video was to make it more efficient --

THE COURT: I also read a number of letters with respect to both Defendants.

MR. STUMPHAUZER: Okay.

THE COURT: Go ahead.

THE COURTROOM DEPUTY: Do you want to keep it over there?

MR. STUMPHAUZER: Yes. Thank you.

(Thereupon, the video was played.)

MR. STUMPHAUZER: That concludes the video. I don't know if you wanted to hear argument in any particular order with respect to the 3553 factors.

THE COURT: Why don't we start with Ms. de Boer and I will hear your recommendations, and probably hear from -- there are some -- perhaps some differences between the Defendants, but I am not sure of the significance in terms of the overall issue of sentencing. There are perhaps some differences in personal characteristics.

Mr. Strong was actually, I think, convicted of two counts that Mr. Lloyd wasn't, although that was -- in terms of the money laundering. I guess in many respects I see them as similar in terms of their situation here. So, I guess I would

like to hear argument from everybody and then we will hear from the Defendants and come to some conclusions.

Ms. de Boer, what are your recommendations?

MS. de BOER: Yes, your Honor. We are going to be recommending the same sentence for each Defendant, but I think there is a witness for Mr. Strong. I don't know if you want to take that first.

THE COURT: Is there?

MR. HOWARD: Yes, sir. We have a few people who want to say something.

THE COURT: I want to hear the arguments together. Now, in terms of the presentations, you can make your choices in terms of how you want to go forward.

Let's hear from your people and then we will have argument from all the lawyers.

MR. HOWARD: Your Honor, we have Mr. Strong's mother, sister, and stepson.

THE COURT: All right.

MR. HOWARD: And brother.

THE COURT: All right.

MR. HOWARD: Thank you.

THE COURT: Good afternoon.

THE WITNESS: Good afternoon, Honorable Judge. I am sorry, very nervous. I am Steven Strong's mother, and I stand before you today as a character witness for my son, as I said,

Steven Strong, and I just ask to allow you to let me speak from my heart.

This is my son's first offense. He is my eldest, he was raised a devout Catholic upbringing. I was a Catholic school teacher in Arizona, and I will get to that a little later, you know, church, faith, charity, generosity, family, Italian-Irish family. I am one of nine children. My mother just passed. It was his grandmother that we were trying to have him be part of that.

Anyhow, you know, what can I say, my first born and I know you have heard this many, many times, but he has helped me raising his brother and sister. They are all five years apart, when he was ten, the other one was five, and the other one was one. I relied on him heavily. He has always been a role model, went to work very young, lived in Sedona, Arizona. He was the first one to get a job at the cafe and the ice cream shop, even if he had to walk there to get there.

He is such a great son and I just -- I know it is a mother's thing to say, but not only that, he is a great father, and his children, eight and 12, yes, they are -- he is going to be gone hopefully -- I mean, through their teen years and that breaks my heart. He has always been there for them, took them to school, tennis. Whenever they felt like they were not really making it in school he was like, come on, let's get into tennis, drama, get into something so you could feel confident

and get that confidence you need in school.

He is just a positive individual. He has always helped everybody. People in our family, generosity. My niece needed IVF, he contributed, he was really just behind her in the whole thing and that is just the type of person he is.

I just, you know, I want you also to consider his young children, having an absent father, you know, for a very long period of time, especially the critical time that he is going to -- they are going to miss their father that causes so much harm that reaches beyond this courtroom. I can't really imagine how that must feel in everybody involved.

I would like to share a personal experience regarding COVID.

I was working in Arizona as a teacher, and I was laid off, COVID-19, and I found myself without insurance, and I was like, okay, I am healthy, it is okay in any other circumstance, but it was COVID-19, locked down, and people going to hospitals. I was nervous about not having insurance at this time in my life, and he was able to secure insurance for me.

And anyway, to make a long story short, I contracted COVID, I unknowingly infected my elderly mother and my two sisters. They all ended up in the hospital, pretty bad for me, luckily I tuned the corner. I didn't need to go to the hospital. That coverage was a security I desperately needed and it was a life line for me, and I can't -- I know I am not

the only one, there were so many people, and thank God that I had the ability to be covered under the fact that I was laid off and on unemployment, and I was able to be covered with this insurance.

And he also helped my brothers and other family members. I have two plumbers in the family, and my other brother is a high school counselor. When they would have an ending of their coverage or a lapse somehow in changing schools, once we all got back into the work force we just ended it.

That coverage and that insurance, I know the horrible part of it, but it helped millions of people, and it helped me, too. That is what he wanted to do. If anybody, any of my brothers needed help, that was another way that he helped out.

I just want to say that I'm not here to say he is perfect. None of us are. I understand that the Court must uphold the law.

I only ask that you see him as a whole person, my son, a good son, a father, a great father, a husband, a man of faith, a man who has helped many people.

I am religious, so I will end with this little saying if you don't mind. God granted King Solomon wisdom to judge fairly and with understanding. Justice and mercy can exist together, to consider not only the offense, but the whole person before you. I pray that same wisdom today.

Thank you for hearing a mother's heart.

THE COURT: Thank you. Good afternoon.

THE WITNESS: Hi, your Honor. I am Steven Strong's little sister. Thank you for letting me speak as a character witness today.

I want to speak on behalf of him for a little bit because, as my mother said, he was there for us growing up and in fact he is kind of my first memory. He was the one who helped me tie my shoes, ride my bike. In sixth grade I had to do a report on who was your hero, and fro me it was Steve. You would think being ten years older he would be ready to kick me to the curb and go hang out with his other friends, but we just have an amazing bond and he was kind and loyal and was always there for any of us.

And I see that now as a father to his own kids, and he is such a pillar for all of us, he is our world, and I see he is his children's world, and I really do hope, as my mother said, seeing us stand here today, hearing what we have to say about him, seeing how much we love him -- I understand it is the justice system, but I hope you can look at him as a whole person and see how much it would affect our family, the society as a whole to not have him with us.

Thank you.

THE COURT: Thank you.

THE WITNESS: Hello, your Honor.

THE COURT: Good afternoon.

THE WITNESS: Could I grab a tissue? Thank you.

My name he is Joseph Strong, I am Steven Strong's younger brother of five years. The reason I am coming up here, I just want to say a few words. I listened throughout this trial and heard them go after his character time and time again, and I want to share a little tidbit of my life with my brother and how our life was.

When I grew up, as my sister said, my first memory is my brother. He is the one who dropped me off at class, picked me up. He is the one who showed me how to hit a baseball, throw a ball. He is the one who showed me how to treat people with compassion, how to go out there and be part of the community, and throughout the years as I was in high school and he was in college, he was the one I sought after to hang out with.

Like my sister said, he could have left us in the dust. I would always talk to him five times a day -- I am sorry, a week, if not more, and it continued into adulthood and as we figured out our careers. I have been ten years in a fire service, I drive a fire truck with a ladder, very similar to what is in West Palm Beach. I train all of the newcomers coming in, I am a mentor, one of the lead instructors.

We talk about the values, integrity, respect, passion, community service, all these things, and I look and I am like

why am I here? How did I learn those values? It is him. (Witness crying.) I am sorry. I am sorry.

He is a great man. I know he made a mistake and he has always presented good. During this process, and during the time, 2018 to 2022, it wasn't malicious, it was helping people, helping people get insurance during COVID, I was in it. We were ground zero for COVID, we have seen the facts.

I am not here to talk about the case, but I pray you have mercy. He is good, he showed me the foundational values I have today, and I am entrusted by community, citizens to deliver those values every single day, and those values -- I love him. Thank you.

MR. HOWARD: Your Honor, we have one more person, Mr. Strong's stepson.

THE COURT: Good afternoon.

THE WITNESS: Good afternoon, your Honor. My name is Matthew, I am 26 years old, Steven's stepson.

I work at Progressive, I am an auto claims adjustor, so I handle car accidents and things like that. I am a soon to be husband, father of two young boys, and a devoted son.

I take pride in living a responsible and law-abiding life and in building a stable future for my family. These values that I hold very highly were instilled in me in part by Steven.

Steven has been my stepfather since I was a child. He

played a significant role in shaping the man that I am today. He taught me practical life skills like how to fish, play the guitar, I may have gotten a little bit better over the years, riding a motorcycle, playing pool, but most importantly, he taught me what it is to -- sorry, sorry -- taught me what is to be a better husband and a caring father.

His influence on my character and my work ethic and a sense of responsibility cannot be overstated.

As a father he is deeply involved with his children. He takes them to school and supports them and attends their sports activities and he actively participates in their development, as well as mine. He is a musician, a present father, and he uses his strengths to guide his children as well as myself. In this critical stage of his young children's lives his presence is not only meaningful, but essential.

I deeply understand and respect the seriousness of the Court's responsibilities, however, I firmly believe Steven's true character, history, and conduct show more accurately who he is and I don't believe that he is a risk or danger to the community. He is a devoted family man whose absence places a profound and emotional developmental strain on those who depend on him most.

I would like to end on that. I thank you for your time and consideration and service. I am grateful to be able to share my perspective, and if I could try to get through it,

if you would allow, if I could share some thoughts on behalf of my mother. As you can tell, this is extremely emotional and difficult for her, too.

THE COURT: Sure.

THE WITNESS: Okay. On behalf of my mother: Your Honor, thank you for allowing me the opportunity to share my thoughts about Steven Strong, the father of two young children. My name is Larissa Strong, I am the founder of a non-profit in Texas called Haley's Legacy, which advocates for those suffering from mental illness and suicide prevention. The mission was born from the devastating loss of my oldest daughter, Haley, who died by suicide in February 2024.

I work alongside legislators, Senators, members of Congress and other influential leaders in the mental health sector to help address capped and existing laws, particularly those related to temporarily restricting access to firearms following involuntary psychiatric holds for suicide prevention while bringing about health care reform.

Although Steven and I are divorced, our separation does not diminish my support and love for him in any capacity, nor my willingness to stand by him. If anything, it has clarified it. It may not be customary for an ex-spouse to speak on behalf of their former partner, however, I believe it speaks volumes and quite directly to Steve's intrinsic character. My support for him is not rooted in obligation, but

because I know fully, honestly, and without reservation. Throughout this painful and exhausting process I watched Steven hold fast to the truth even when doing so came at a profound personal cost.

I have seen him endure loss, uncertainty, and separation from his children without allowing bitterness to take root. His commitment to his principles has not only sustained him, it has strengthened us as coparents and as a family bound by love, respect, and trust, rather than circumstance, building a stronger foundation for our family to move forward.

Steven lives with honesty, accountability, and a deep sense of purpose. He strives to be better, to do right, and to lead with integrity even in the darkest moments. I believe with my whole heart that he is deserving of leniency due to his character throughout what is before the Court at this moment. I ask that you consider my words not only as testimony, but the voice of someone who has shared a life with him, raised children with him, and witnessed his character proven through suffering not comfort.

Steve has been my closest companion and best friend for more than 15 years, but more importantly, he has always been a present, loving and devoted father. While my family may not be fit the conventional mold, it is one built on mutual respect and commitment to provide consistency for our children.

Every morning before his incarceration Steven took our children to school. The drive was their special ritual, a time filled with shared stories, jokes, and laughter that set the tone for their entire day. It was a simple routine, but it brought them joy and comfort and a sense of security like only their father could provide.

In his absence those mornings now feel heavy and painfully quiet. At home Steven filled our house with music. Even their friends would gather around singing together and creating moments that became treasured memories. Since his absence that guitar now sits silenced in the corner. Our children who once fell asleep after talking with their father now curl up by a quiet guitar instead. Their voices and songs and laughter have been without him. The emotional impact has been profound and the silence has been painful for all of us.

We feel the emotional void left in his absence. Steven is essential to the functioning, stability and well-being of our family unit. He is an actively involved parent who handled countless day-to-day responsibilities that directly support our children's health, education and structure, through helping with school work, coaching our child's tennis, attending appointments and managing the routines to provide the practical support that keeps our household steady. His presence at home in their everyday life is irreplaceable.

Our eight year old son Sawyer and twelve year old daughter Sophia have not been able to see their father even on video due to the distance living in Texas and not close to him. They had not seen their father in 38 days since the morning of November 17th when he kissed them good-bye and later was suddenly remanded until I was able to bring them to Florida for Christmas. The day he was remanded I had the task to tell them what happened, that he was gone.

His absence in our home has caused such confusion in these little ones' minds. They are now thinking that they themselves must be guilty of not praying enough, thinking to themselves that God must not know how much they want daddy home.

It is heartbreaking to see them struggle, not only with the sudden loss of their father, their protector, but also their faith in God and their efforts in prayer.

Despite all we have endured -- I am sorry. The holidays have made his absence even more heartbreaking. Thanksgiving was difficult at best. Christmas was unimaginable pain. Christmas has always been Steven's favorite season not because of material things, but because of the joy he takes in recreating the magic of his own childhood for our children. He lights up when he sees their excitement and he works so lovingly to make the holidays special and memorable.

This year without their father the magic of

Christmas didn't feel right for them, not because I didn't try, but because their loving father and creator of magic was not there.

My daughter Sophia doesn't believe in Santa and my son is confused as to why Santa couldn't bring his daddy home. What should be a season of joy and wonder, instead felt incomplete and quiet. It is a painful reminder of how much Steven's presence truly means to his children.

Despite all that we have endured, I remain hopeful because I know Steven is compassionate, steady, deeply committed, and always trying to do what is right. He stood by our family in some of our darkest moments, including the loss -- the sudden loss of my oldest daughter Haley. Steven helped pull our family together, offering strength, stability and comfort when we needed it most.

Out of that pain Steven was not only to grieve, but to act. Witnessing the suffering our children and I endured, he reached out to app developers to create a program designed to help other families from experiencing the same loss. The program was to be installed on children's phones to alert parents to potential warning signs of depression, suicide ideation, and threats of gun violence toward themselves or others.

His hope was simple, but yet profound, to save lives and spare other families the pain we now carry. The project

remains unfinished due to Steven's incarceration and his inability to complete what he began.

In his absence and inability to finish this noble project we feel that loss again, not only in his presence, but of the purpose driven work that he was so committed to seeing through, another missing piece of our lives.

Allowing him to return home would bring stability and support back to our family at a time when we desperately need it. When I told our twelve year old daughter that her daddy was remanded she wiped her tears and said, mommy, it feels like when you told me Haley had passed all over again.

These children have already been so much, I worry for them. They lost their sister and the opportunity to have their father home with them, to bring back life to their every day.

Again from her, I have previously signed a signature bond for Steven and would be honored to do so again. Our family stands with him with confidence and faith in his integrity, his dedication to the truth, legal system and his unwavering commitment to our children.

Your Honor, we respectfully and hopefully ask for compassion on behalf of our family. I believe that granting Steven leniency in sentencing and even supervised release through any appeal process would allow their children to regain a sense of peace, safety, and restore joy to their daily routines and help our family to continue to move forward with

strength.

Thank you for your time. I am sorry it was a lot, but thank you for your time.

MR. HOWARD: We have nothing further, your Honor.

THE COURT: All right. Thank you.

MS. de BOER: Thank you, your Honor.

The United States recommends a sentence of 35 years as to each of the Defendants, and in recommending the sentence the Government urges the Court to consider the seriousness and sophistication of the conduct in this scheme; the need for deterrence and the fact that deterrence is among the only ways to protect public programs like the Affordable Care Act from white collar offenders; the need to emphasize respect for the rule of law, comparable sentences issued by other Courts in this district in other healthcare related fraud cases; and the fact that this scheme was a choice that the Defendants intentionally made not once, not twice, it was not a mistake, it was day in and day out for several years and to the tune of thousands and thousands of applications.

As we have detailed in our sentencing memo and as the Court recalls evidence at trial, the sophistication and seriousness of this offense cannot be overstated. The actual loss of 180 million dollars as a result of the Defendants' conduct, the patient harm, the consumers who were put at risk of losing access to critical opioid dependence medication, to

medication that satisfied their mental health needs that kept them from being hospitalized or Baker Acted, medications to control their HIV infections that kept them from experiencing symptoms from that or from passing that on to others. We heard directly from doctors or patients affected by these very things, and that is the kind of people who were targeted in this scheme, most vulnerable in our society.

The program itself -- we heard a story today about why insurance is so important, and we completely agree, and that is why this program needs to be protected and fraud of this scale needs to be deterred.

And so, your Honor, we encourage you to consider very seriously the need for deterrence of this particular type of fraud scheme and in general healthcare related fraud schemes that target public healthcare programs.

There have not been many prosecutions of Affordable Care Act enrollment fraud cases and this prosecution underscores the depth and scale of fraud that can happen in this program. Sending a powerful deterrent message alongside this prosecution is one of the only ways we have to control fraud in this space. We simply cannot prosecute our way out of these types of offenses.

The Court saw firsthand the amount of resources it took to bring just this one case. We simply cannot prosecute our way out of this type of fraud.

In addition, respect for the rule of law cannot be overstated in this case. We are dealing here with two individuals who discussed and knew that their behavior was wrong and risky, and so deterring individuals like that and ensuring that licensed insurance brokers know it is not okay to gain the system and they will be caught and the laws and program requirements must be respected is essential.

We appreciate very much the amount to which both of these individuals, these Defendants, have contributed not to just their own families, but to their communities. We have seen firsthand the support that each of them have not just today, but throughout this entire trial.

That is really the tragedy of this case because it is very difficult to square the two individuals that we see and hear about in the video that we saw and the statements from the supporters and family, and in all of the letters that were submitted, it is very difficult to square the picture of the individuals being described with the conduct that we saw in this case.

And the only explanation for that is they did not think that they would get caught or they thought the money that they would make, and they both made millions, was worth the risk, and that is exactly why deterrence matters in this type of case.

I would point the Court to, as we did in our

sentencing memo, recent healthcare related cases in this district that are on a comparable scale. I think the most comparable and most recent is the Patel case in which the Defendant was sentenced in 2023. It was a $187 million paid amount, a Medicare genetic testing lab fraud scheme, and the Defendant organized the scheme over the course of three years, stole $187 million from Medicare, and in -- operated a lab that contracted with call centers to deceptively target Medicare beneficiaries on a large scale through telemarketing.

In that case there were 27,000, approximately, beneficiaries whose Medicare was billed for these medically unnecessary cancer genetic tests and the Defendant received a sentence of 27 years.

This case is even worse. The financial loss to the public program is on par, but the conduct here is even worse. In the Patel case there weren't vulnerable victims in the same way that there are here, there were Medicare beneficiaries contacted in their home. While it was terrible, it did not put them at risk of losing access to critical health care. Vulnerable homeless populations were not targeted in the Patel case, but they were here.

So, we think that this case is deserving of a sentence even higher than the Patel case because it is on par in terms of economic loss, but the conduct here is far worse.

The Court alluded to the fact that the Defendants are

similarly situated, and we agree with this. Strong was squarely warned by CMS that this conduct was wrong and he continued to do it anyway. He was also convicted of more counts than Mr. Lloyd, but Mr. Lloyd ran a larger operation and that operation included the subsidy fix process whereby processors at Fiorella would access applicants' ACA plans and kick out the deadline to respond to CMS' attempts to verify information like income in order to keep the subsidy money flowing. We do not contend that Strong played a part in that part of the process, but Lloyd did.

That said, this scheme could not have happened without both of them. They were the ones who planned it together. We saw it in their text messages at the beginning of the scheme. They were the ones who put the plan into action, they flipped the switch. They were the ones who wound the clock on this. They were both vital to the scheme and essential to the fraud.

At the end of the day, this was not a mistake, it was so much more than that. It was a choice by each Defendant despite knowing, using their own words, they could face an inquisition. Despite knowing it was risky, despite the warnings from CMS, despite the complaints, despite everything that was piling up in front of them, it was their choice to engage in this scheme for four years to the tune of tens of thousands of fraudulent applications, $233 million in intended loss and $180 million in actual loss affecting approximately

35,000 consumers.

So, your Honor, the Government believes that a sentence that is just, that is not greater than necessary to satisfy the 3553(a) factors, is a sentence of 35 years as to each Defendant, which is one year for every 1,000 consumers fraudulently affected by this scheme.

In addition to the custodial sentence, the Government seeks a restitution order in the amount of $180.6 million payable to the U.S. Treasury joint and several with each other and with Dafud Iza, as well as forfeiture money judgments for both Defendants, which I will be happy to let Mr. Grove speak to.

MR. GROVE: Do you want me to do that now, your Honor?

THE COURT: All right. Go ahead.

MR. GROVE: Good afternoon, your Honor. In addition to what counsel has already argued for a recommendation for a sentence, the Government is also asking for the imposition of a forfeiture money judgment to be included as part of the sentence. You may be aware forfeiture money judgments are separate and apart from restitution orders and they are mandatory.

In this case, the applicable forfeiture statute, including the allegations in the superseding indictment, Title 18 United States Code, 981(a)(1)(C). That is the applicable forfeiture statute for specifically the wire fraud, conspiracy

to commit wire fraud, Count 1, and the wire fraud counts. We are not seeking a forfeiture money judgment relating to the money laundering money offenses for which Mr. Strong was found guilty.

We are asking specifically for the imposition for Mr. Lloyd $2,706,372.74, and that is based on the evidence that is in the record, the record of trial, the offense conduct evidence, and specifically Government Exhibit 41, which shows how much money was -- how much of the proceeds from the conspiracy and schemes of fraud went to Mr. Lloyd.

And then for Mr. Strong we are asking for a forfeiture money judgment of $7,085,345.22, and that is from -- sorry, correction, it is going to be -- it is going to be 6 million -- this is for Mr. Strong, $6,516,457.15, and we point to Government Exhibit 42, and there you will see there is a larger number, but when you subtract out just for the time frame of the conspiracy from that exhibit, that is how we arrived at that number.

Specifically, the exhibit shows the money that flowed to Defendant Strong, but it shows from the time period of September 9, 2016 through August 10, 2022, so subtracting out just during the time frame of the conspiracy, which extended from August 2018 to the end of September 2022, that is where we come up with the $6,516,457.15.

THE COURT: All right. Thank you.

Mr. Stumphauzer.

MR. STUMPHAUZER: Yes, your Honor. I would like to start where they ended, which is on the issue of forfeiture. I have two positions on that I want to make clear.

My first and initial position is that they have completely waived their right to seek forfeiture. The reason why is there is a Federal Rule of Criminal Procedure on point that specifies what they are supposed to do, and as your Honor has been doing this for many, many years, what would typically happen is there would be a motion for a preliminary order of forfeiture, they would cite the statutory basis for what they think they can forfeit, and they would also hopefully submit evidence that would show your Honor a nexus between the alleged criminal conduct and an asset they were seeking to forfeit.

Also, if they were going to seek a money judgment -- which I know in terms of notice to the defendant there was no request for a money judgment or demand for a money judgment in the indictment.

In any event, to be eligible for a money judgment, as I understand it, the Government would also have to prove that the money had been, for example, outside of the jurisdiction, assets had been transferred to others, assets had been diminished or otherwise disappeared. That would be the standard for seeking a money judgment instead of specific assets.

My first argument is that they have completely waived their right to forfeiture. However, if your Honor is unwilling to find that, I do think that that should be set for another day because we should have an opportunity to oppose it after they articulate the rationale. I am not sure if they will go after any specific assets or if it is just the money judgment, but I think procedurally it would be improper to do it today.

I would make the same argument as to forfeiture, I think that is an issue that should be left for another day.

I would like, of course, to talk to your Honor about the 3553 factors. I think you indicated at the beginning the Guideline range in this case is extraordinarily high and may not ultimately matter in what you choose to impose today, but I wanted to speak about that if I could.

So, to put this in perspective, I am standing before your Honor representing a 47 year old man who prior to this case had never been convicted of anything, not a felony, not a misdemeanor, a person who had never even been arrested before and who now has been convicted of a crime that doesn't involve violence or hurting people, and yet I am standing before you trying to fight my way against an 85-year sentence. I think your Honor mentioned that is over a thousand months in jail.

This, to me, is a case that truly exposes the folly of the Sentencing Guidelines. I don't want to minimize the amount of the loss, of course it is important, other factors as to the

victims are important.

This wasn't justice and it wouldn't be equitable or fair, it simply wouldn't be. If anything, what it shows is that a formulaic mathematical application of the Guidelines doesn't always lead to the right result. I know you know now from watching the video, my client is far more than formula, far more than a table. There is a lot more to this.

Just by way of putting things in perspective, one of the things we attached to our sentencing memo to show, this is actual data put out by the State of Florida, if you are convicted of first degree murder or second degree murder in this state you would serve an average of 24 years. Yet, we have the Government standing up asking for 35 years, which is something I will get back to because I think it is totally inconsistent with their prior cases.

Let's compare it also to some of the most high profile large loss amount cases in this country's history. To start with one of the most obvious, there is the infamous FTX fraud, which was Sam Bankman-Fried, might be a defendant name you are familiar with. In that case there was a loss of $8 billion, billion. As far as I know, it is the largest loss amount except possibly the Madoff case.

But in addition to that, Mr. Bankman-Fried took the witness stand and by all accounts, based on what I read in the newspaper, he perjured himself, the testimony was laughable,

and even Mr. Bankman-Fried only got 20 years, 15 years less than what the Government is suggesting that Mr. Lloyd should be sentenced to.

You can compare it to other cases like the Allen Stanford Ponzi scheme in Texas, a $5.9 billion loss, involving some egregious conduct that didn't lead to sentences like this. Also, Elizabeth Holmes, that is the infamous Theranos case where there was not only a massive, massive fraud. In that case I think the loss amount was 452 million, almost twice what we have here.

By the way, that case I think led to even more egregious harm. There she not only defrauded people in terms of money, but also had people taking tests. They thought they had HIV or didn't, or were pregnant or not based on false test results. She ended up with 12 years.

The list could go on and on. The Government, what they touted at the time was the single largest Medicare fraud case in the history of the country ever anywhere under any circumstances was Philip Esformes, also on the hook for a billion dollar fraud and engaged in some truly egregious conduct, including trying to getting witnesses to lie. He was only sentenced to 20 years in jail.

How in the world could we justify --

THE COURT: Of course, he was 85, wasn't he?

MR. STUMPHAUZER: Pardon me?

THE COURT: Wasn't Esformes about 85?

MR. STUMPHAUZER: No, I think he was in his 50's, your Honor.

THE COURT: All right. I got the wrong person. Go ahead.

MR. STUMPHAUZER: You know, I think you can look at these cases, even in the highest dollar amount cases a sentence of 35 years is way more than is necessary under the guidelines.

I also want to talk about the Patel case. I found it interesting that the Government used that as a data point and actually suggested that this case should result in a higher sentence.

First of all, Mr. Patel was held liable for a loss amount of $463 million, and I have read quite a bit from that case to figure out why Judge Ruiz was so enraged, and let me give you a couple of things that stood out on the record to me.

First of all, when he found out he was being investigated he went out and told multiple witnesses to lie to Federal investigators. He also falsified and backdated contracts when the investigation was underway to conceal his criminal conduct. And it seems to me that the most egregious part of it that Judge Ruiz took into account is that he took the witness stand and testified, just like Mr. Bankman-Fried did, and gave outrageously false testimony, and it was based on those factors that Judge Ruiz found a sentence of 30 years to

be appropriate.

None of those factors are at play here. Mr. Lloyd, there is no evidence he told anyone to lie to investigators. In fact, he produced information to them pursuant to subpoena. He didn't take the witness stand and lie. He didn't have a loss amount of 463 million or 7 billion or 5.9 billion, or any of the numbers that you hear in the other cases.

So what is one guidepost that you could look to? Your Honor, I am sure, is familiar with the Jason data, which is data published about sentences handed down all over the country. I admit Jason data does not get into every single detail or aggravating factor of each case, however, I do think it is informative here.

If you look at Defendants who had a level 43 and who were being sentenced under 2B1.1, so it is either a fraud case or a kickback case because that is what 2B1.1 applies to, and scored out at a level 43, and a criminal history category of I.

When we launched on this project I thought how many are we actually going to find that score out to a level 43. It turns out it is actually a pretty big sample size. It is 31 Defendants that fit into those parameters, the same parameters you have here. The average sentence imposed was 158 months, the median sentence imposed was 138 months, far, far less than the Government is seeking here.

And I think, you know, when these judges are faced

with a Guideline range of 43, the fact that they are sentencing people in the range of 150 months shows they recognize in these high loss amount cases the Guidelines simply lose any semblance of meaning whatsoever.

I also want to talk about the nature and the characteristics of the offense. I think your Honor has made enough comments where I have some idea how you feel about the evidence at this trial, but I think it is worthwhile to point out how this case differs from others.

To me, this case is fundamentally different, for example, from a Ponzi case, an Allen Stanford type of case, or a Sam Bankman-Fried sort of case, or many of the securities fraud cases you see in this district all too often, where they are soliciting money from people, collecting it to invest in a particular type of instrument, and are just flat out stealing it, no value conveyed, nothing at all, just a bunch of elderly folks left with empty wallets and empty retirement accounts.

This case, to me, is fundamentally different even if you think the applications were all fraudulent and the Government shouldn't have paid these advance premium tax credits. Here they were submitting applications, they did in fact get health insurance coverage. Many of the people did in fact use the health insurance and people had claims submitted in fact. Some of the evidence produced by the Government in this case showed that about 181 million of claims for medical

services were paid out under these policies. It may be a figure the Government disputes, but it is derived directly from its own data.

So there was value conveyed certainly to the consumer, and to some extent to the Government. I know that didn't prevail upon you for the sentencing guideline purposes, but I think it is fundamentally different from a case where it is essentially dressed up fact. That is simply not what we have here.

Another thing I think you ought to take into account, your Honor, is in a lot of the cases you see in this district, especially the healthcare fraud cases, you see people setting up companies where their goal from moment one is to commit fraud. They enter in a new healthcare business, they have no familiarity or background in genetic testing or whatever it might be, and their goal is to rip-off the system.

That is not the case here. As you heard during trial, Mr. Lloyd started Fiorella Insurance in 2003, that was exactly ten years before the ACA was ever a glimmer in anybody's eye. That didn't start until the 2013-2014 enrollment period. He worked for ten years around the clock at this place doing tons of work that had nothing at all to do with the offense conduct.

Even once Obama Care started, and it certainly accounted for a significant part of the business, there was plenty of other legitimate business going on, property and

casualty work, auto insurance work.

And to place this in perspective again, the Government would suggest he made millions and millions of dollars and it was all derived from this fraud scheme, but their own evidence proves otherwise. They were honest with you when they told you that only 13 percent of the revenue of Fiorella Insurance was related to the scheme.

So, again, I think you ought to take into account there was more than a decade of hard honest work in this company before any of this Obama Care nonsense even started up. I think it makes a difference that this business was not started by any stretch of the imagination just to perpetrate a fraud.

I also want to go back to some of the data published by the U.S. Sentencing Commission. This goes, your Honor, to specific deterrence, which is one of the 3553 factors. All biographical information about Mr. Lloyd indicates that he will never commit a crime again.

The Sentencing Commission publishes plenty of data on that, but if you look at things like the age of the Defendant when he is first is convicted of an offense, Mr. Lloyd is currently 47 years old, the fact that he has a college education, the fact that he has a stable family life, the fact that he is married and has children, all of those factors show that there is very little likelihood of him ever reoffending.

Another reason he could not reoffend is he doesn't have an insurance license, and I think for pretty obvious reasons he would have a hard time getting back into this business in any event.

As to general deterrence, I don't think there is a person in this industry -- if your Honor would impose a sentence of even ten years, I don't think there is anyone in this industry that is going to say, this is a risk that is worth it, that is a slap on the wrist, this is worth a risk to take. A ten-year sentence is absolutely life altering.

In terms of general deterrence, I think people are going to internalize the message here and think long and hard about how they process Affordable Care Act applications. I don't think a sentence of 35 years is necessary to convey that same message at all. Even a decade, it will dramatically alter the course of his life, dramatically alter his relationship with his kids, it will dramatically alter his ability to earn a living for his family. That will probably never happen again.

Another data point, and your Honor mentioned it briefly, is the sentence that was imposed on Mr. Dafud Iza, who you saw testify during the trial. Going back to the loss amount -- and I understand you have already made your decision under the Guidelines, but you can consider these things for 3553.

The Government told you is they used the same exact

methodology, yet somehow Dafud ended up with a loss amount of 130 million, Mr. Lloyd ended up with a loss amount of 230 million. That is not a little five percent change. I think that goes to show you that the loss amount is somewhat hocus-pocus.

He also didn't get a role enhancement. His title was Executive Vice-President. He didn't get a vulnerable victim enhancement or a mass marketing enhancement. His guideline range that he started at prior to a reduction for cooperation was 70 to 87 months. Notwithstanding the fact that he got on the witness stand and reputed his own plea agreement, the Government gave him a 50 percent reduction, so now the number two person in the company is facing a sentence of 36 months and they are saying that Mr. Lloyd deserves 35 years.

What kind of sense does that make?

To be clear, I am not saying they are similarly situated, they are not. One pled guilty, the other went to trial. One cooperated with the Government and testified on their behalf. Mr. Lloyd didn't do that and we are all aware of that. Even if you were to adjust accordingly, take Mr. Dafud's starting guideline range of 78 to 87 months, without a sentence reduction, in fact add three points on to his score because Mr. Lloyd didn't get acceptance of responsibility, even then the bottom end of Dafud's Guidelines would have been 97 to 121 months.

Now, I'm sure under the circumstances your Honor could say Cory was a part owner of the company, he made more money, you could justify a higher sentence, but ten percent higher, 20 percent higher? Does it really need to be multiple, several multiples of what Mr. Dafud Iza has been sentenced to? I think it honestly strains credibility.

Also, I understand that one of the elephants in the room in this case is the money that these gentlemen earned and in every fraud case the Government is going to show exhibits with boats and cars. I want to put that all in perspective, though, which again comes back to the fact that this is a company that had a very long, multi-decade history before the Affordable Care Act even started, in fact before Cory worked there. It's a multi-generational family business. There were many parts of the business that the Government has not alleged were fraudulent at all.

I will bring you back to the fact that even the Government admits, only 13 percent of the revenue was derived from these Florida Care applications. In short, what I would say about the assets is he earned it. Unlike the typical fraud cases where everything was derived from fraud, this is a guy that was able to sell his company and a huge portion of the revenue was completely unrelated to the conduct.

Not surprisingly, I do want to end on the history and characteristics of the Defendant. I am not going to beat this

to death because you heard from people firsthand who have known Cory all his life, which I don't have the pleasure of saying.

I think at plenty of sentencing hearings, your Honor, I am reminded of the saying that there is no atheist in fox holes. When people are facing disaster they find religion and start doing community service. Sometimes it is not all that convincing. That is not the case here with Mr. Lloyd.

Mr. Lloyd is a very special person, a very unique personality. For years and years and decades he has been very actively involved in the ministry, involved in his church, involved in young adult church groups. He has done a ton of community service for his church and outside.

And what else stands out in this case is, in a lot of fraud cases you will hear people want to present mitigating evidence, how generous a person has been, but usually it is being generous with money. Mr. Lloyd has been generous with money, scholarships for kids who couldn't afford soccer, but what is much most important is he has been generous with his time.

You heard during the trial that he didn't sleep for days at a time, he worked around the clock, he would often spend nights in the office working around the clock. Somehow, some way he made all of this time for people that needed his help. He made time for people in his church. He made time for people that he barely knew.

For example, you might have read a letter from Charlie Harris, a person he brought him into the ministry when he suffered a catastrophic loss where he spent countless hours at his side trying to console him from grieving and loss.

You heard about how he basically dropped everything when his sister-in-law died and his nephew was left without a mother and was lost and seeking answers, and again Cory more than anything was there with his support and with his time, and I think it shows he has gone out of his way for so many people.

Also, in all of the letters you heard a lot about the soccer league, and serving as a commissioner and driving around transporting people for hours at a time, but this isn't about soccer.

Really what Mr. Lloyd was trying to do, and what is much more important, it wasn't for the sport. You actually got letters from a couple of pretty young kids, Miguel Ducum (phon) and Brian Escobar who told you this gave them a purpose. This gave them a sense they had access to the activities they wouldn't have afforded at their age. It gave them a chance to learn confidence, how to learn to be a good teammate. What he did for the community far exceeded baseball and soccer.

You heard that Mr. Lloyd -- there is a young woman whose mother found herself to be homeless and found herself in dire straits. Cory took her into his house and she lived with Cory for months on end, and he continues to serve as her

guardian to this day.

Likewise, you heard incidents where there were people either involved in the school or the soccer league that even had trouble with law enforcement or discipline, people that weren't even his own children, Cory Lloyd would go out of his way to help them, to counsel them, help them get what they needed.

And so, your Honor, I do think that has to count for something.

You heard weeks of testimony about Cory Lloyd and the alleged criminal conduct, but didn't have a chance to consider him as a person. Again, Mr. Lloyd is far, far more than a scoring system; he is far, far more than a sentencing guideline chart. He is a human being, and he's a great one at that, with many, many redeeming qualities.

I don't think you'd have 25 people in the back of the courtroom every day for a trial unless he has done a lot of good for a lot of people.

I want to end by putting this in perspective. It pains me to even say this, but the Government got up and asked you to impose a 35-year sentence that is totally out of line with multi-billion dollar fraud cases throughout the country.

If you were to sentence Mr. Lloyd to 35 years, his daughter who is now 15 years old would be 50, high school without her dad, college without her dad, probably will be

married and have kids at that time. They are telling you to put him in jail until his daughter is 50 years old. Is that sufficient, but not greater than necessary? I think not.

Even if you were to impose a ten-year sentence or a 15-year sentence, which is more in line with the Jason data, I think it is more in line with some of the cases I mentioned, that is more than sufficient deterrence, not only for the community generally, but also for Mr. Lloyd. Again, to put that in perspective, even a sentence of 15 years, he will come out of jail when his daughter is 30 years old.

So, all the moments between now and then that any father would like to experience with their daughter, they are all going to be lost. As Mr. Lloyd's father said, we all understand there have to be consequences in cases like this. We understand it is your job to impose a sentence, but there has to be some proportionality, and we need to account for who Mr. Lloyd is as a person.

I think the guideline range is dramatically overstated. I think a sentence of ten years could be justified based on the Jason data, and I think if you look at some of the cases, including Theranos, it should be well below 15 years.

Your Honor, we appreciate your time, and we trust you will impose a fair sentence in this case. And I remind you again that I think the forfeiture has been be waived, and if you decide it has not been waived, we would ask that it be

addressed on another date.

THE COURT: All right. Thank you.

MR. HOWARD: Thank you, your Honor.

Again, I had to scratch out the entire portion of my presentation with respect to similarly situated Defendants or cases that are comparable which the Court should take into consideration.

I don't mean to make light of the situation, but I was asked -- along Biscayne Boulevard there was this landfill and they are putting up beautiful condos and somebody invited me over. I said I could never get a condo here because of the smell. They said, no, just wait 15 minutes, and after 15 minutes, as you know, we are all nose blind and that goes away. That is both a blessing and a curse of the human condition.

When we are in a position so long we that are inside any particular operation or business, we who are inside the area on the balcony of the condo with the landfill, after 15 minutes it doesn't smell anymore.

I raise that because we inside the criminal justice system for years, and you have a few on me, but I have been around for at least 30, have started to throw around months as though they are days, and years as though they are months. And it has manifested in the manner in which the Guidelines play out and are computed.

I won't waste too much time in how it resulted in the

guidelines because the Government is asking for 35 years, but Mr. Strong's PSI calls for 105 years, and even though the guidelines are not presumptively correct, and even though this Court and the Government are -- seem to be distancing itself from the 105 years for Mr. Strong, it still resonates as a reference point to the extent that the Court could sit there and say, you know what, I am going to give you a break, I will give you a 70 percent reduction or departure from what is recommended, which sounds like a good deal, and it is still in excess of 30 years.

THE COURT: Of course, you remember how we got here. In the old days if somebody robbed a bank and got $100, they ended up with a big sentence, and the white collar people who used a pen ended up, and partly because they all -- also presented different circumstances, they often had done good work in the community and had people that would vouch for them, they ended up with these lesser sentences.

So, the guidelines were a reaction to that where essentially it was viewed that people who committed white collar frauds were getting a slap on the wrist as opposed to the people who had more difficult circumstances, who ended up facing these large sentences, and so that is the quandary that we are in in these cases.

MR. HOWARD: I understand and I agree. There are two things; they were also trying to create uniformity among

similarly situated Defendants, not just those who committed potentially violent offenses and white collar crimes. Just because we develop the guidelines in an attempt to correct it, doesn't mean we got it right, and we have a tendency to over correct.

I think the fact that for a nonviolent offense where we live in a world where there are things like rapists and sexual offenders, and serial rapists, and people who commit manslaughter and end people's lives, and are getting sentences ten, 15, 20 years, whatever the case may be, and that this case calls for 105, just starkly demonstrates that even though we are trying to get it right with the Guidelines we have not.

I know the Government is not asking for 105 years, but 35 is still absurd under the circumstances where there has been no violent offense that occurred.

In the typical fraud where the loss amount is taken into account, that loss amount is usually attributable to the amount that the person was attempting to obtain, notwithstanding the fact -- so there is intended loss and there is actual loss, but usually somebody is committing a crime to stuff their own pockets.

Here the loss amount is $233 million, which the Court has determined, and the amount that ended up going to Mr. Strong's company in commissions was more in the order of 6.5 million, and the amount that he retained after paying the

people who he hired was more like 3 million.

So, for somebody who engaged in a fraud that yielded him $3 million or thereabouts, the Government has devised this arbitrary, let's give him a year for every thousand applications. There is no rhyme or reason to that. That is an arbitrary and convenient abdication of the responsibility to determine individualized sentences which suit the needs of the particular circumstance.

And the Government tends to suggest that, oh, you know, this is really serious, so it needs to be 35 years as a deterrent, and Mr. Stumphauzer already addressed this, 35 years is not necessary for the deterrent effect that the Government seeks to obtain for a white collar offense. He said ten would be too much, five would be too much. I am in the white collar area, give me two days and I am in a panic, and for everybody else here, too.

This notion that, hey, it's 35,000 people, so let's tack on a thousand -- or a year for every thousand applicants does not -- it does not -- there is no rhyme or reason, and it doesn't tailor to any notion of justice.

Because we understand that the Guidelines have now put as a reference point over a hundred years (sic), I think the Court needs to be more mindful of the fact that we are a little nose blind here. The Government thinks that we are doing a solid, we are only asking for 35 years, we could have asked for

135, or 105. That 105 figure is so absurd and outlandish that I don't think that it should cause the Court to be numb to the fact that 35 years is also absurd and outlandish under the circumstances, especially when you consider -- forget the Bankman-Frieds of the world, and a billion dollars versus a hundred million dollars is a substantial difference, versus five or six or eight billion, a big difference. But also the similarly situated nature of Dafud Iza.

Now, he is not the same guy, they didn't all play the same role, but they are involved in equal measure in the same fraud, and the notion -- first of all, I think the fact that there was a body of law related to sentencing manipulation where in a drug case you see somebody selling a dime bag at a time and you sit around and wait until they get to a kilo before you arrest them, thereby abrogating your responsibility to avert a crime, that is not this.

But the mere notion that he would have a difference of 32 years in his proposed sentence because they stopped the clock by arresting him earlier and therefore did not have that information for what they now deem to be a correct dollar amount, does not negate the fact that, given that matrix, similarly situated Defendants involved in the same fraud with the same measure to some degree of culpability, and I understand there may be some disparities, can result in a difference of 32 years in your sentence because of when the

Government decides to arrest you and the fact that you have accepted responsibility and cooperated.

That is deserving of credit, not the difference of 90 percent of what people involved in the same activity receive.

So, I think the Court is supposed to try and avoid unjustified disparities and absurdities and the notion that Mr. Iza would get 37 months and they are asking for 35 years for Mr. Strong is an absurdity in and of itself and would result in an unwarranted disparity that is an injustice.

The other issue that we raised in our papers and I would like to address briefly is the notion of the imperfect advice of counsel defense.

I want to make clear that I am representing Mr. Strong and Mr. Strong intends to appeal his conviction, as I am sure the Court expects. I don't want -- he has already been denied the three levels of acceptance of responsibility credit, so I don't want my argument to be deemed as some sort of lack of acceptance of responsibility. That is already baked in.

But the notion that someone would be in the proximity of a lawyer who is sanctioning the activity in which they are engaging, he wouldn't have an advice of counsel defense because there is no attorney/client relationship between them, that is understandable, but just sitting next to a Federal Judge at lunch and hear him opine on the legality of something, and you

proceed with that understanding.

The Court should know it wasn't brazenness that made this entire fraud be evident in text messages and emails and the like. It was more indicative of the measure to which Mr. Strong thought his conduct may have conformed with the advice that he understood to persist at the time.

And this is not to say that his conduct wasn't wrong, but when people are about to do something which they know to be absolutely outrageous, they don't put it down in a text, and when they get subpoenaed, they don't, unlike the case that Mr. Dafud mentioned, or Mr. Patel changing evidence, changing documents, telling people to lie, he turned over, what is it, 17,000 applications upon subpoena request.

And it goes to somewhat, I think, the measure to which he believed he was exposed by the conduct in which he was engaging. He was wrong, and I am not saying there aren't places where he committed a crime according to the jury's verdict and over a trial that the Court presided over, but I do want the Court to take into consideration there was a lawyer out there who gave his blessing to the procedure that was taking place, even if it doesn't --

THE COURT: That defense requires you to tell the lawyer full disclosure of what is going on and then relying on his advice. Your client and Mr. Lloyd chose not to pursue any kind of attorney/client or advice of counsel defense.

MR. HOWARD: That is why it is an imperfect defense, and that why we are standing here convicted. I am not saying he is not guilty. For purposes of this sentencing argument, what I am saying there is an imperfect middle ground there where this evidence or this advice reached his ears. It wasn't formalized in a way that would present him with that defense. I don't want the Court to mistake me to be arguing that it should have been. There is a factor that goes to the extent of his criminal complicity and his state of mind throughout this process.

Your Honor, the family, I think, spoke directly to the family circumstances and the character of Mr. Strong. And nobody likes to be defined by the worst episode of their life, and this Court has sat there and had to sentence a lot of first time offenders, and so it is not an anomaly that, one, a person's family would be supportive, nor is it that sometimes you are dealing with first time offenders, and we recognize that.

But Mr. Strong, the fact that he has an ex-wife, ex-wife and stepchildren or stepchild who came to speak on his behalf is indicative of the person that he is.

The fact that his own children and the fact that his siblings speak to the manner in which he has mentored them throughout life speaks to the person that he is, and I am asking the Court not to end the effective useful years of his

life by trashing him with a 35-year sentence. That would essentially be putting his life in a box behind a cage for the rest of the time when his young kids, and he has young kids as well, would be maturing, developing, and needing his counsel and his guidance.

I am asking your Honor not to impose a sentence that pretty much eliminates his life for the crime that is at issue in this case, especially in light of the billion dollar frauds whose Defendants have received far less sentences than is being asked for today.

THE COURT: All right. Thank you.

Let me ask the Government a question. I was surprised by this forfeiture issue. It was not, I don't think, raised or briefed in any of the papers I saw.

Do you object to Mr. Stumphauzer's request that we allow some briefing or consideration on that?

MR. GROVE: No, your Honor, we can file a motion and Defense can respond.

MR. HOWARD: We adopt that position.

THE COURT: Mr. Stumphauzer, you are not going to order some sort of waiver of forfeiture by waiting for them to file a motion and waiting for them to respond?

MR. HOWARD: For Mr. Strong's part, not if it has not already occurred.

MR. STUMPHAUZER: Your Honor, to be clear, I think

there is an argument that they have waived it already here today, however, I will not argue to the extent you want to give them more time.

THE COURT: You asked for more time. Rather than me wanting to give it to them, you suggested that we have some briefing.

You agree that from this point forward you are not going to argue any waiver. If they have already lost the ability, sobeit, but from this point forward to allow this briefing you are not going to argue any waiver; is that right?

MR. STUMPHAUZER: Your Honor, may I consult with cocounsel?

MR. GROVE: Your Honor, we are prepared to argue that we haven't waived it, and I can cite to rules.

MR. STUMPHAUZER: Yes, your Honor, I did ask for an extension. I would not argue that any time between today and whenever you set it --

THE COURT: All right. The Government will file a motion and you will have a chance to respond and then we'll rule on the forfeiture issue. I had not prepared on that issue.

All right. Mr. Lloyd, would you like to speak, sir? You are not required to, but I want to make sure you know you have the opportunity.

THE DEFENDANT: I think I have been spoken for on my

behalf.

THE COURT: Mr. Strong?

THE DEFENDANT: No.

THE COURT: You choose not to?

THE DEFENDANT: Yes, sir.

THE COURT: All right. I thank you all for your excellent presentations.

I have considered -- first, I adopt the findings of the Pre-Sentence Report with respect to the Guidelines and deny the objections for the reasons stated.

With that, the offense level became 43, the criminal history category I, the advisory guideline is 1,020 months. That is driven, as many of the lawyers mentioned, by the loss amount, and it would result in a sentence that is far greater than necessary to meet the 3553 factors.

It is the finding of the Court that the Defendants are not able to pay a fine in addition to restitution.

Considering the 3553 factors, really the thing that outweighs everything else in this case is the nature and circumstances of the crime and the type of crime. I consider it very serious, egregious, and in many parts cynical. It is hard to get past the emails back and forth about raping homeless shelters and clustering around the fire barrel. There was a cynicism about it that was disturbing.

It did create a substantial loss to the Government,

over 180 million dollars, and harm to patients and consumers. Many of the patients were in desperate circumstances and faced the loss of medical care, as we heard from the doctors who testified in the trial, and it is an injury to a very vital Government program, and it was a program designed to help people. And there is a need for deterrence.

If I thought that a 35-year sentence would provide that deterrence and stop fraud against the Obama Care program, I would impose it, but I don't think it would conserve deterrence to the greater extent than a lesser sentence, and that would be the 35-year sentence requested by the Government is greater than necessary to serve the ends of the justice system.

I have, however, looked at other sentences imposed in this district and elsewhere. The Government cites United States versus Patel, which was a 27-year sentence, United States versus Moran, there were two defendants there, one 360 and the other 300 months. Of course I looked and Mr. Iza's sentence, which was substantially less.

He is not situated similarly both in terms of his plea and cooperation, but also in terms of his role. He didn't organize this conspiracy and didn't gain the fruits of it the way these Defendants did.

One of the things Ms. de Boer said, which I think is true, is that the tragedy of this case is it does reflect two

aspects of the Defendants. The Defendants on the one hand made the deliberate choice committing this crime and continued to do it for a period of time and were motivated, I guess, by greed.

On the other hand, there is clearly another side to them as has been displayed by their family and friends and the service they committed to the community, and they clearly have many admirable traits and they aren't defined by this episode in their lives and hopefully will be able to have enjoyment in their lives with their families.

That is another reason I don't think a 35-year sentence is necessary, but a significant sentence is.

It is therefore the judgment of the Court that the Defendant, Cory Lloyd, is committed to the Bureau of Prisons for 240 months. This term consists of 240 months as to each of Counts 1 through 4 to be served concurrently with each other, and a 60-month term imposed as to Count 5 to be served concurrently.

With respect to Mr. Strong, it is also the judgment of the Court that he be committed to the Bureau of Prisons for 240 months. This term consists of 240 months as to each of Counts 1 through 4, 60 months as to Count 5, and 120 months as to Count 8, all to be served concurrently.

It is further ordered that the Defendants pay restitution in the amount of 180,000 -- $180,600,000 to be paid joint and severally with each other and co-conspirator Dafud

Iza in Docket number 24-CR-80154-SMITH.

During the period of incarceration if the Defendants earn wages in a Federal Prisons Industries job they must pay 50 percent of wages earned. If they don't work in such a job they must pay $25 per quarter towards financial obligations.

Upon release from incarceration, the Defendants shall pay restitution at the rate of ten percent of monthly gross earnings until such time as that schedule may be altered in the interest of justice. The Bureau of Prisons, Probation Office, and U.S. Attorney's Office shall monitor payment of restitution and report any material change in ability to pay.

These payments don't preclude the Government from using any unexpected or unanticipated financial gains, assets, or income of the Defendants to satisfy restitution, which shall be payable to the Clerk, United States Court, and forwarded to the victim.

Jeannie tells me I didn't mention Count 9 with respect to Mr. Strong. It is also concurrent, but what is the amount of that?

THE PROBATION OFFICER: 120 months, your Honor.

THE COURT: It is 8 and 9, 120 months to be served concurrently.

It is further ordered that restitution -- supervised release is warranted with respect to both Defendants based on the following factors: The nature and circumstances of the

offense, and the need for the sentence imposed to afford adequate deterrence to criminal conduct.

Upon release from imprisonment, the Defendants shall be placed on supervised release for three years. This term consists of three years, with respect to Mr. Lloyd, as to each of Counts 1 through 5, all to run concurrently; with respect to Mr. Strong, Counts 1 through 5, 8 and 9, all such terms to run concurrently.

Within 72 hours of release, the Defendants shall report in person to the Probation Office in the district in which released. While on supervised release the Defendants shall comply with the mandatory and standard conditions of supervision as referenced in Part F of the Pre-Sentence Report.

The Defendants shall also comply with the following special conditions: Substance abuse treatment, financial disclosure requirement, no new debt restriction, related concern restriction, permissible search, and unpaid restitution or special assessments.

It is further ordered Defendant Strong pay a special assessment of $100 as to each of Counts 1 through 5, 8 and 9, a total of $700. Mr. Lloyd's special assessment is $100 as to each of Counts 1 through 5, a total of $500.

So, the total sentence for each Defendant is 240 months imprisonment, $180,600,000 in restitution, three years supervised release, and in the case of Mr. Strong a $700

special assessment, Mr. Lloyd's is 500.

With respect to forfeiture and the issue of forfeiture money judgments, the Government has agreed will file a motion -- when can you file it?

MR. GROVE: Your Honor, can you give me 48 hours?

THE COURT: Certainly. I can give you more than that. I was asking about days.

MR. GROVE: I can file it in two days.

THE COURT: How much time do you want to respond?

MR. STUMPHAUZER: Could we have a week, your Honor?

THE COURT: All right. Will a week work for you all?

MR. HOWARD: A week will work, yes.

THE COURT: All right. Then I will issue a ruling on the forfeiture money judgment. I am sorry I wasn't prepared to deal with that today.

Now that the sentence has been imposed, does counsel or the Defendants object to the Court's findings of fact or the manner in which sentence was pronounced?

MR. STUMPHAUZER: No your Honor. I do have a couple of issues I want to raise with you.

THE COURT: Give me just a second.

MR. HOWARD: None other than those preserved by our objections and argument.

THE COURT: Let me let both Defendants know you have a right to appeal the conviction and sentence imposed. Any

Notice of Appeal must be filed within 14 days. Failure to file a notice within that period will constitute a waiver of your right to appeal.

Also, the Probation Office has possession of the passports and with respect to Mr. Strong, it was requested that it be returned to you, Mr. Howard.

MR. HOWARD: Yes, your Honor, that is fine.

THE COURT: And Mr. Lloyd's to his wife.

MR. STUMPHAUZER: That is correct, your Honor.

THE COURT: Let's take Mr. Stumphauzer first, you had some other matters you wanted to raise?

MR. STUMPHAUZER: Yes, your Honor. One, based on the information included in the PSI, there is ample information in there to support and we would ask for a recommendation that Mr. Lloyd be allowed to participate in the RDAP program. Likewise we would ask for a recommendation that Mr. Lloyd be designated to FCI Jessup, the low security facility.

THE COURT: I stay away from the security level, but I will recommend a geographic area. Where do you want me to recommend?

MR. STUMPHAUZER: Your Honor, could you recommend a facility in Florida or Georgia?

THE COURT: All right, I will and the RDAP program for Mr. Lloyd.

MR. STUMPHAUZER: One other clarification, did you

intend to put off just the forfeiture portion or forfeiture and restitution?

THE COURT: No, restitution I ordered and the terms of the method of payment.

MR. STUMPHAUZER: I wanted to clarify your ruling.

THE COURT: I only intended to put forfeiture off.

MR. BERGENDAHL: Judge, despite Mr. Howard indicating to the Court that our objections in our written papers might be sufficient, in an abundance of caution, I want to state on the record that we do object to the Court's findings of fact and conclusions of law concerning the enhancement that is based upon a finding of a 233 million-dollar intended loss, a four-level combined enhancement based upon vulnerable victims, the number of vulnerable victims, a two-level enhancement based upon mass marketing, the two-level enhancement based upon sophisticated means, and the a four-level enhancement based on role in the offense.

It is our position those findings of fact lead to procedural error in the sentence imposed, and we also object that the Court's ultimate sentence was substantively unreasonable. I just wanted to make sure those objections were preserved.

Concerning the restitution, your Honor, we are in a somewhat unique position. I know the Court ordered 180 million dollars restitution today jointly and severally payable by Mr.

Strong, Mr. Lloyd and Mr. Iza. The problem we have is that there is another player involved in this, and played an instrumental role in what happened in this case, and in large part was the recipient of every nickel that the Government paid out.

Of the $180 million actual loss figure that is the basis for the restitution, Florida Blue received 165.3 million net. They got 180 and they paid 14 million in gross commissions, so they are holding $165.3 million of the money that was paid by the Government.

Procedurally, I don't know how the Court wants to address it, but it strikes me that if they are the beneficiary and are holding what a jury has determined to be criminally derived proceeds, that they too at some level need to be involved in the restitution proceedings in order to make the restitution order fair, equitable, and just under the circumstances.

THE COURT: Of course, they are not a criminal defendant in the case and haven't been prosecuted, so I don't think restitution is due from them. There may be other avenues that the Government could explore civilly perhaps. I don't see how that has any impact on the restitution order.

MR. BERGENDAHL: Your Honor, it does to a certain extent because restitution is often classically calculated on the amount that ended up being paid to a defendant as a result

of the fraud, and that wasn't the case here. I think it is an issue that we do need to address in a little more detail down the road on the day that the Court sets for hearing of the forfeiture motion that the Government is going to go ahead and file.

THE COURT: If you think there is some authority, in the memo that you file in response to their forfeiture motion, you can bring it up. I don't see how I have any authority to order restitution.

MR. BERGENDAHL: I didn't want my silence to constitute a waiver to the --

THE COURT: Do you want me to make any recommendations with respect to Mr. Strong?

MR. HOWARD: Yes, your Honor, as close to his residence as possible in Texas. There are facilities in Bastrop, Austin, and Dallas/Fort Worth, and I would like to ask the Court to recommend the RDAP program.

THE COURT: I will recommend the RDAP program. I don't know where that is in Texas, central, west. Tell me more so i can --

MR. HOWARD: Dallas.

MR. BERGENDAHL: Dallas/Fort Worth area.

THE COURT: All right. As close to Dallas as possible. Good luck to both of you.

MR. STUMPHAUZER: Your Honor, I think we preserved all

**of our objections. I just want to adopt the objections that Mr. Bergendahl just put on the record if that's okay.**

**THE COURT: All right. Good. Thank you all for your excellent presentations.**

**(Thereupon, the hearing was concluded.)**

* * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.

Date: March 1, 2026

/s/ Pauline A. Stipes, Official Federal Reporter

Signature of Court Reporter

**MR. BERGENDAHL: [5]** 3/18 100/6 101/22 102/9 102/21
**MR. CLOUSER: [1]** 3/6
**MR. GROVE: [7]** 3/8 65/12 65/14 91/16 92/12 98/4 98/7
**MR. HOWARD: [32]** 3/16 4/9 4/13 5/16 6/19 19/25 32/21 33/3 33/17 34/1 34/6 34/13 34/22 39/21 40/4 40/18 46/8 46/15 46/18 46/20 52/12 60/3 83/2 84/23 89/25 91/18 91/22 98/11 98/21 99/6 102/13 102/20
**MR. STUMPHAUZER: [38]** 3/10 4/2 5/10 6/4 10/13 10/17 13/13 13/18 13/21 15/18 25/7 25/19 26/12 28/20 28/24 30/8 30/14 30/21 44/17 45/1 45/6 45/10 45/12 67/1 70/24 71/1 71/5 91/24 92/10 92/14 98/9 98/18 99/8 99/11 99/20 99/24 100/4 102/24
**MS. de BOER: [16]** 3/4 5/7 7/8 8/5 8/12 8/25 9/21 10/1 20/13 31/17 37/15 41/12 42/10 42/18 46/3 60/5
**THE COURT: [96]** 2/10 3/14 3/19 4/4 4/12 5/1 5/9 5/15 5/19 6/21 8/1 8/9 8/16 9/20 9/24 10/12 10/15 13/11 13/15 13/19 15/16 19/24 20/10 24/12 25/14 26/9 28/2 28/22 30/6 30/10 30/16 31/12 32/19 32/22 33/14 33/21 34/3 34/7 34/18 37/9 39/3 39/25 40/17 41/10 42/8 42/12 43/11 44/21 45/4 45/7 45/15 46/7 46/10 46/17 46/19 46/21 50/1 50/23 50/25 52/14 54/3 60/4 65/13 66/24 70/23 70/25 71/3 83/1 84/10 89/21 91/10 91/19 92/3 92/17 93/1 93/3 93/5 96/20 98/5 98/8 98/10 98/12 98/20 98/23 99/7 99/9 99/17 99/22 100/2 100/5 101/17 102/5 102/11 102/17 102/22 103/2
**THE COURTROOM DEPUTY: [1]** 45/8
**THE DEFENDANT: [3]** 92/24 93/2 93/4
**THE PROBATION OFFICER: [1]** 96/19
**THE WITNESS: [6]** 46/22 50/2 50/24 51/1 52/15 54/4

**$**

**$100 [3]** 84/12 97/20 97/21
**$165.3 [1]** 101/9
**$165.3 million [1]** 101/9
**$180 [3]** 8/5 64/25 101/6
**$180 million [2]** 8/5 101/6
**$180,600,000 [2]** 95/24 97/24
**$180.6 [1]** 65/8
**$180.6 million [1]** 65/8
**$187 [2]** 63/4 63/7
**$187 million [2]** 63/4 63/7
**$2,706,372.74 [1]** 66/6
**$233 [2]** 64/24 85/22
**$233 million [2]** 64/24 85/22
**$25 [1]** 96/5
**$3 [1]** 86/3
**$3 million [1]** 86/3
**$463 [1]** 71/14
**$463 million [1]** 71/14
**$5.9 [1]** 70/5
**$5.9 billion [1]** 70/5
**$500 [1]** 97/22
**$6,516,457.15 [2]** 66/14 66/24
**$7,085,345.22 [1]** 66/12
**$700 [2]** 97/21 97/25
**$8 [1]** 69/20
**$8 billion [1]** 69/20
**$82 [1]** 19/24
**$82 million [1]** 19/24

**/**

**/s [1]** 103/11

**0**

**0867 [1]** 1/17

**1**

**1,000 [1]** 65/5
**1,020 [2]** 44/12 93/12
**10 [2]** 33/7 66/21
**105 [6]** 84/2 84/5 85/11 85/13 87/1 87/1
**1100 [2]** 2/2 2/6
**12 [4]** 6/7 6/11 47/20 70/15
**120 [3]** 95/21 96/20 96/21
**121 [1]** 77/24
**13 percent [2]** 75/6 78/18
**130 million [1]** 77/2
**135 [1]** 87/1
**138 [1]** 72/23
**14 [1]** 99/1
**14 million [1]** 101/8
**1400 [2]** 1/15 1/24
**15 [10]** 5/15 55/22 70/1 81/24 82/9 82/21 83/12 83/12 83/17 85/10
**15-year [1]** 82/5
**150 [1]** 73/2
**158 [1]** 72/22
**1600 [1]** 1/23
**165.3 million [1]** 101/7
**17,000 [1]** 89/13
**17th [1]** 57/5
**18 [2]** 1/8 65/24
**180 [11]** 10/1 12/12 12/25 13/12 13/17 15/10 16/2 60/23 94/1 100/24 101/8
**180 million [6]** 9/12 13/6 15/1 15/17 15/20 19/18
**180,000 [1]** 95/24
**180,600,000 [1]** 24/21
**181 million [1]** 73/25
**19 [2]** 48/15 48/17

**2**

**20 [4]** 12/14 70/1 70/22 85/10
**20 percent [2]** 11/3 78/4
**2003 [1]** 74/18
**2013-2014 [1]** 74/20
**2014 [1]** 74/20
**2016 [1]** 66/21
**2018 [3]** 37/23 52/5 66/23
**2019 [1]** 38/1
**202-256-0867 [1]** 1/17
**2022 [3]** 52/5 66/21 66/23
**2023 [1]** 63/4
**2024 [2]** 7/13 54/12
**2025 [1]** 7/16
**2026 [2]** 1/8 103/10
**20530 [1]** 1/16
**21 [1]** 8/7
**2168 [1]** 2/7
**230 [2]** 10/1 13/1
**230 million [3]** 8/4 12/11 77/3
**233 million [6]** 9/5 11/8 13/5 24/9 24/18 24/25
**233 million-dollar [1]** 100/12
**233.2 [1]** 8/14
**24 [2]** 14/14 69/12
**24-CR-80154-SMITH [1]** 96/1
**240 [5]** 95/14 95/14 95/19 95/20 97/23
**25 [3]** 2/2 2/6 81/16
**25 percent [2]** 11/4 12/14
**25-80015 [1]** 3/4
**25-CR-80015-MIDDLEBROOKS [1]** 1/3
**26 [1]** 52/17
**27 [1]** 63/13
**27,000 [1]** 63/10
**27-year [1]** 94/16
**2B1.1 [3]** 33/7 72/15 72/16
**2nd [2]** 2/2 2/6

**3**

**3 million [1]** 86/1
**30 [5]** 15/25 71/25 82/10 83/21 84/10
**300 [1]** 94/18
**305-536-2168 [1]** 2/7
**305-614-1400 [1]** 1/24
**31 [1]** 72/20
**32 [2]** 87/18 87/25
**32,000 [1]** 17/18
**324 [1]** 44/8
**33131 [3]** 1/24 2/3 2/7
**33132 [1]** 1/19
**3434 [1]** 2/10
**35 [14]** 60/7 65/4 69/13 71/8 76/14 77/14 81/23 84/1 85/14 86/10 86/11 86/25 87/3 88/8
**35,000 [5]** 15/13 18/5 22/15 65/1 86/17
**35-year [5]** 81/21 91/1 94/7 94/11 95/10
**3553 [8]** 18/7 45/15 65/4 68/11 75/16 76/24 93/15 93/18
**36 [1]** 77/13
**360 [1]** 94/17
**37 [1]** 88/8
**38 [1]** 57/4
**386 [1]** 38/4

**3**

**3B1.1 [3]** 40/19 41/7 43/4

**4**

**405 [1]** 44/9
**41 [2]** 44/8 66/8
**42 [1]** 66/15
**43 [6]** 44/11 72/14 72/17 72/19 73/1 93/11
**45 percent [1]** 14/18
**452 million [1]** 70/9
**463 million [1]** 72/6
**47 [2]** 68/16 75/22
**48 [1]** 98/5
**4th [1]** 1/19

**5**

**5.9 billion [1]** 72/6
**50 [2]** 81/24 82/2
**50 percent [3]** 19/7 77/12 96/4
**50's [1]** 71/2
**500 [1]** 98/1
**51 percent [1]** 14/14
**55 [1]** 19/14
**55 percent [3]** 14/20 15/3 15/11
**561-803-3434 [1]** 2/10

**6**

**6 million [1]** 66/13
**6.5 million [1]** 85/25
**60 [3]** 11/16 16/3 95/21
**60 percent [1]** 18/18
**60-month [1]** 95/16
**6056 [1]** 2/3

**7**

**7 billion [1]** 72/6
**70 [1]** 77/10
**70 percent [1]** 84/8
**72 [1]** 97/9
**78 [1]** 77/21
**786-360-6056 [1]** 2/3
**79 [1]** 33/6

**8**

**80 [1]** 11/3
**80015 [1]** 3/4
**82 million [5]** 13/24 15/11 19/17 20/12 24/14
**85 [2]** 70/24 71/1
**85-year [1]** 68/21
**87 [2]** 77/10 77/21
**87 percent [1]** 14/16
**8th [1]** 1/16

**9**

**90 [2]** 15/25 16/3
**90 percent [1]** 88/4
**97 [1]** 77/24
**981 [1]** 65/24
**99 [1]** 1/19

**A**

**a thousand [1]** 68/22
**abdication [1]** 86/6
**abiding [1]** 52/21
**ability [5]** 28/14 49/2 76/17 92/9 96/11
**able [14]** 7/24 12/16 14/23 14/24 19/13 29/20 48/19 49/3 53/24 57/2 57/6 78/22 93/17 95/8
**about [47]** 5/12 6/8 9/4 12/21 16/13 17/4 23/18 25/13 26/6 26/11 26/14 27/1 27/19 34/10 35/8 35/21 38/4 39/15 40/14 44/16 48/18 50/19 51/24 52/8 54/7 54/18 61/8 62/15 68/10 68/14 71/1 71/9 72/10 73/5 73/7 73/25 75/17 76/13 78/20 80/5 80/10 80/12 81/10 89/8 93/22 93/24 98/7 101/6
**above [2]** 8/11 103/8
**abrogating [1]** 87/15
**absence [8]** 20/21 53/20 56/7 56/11 56/16 57/9 57/18 59/3
**absent [1]** 48/7
**absolutely [4]** 13/1 27/11 76/10 89/9
**absurd [3]** 85/14 87/1 87/3
**absurdities [1]** 88/7
**absurdity [1]** 88/9
**abundance [1]** 100/9
**abuse [1]** 97/15
**ACA [4]** 16/17 18/23 64/6 74/19
**accept [1]** 26/2
**acceptance [3]** 77/23 88/17 88/19
**accepted [1]** 88/2
**access [6]** 21/6 54/16 60/25 63/19 64/6 80/18
**accidents [1]** 52/19
**accomplish [1]** 42/1
**according [4]** 10/2 12/6 14/13 89/17
**accordingly [1]** 77/20
**account [6]** 19/6 71/22 74/10 75/8 82/16 85/17
**accountability [1]** 55/12
**accounted [1]** 74/24
**accounts [2]** 69/24 73/17
**accurate [2]** 8/25 16/8
**accurately [1]** 53/18
**achieve [1]** 40/11
**achieved [3]** 35/9 35/15 35/17
**across [1]** 16/15
**act [6]** 27/7 58/17 60/12 61/17 76/13 78/13
**Acted [1]** 61/2
**action [1]** 64/14
**actively [3]** 53/11 56/18 79/10
**activities [3]** 43/21 53/11 80/18
**activity [11]** 41/12 41/16 41/18 41/21 42/2 42/7 42/7 42/14 42/16 88/4 88/21
**actual [19]** 8/4 8/16 8/22 8/22 9/6 12/25 16/11 29/6 32/6 33/21 34/3 34/14 34/20 43/1 60/22 64/25 69/10 85/20
**actually [12]** 9/2 9/13 11/20 15/20 24/21 35/7 36/17 45/22 71/11 72/19 72/20 80/15
**add [2]** 32/20 77/22
**addicted [1]** 27/12
**addiction [2]** 26/20 28/8
**addition [10]** 5/4 21/17 22/3 32/8 38/12 62/1 65/7 65/15 69/23 93/17
**additional [2]** 4/16 7/24
**address [7]** 4/11 22/4 23/15 54/15 88/12 101/12 102/2
**addressed [2]** 83/1 86/11
**adequate [3]** 19/6 27/12 97/2
**adjust [1]** 77/20
**adjustment [1]** 37/15
**adjustor [1]** 52/18
**admirable [1]** 95/7
**admit [1]** 72/11
**admits [1]** 78/18
**adopt [4]** 24/22 91/19 93/8 103/1
**adult [1]** 79/11
**adulthood [1]** 51/19
**advance [3]** 11/9 33/12 73/20
**advanced [2]** 13/4 25/14
**advice [6]** 88/13 88/22 89/5 89/24 89/25 90/5
**advisory [2]** 44/11 93/12
**advocates [1]** 54/9
**affect [3]** 8/13 24/23 50/21
**affected [2]** 61/5 65/6
**affecting [1]** 64/25
**affects [1]** 8/10
**afford [2]** 79/17 97/1
**Affordable [5]** 27/7 60/12 61/16 76/13 78/13
**afforded [1]** 80/19
**after [13]** 10/8 11/2 11/16 26/15 44/21 51/6 51/15 56/12 68/4 68/6 83/12 83/17 85/25
**afternoon [15]** 3/1 3/5 3/7 3/11 3/16 3/17 3/19 3/20 46/22 46/23 50/2 51/1 52/15 52/16 65/15
**afterwards [1]** 27/7
**again [22]** 12/1 13/7 15/20 18/21 19/4 26/15 29/13 51/7 59/4 59/11 59/15 59/16 75/2 75/8 75/18 76/18 78/11 80/7 81/12 82/8 82/24 83/4
**against [8]** 7/14 11/23 14/4 14/22 14/22 33/8 68/21 94/8
**age [2]** 75/20 80/19
**agent [1]** 36/23
**agents [2]** 36/19 36/22
**aggravating [1]** 72/12
**agree [10]** 26/2 26/18 28/5 29/21 30/4 31/18 61/9 64/1 84/24 92/7
**agreed [3]** 27/25 29/19 98/3
**agreement [4]** 7/8 7/13 7/17 77/11
**ahead [6]** 39/21 40/18 45/8 65/14 71/5 102/4
**aid [1]** 36/22
**alert [3]** 4/24 4/25 58/20

## A

**all [93]** 5/16 5/20 9/9 9/11 9/17 11/24 12/9 13/22 17/18 18/5 19/16 19/20 19/25 20/11 24/23 25/9 26/6 29/21 29/23 30/22 31/12 32/21 35/10 39/4 41/11 42/10 43/1 43/5 43/12 43/14 43/25 43/25 46/15 46/18 46/20 47/12 48/22 49/9 50/16 51/22 51/25 56/15 57/17 58/9 59/11 60/5 62/16 65/14 66/25 69/24 71/4 71/13 71/17 72/10 73/13 73/16 73/19 74/22 75/4 75/16 75/24 76/15 77/19 78/10 78/16 79/2 79/6 79/23 80/10 82/11 82/13 82/13 83/2 83/13 84/14 87/9 87/11 91/11 92/18 92/22 93/6 93/6 95/22 97/6 97/7 98/11 98/11 98/13 99/23 102/23 102/25 103/3 103/3
**allegations [1]** 65/23
**allege [1]** 9/7
**alleged [4]** 29/16 67/13 78/15 81/11
**allegedly [1]** 14/18
**Allen [2]** 70/4 73/11
**allocated [2]** 9/14 24/3
**allow [6]** 17/18 47/1 54/1 59/23 91/16 92/9
**allowed [2]** 39/17 99/15
**allowing [3]** 54/6 55/6 59/7
**alluded [1]** 63/25
**alludes [1]** 40/7
**almost [2]** 19/7 70/9
**along [3]** 3/18 37/20 83/9
**alongside [2]** 54/13 61/19
**already [14]** 15/25 16/4 18/14 25/17 39/22 59/12 65/16 76/22 86/11 88/16 88/19 91/24 92/1 92/8
**also [43]** 3/13 16/12 18/7 18/16 18/17 19/2 22/13 25/2 28/9 40/9 43/20 44/2 45/5 48/6 49/5 57/15 64/3 65/17 67/12 67/15 67/20 69/16 70/7 70/13 70/19 71/9 71/19 73/5 75/14 77/6 78/7 80/10 82/8 84/14 84/25 87/3 87/7 94/21 95/18 96/18 97/14 99/4 100/19
**alter [3]** 76/15 76/16 76/17
**altered [1]** 96/8
**altering [1]** 76/10
**although [7]** 5/21 7/1 7/2 13/10 24/20 45/23 54/19
**always [10]** 47/14 47/22 48/2 50/13 51/18 52/4 55/22 57/20 58/11 69/5
**am [58]** 6/22 8/17 13/16 23/15 24/18 24/24 28/16 28/21 34/2 36/16 40/18 42/11 42/21 44/18 45/19 46/23 46/24 47/7 48/16 48/25 49/21 50/3 51/3 51/4 51/18 51/23 51/25 52/1 52/2 52/2 52/8 52/10 52/17 52/18 52/19 53/1 53/24 54/8 57/17 60/2 68/5 68/15 68/20 72/9 77/16 78/25 79/4 84/7 86/14 86/15 88/14 88/15 89/16 90/2 90/4 90/24 91/6 98/14
**amazing [1]** 50/13
**AMERICA [1]** 1/4
**among [2]** 60/11 84/25
**amount [53]** 5/2 6/25 7/2 7/4 7/6 7/8 7/10 7/11 7/15 8/3 10/22 11/6 12/5 12/25 13/17 13/21 13/24 18/21 20/4 20/4 20/8 20/25 20/25 21/1 24/9 24/9 61/23 62/8 63/5 65/8 68/24 69/17 69/21 70/9 71/7 71/14 72/6 73/3 76/22 77/1 77/2 77/4 85/16 85/17 85/18 85/22 85/23 85/25 87/21 93/14 95/24 96/18 101/25
**amounts [1]** 7/3
**ample [3]** 11/11 15/15 99/13
**analyses [1]** 8/9
**Analysis [1]** 8/8
**ancillary [1]** 4/11
**and then [1]** 10/9
**annual [1]** 29/23
**anomaly [1]** 90/15
**another [15]** 16/9 17/6 22/3 27/2 49/14 59/6 68/3 68/9 74/10 76/1 76/19 83/1 95/4 95/10 101/2
**answer [3]** 12/24 31/9 33/20
**answers [1]** 80/7
**any [58]** 4/20 4/21 6/4 6/11 12/16 15/7 16/15 18/19 19/22 21/1 21/25 23/15 23/25 24/13 29/23 31/5 32/8 32/16 33/13 35/16 36/4 36/10 37/3 41/1 41/5 42/5 42/15 42/20 43/1 43/22 45/14 48/16 49/13 50/14 54/20 59/23 67/19 68/6 70/18 72/6 73/3 75/10 75/12 76/4 82/11 83/16 86/20 89/24 91/14 92/8 92/10 92/16 96/11 96/13 98/25 101/22 102/8 102/12
**anybody [2]** 44/22 49/13
**anybody's [1]** 74/19
**anyhow [2]** 17/3 47/10
**anymore [1]** 83/18
**anyone [3]** 45/3 72/3 76/7
**anything [8]** 5/6 28/20 29/25 43/10 54/21 68/17 69/3 80/8
**anyway [2]** 48/20 64/3
**anywhere [2]** 15/15 70/18
**apart [2]** 47/12 65/20
**app [1]** 58/18
**appeal [8]** 6/17 6/18 32/19 59/23 88/15 98/25 99/1 99/3
**Appeals [1]** 32/19
**appearances [2]** 1/12 3/4
**appears [1]** 33/5
**applicable [2]** 65/22 65/24
**applicants [3]** 20/17 20/18 86/18
**applicants' [1]** 64/6
**application [16]** 17/10 17/10 21/9 21/9 21/13 21/20 21/24 21/24 22/14 22/15 34/20 42/25 43/3 43/4 43/13 69/4
**applications [19]** 14/15 16/16 18/10 22/10 28/10 28/13 28/14 37/19 37/19 37/20 41/23 60/19 64/24 73/19 73/21 76/13 78/19 86/5 89/13
**applied [8]** 17/7 26/15 26/15 27/7 32/9 32/17 33/9 38/19
**applies [1]** 72/16
**apply [6]** 29/11 33/24 35/1 37/12 39/1 39/3
**applying [2]** 22/7 35/19
**appointments [1]** 56/22
**appreciate [2]** 62/8 82/22
**approach [1]** 17/25
**appropriate [2]** 24/11 72/1
**approximate [1]** 13/16
**approximately [2]** 63/10 64/25
**arbitrary [2]** 86/4 86/6
**arduous [1]** 20/6
**are [142]**
**area [5]** 5/12 83/17 86/15 99/19 102/22
**aren't [4]** 25/15 25/19 89/16 95/7
**argue [10]** 6/11 6/16 20/2 25/2 44/17 92/2 92/8 92/10 92/13 92/16
**argued [3]** 25/21 29/14 65/16
**arguing [5]** 6/2 6/21 25/7 36/11 90/7
**argument [37]** 5/5 5/6 5/8 5/11 5/18 5/21 13/17 18/9 20/13 20/15 24/14 25/4 25/6 25/10 29/1 30/3 30/7 31/13 31/16 31/24 32/21 33/2 34/19 36/16 36/17 41/21 44/21 45/1 45/14 46/1 46/15 68/1 68/8 88/18 90/3 92/1 98/23
**argument a [1]** 25/4
**argument's [1]** 31/24
**arguments [6]** 13/7 18/8 19/22 23/14 25/1 46/11
**Arizona [3]** 47/5 47/15 48/14
**around [13]** 7/13 16/20 17/13 26/25 56/9 74/21 79/21 79/22 80/11 83/21 83/21 87/14 93/23
**arrest [2]** 87/15 88/1
**arrested [1]** 68/18
**arresting [1]** 87/19
**arrived [1]** 66/17
**articulate [1]** 68/5
**as [114]**
**aside [5]** 5/13 16/6 16/9 22/10 30/4
**ask [14]** 5/3 7/5 19/8 27/22 47/1 49/18 55/17 59/20 82/25 91/12 92/15 99/14 99/16 102/16
**asked [9]** 26/16 27/1 30/24 33/19 81/20 83/9 86/25 91/10 92/4
**asking [14]** 19/11 27/2 38/1 65/17 66/5 66/11 69/13 84/1

**A**

**asking... [6]** 85/13 86/25 88/8 90/25 91/6 98/7
**asleep [1]** 56/12
**aspect [1]** 39/13
**aspects [1]** 95/1
**assessing [2]** 43/5 43/14
**assessment [3]** 97/20 97/21 98/1
**assessments [1]** 97/18
**asset [1]** 67/14
**assets [6]** 67/22 67/22 67/25 68/6 78/20 96/13
**assume [1]** 16/25
**atheist [1]** 79/4
**attached [1]** 69/9
**attachments [1]** 4/1
**ATTC [6]** 11/17 12/2 12/13 12/17 13/5 29/17
**attempt [2]** 21/16 85/3
**attempting [2]** 38/16 85/18
**attempts [1]** 64/7
**attending [1]** 56/22
**attends [1]** 53/10
**attorney [2]** 88/23 89/25
**Attorney's [2]** 1/18 96/10
**attorney/client [2]** 88/23 89/25
**attributable [1]** 85/17
**August [2]** 66/21 66/23
**August 10 [1]** 66/21
**August 2018 [1]** 66/23
**AUSA [1]** 1/18
**Austin [1]** 102/16
**authorities [1]** 14/2
**authority [2]** 102/6 102/8
**auto [2]** 52/18 75/1
**Avenue [3]** 1/15 2/2 2/6
**avenues [1]** 101/20
**average [2]** 69/12 72/22
**avert [1]** 87/16
**avoid [1]** 88/6
**awarded [1]** 24/10
**aware [7]** 34/17 34/24 35/4 35/16 37/6 65/19 77/19
**away [4]** 32/1 42/5 83/13 99/18

**B**

**baby [1]** 17/24
**back [17]** 3/14 10/4 10/11 11/14 27/21 37/25 49/9 59/8 59/14 69/14 75/14 76/3 76/21 78/11 78/17 81/16 93/22
**backdated [1]** 71/19
**background [1]** 74/15
**backs [1]** 12/21
**bad [2]** 17/19 48/22
**bag [1]** 87/13
**baked [1]** 88/19
**Baker [1]** 61/2
**balcony [1]** 83/17
**ball [2]** 37/21 51/12
**bands [1]** 19/22
**bank [1]** 84/12
**Bankman [6]** 69/19 69/23 70/1 71/23 73/12 87/5
**Bankman-Fried [4]** 69/19 70/1 71/23 73/12
**Bankman-Frieds [1]** 87/5
**barely [1]** 79/25
**barrel [1]** 93/23
**baseball [2]** 51/11 80/21
**based [21]** 12/25 13/1 14/21 19/17 19/19 21/18 23/13 30/3 37/9 66/6 69/24 70/14 71/24 82/20 96/24 99/12 100/11 100/13 100/14 100/15 100/16
**basically [8]** 6/23 14/6 24/1 25/7 29/15 44/5 44/9 80/5
**basis [6]** 38/18 39/3 39/19 42/3 67/11 101/7
**Bastrop [1]** 102/16
**bath [1]** 17/25
**be [165]**
**BEACH [4]** 1/2 1/7 2/9 51/22
**Beach/Ft [1]** 2/9
**beat [1]** 78/25
**beautiful [1]** 83/10
**became [2]** 56/10 93/11
**because [51]** 8/22 9/5 9/20 10/6 14/10 14/23 15/12 17/20 19/21 20/6 22/11 23/16 24/2 26/1 26/5 28/1 30/6 33/25 36/7 36/13 36/18 36/24 38/25 40/6 40/8 40/14 42/11 50/7 55/1 57/21 57/21 58/1 58/2 58/10 62/13 63/23 68/4 69/14 72/16 77/22 79/1 83/11 83/19 84/1 84/14 85/3 86/21 87/18 87/25 88/22 101/24
**been [57]** 6/8 6/13 9/9 10/4 10/10 11/9 15/24 16/13 17/3 17/11 23/10 26/25 29/20 32/9 32/18 37/3 41/9 42/22 43/21 44/3 44/8 47/14 47/22 51/20 52/25 55/21 55/23 56/14 56/15 56/15 57/2 57/20 59/12 61/16 67/9 67/21 67/22 67/22 68/17 68/18 68/19 77/24 78/5 79/9 79/15 79/16 79/18 82/24 82/25 83/20 85/14 88/16 90/8 92/25 95/5 98/16 101/19
**before [17]** 1/10 4/12 7/13 7/15 26/15 46/25 49/25 55/16 56/1 68/15 68/18 68/20 74/19 75/10 78/12 78/13 87/15
**began [1]** 59/2
**begin [3]** 4/12 11/15 11/18
**beginning [3]** 38/19 64/13 68/11
**behalf [11]** 3/12 3/18 42/1 50/6 54/1 54/5 54/23 59/21 77/19 90/21 93/1
**behavior [1]** 62/3
**behind [3]** 26/12 48/4 91/2
**being [26]** 10/11 11/14 26/16 30/1 30/24 32/10 32/12 32/13 33/19 35/9 35/15 35/16 35/19 36/23 40/21 40/24 50/11 56/18 61/2 62/18 71/17 72/15 79/16 81/14 91/9 101/25
**belies [1]** 40/13
**believe [7]** 24/8 53/17 53/19 54/23 55/14 58/4 59/21
**believed [1]** 89/15
**believes [1]** 65/2
**below [2]** 13/14 82/21
**beneficiaries [5]** 25/15 26/24 63/9 63/11 63/17
**beneficiary [2]** 32/15 101/12
**benefit [3]** 30/1 30/10 44/7
**benefited [1]** 44/6
**BERGENDAHL [5]** 2/5 2/5 3/18 28/22 103/2
**best [5]** 12/18 23/16 24/17 55/21 57/19
**better [4]** 16/5 53/3 53/6 55/13
**between [8]** 3/13 12/11 36/19 45/18 67/13 82/11 88/23 92/16
**beyond [3]** 5/6 13/17 48/10
**big [3]** 72/20 84/13 87/7
**biggest [1]** 14/17
**bike [1]** 50/9
**bill [2]** 9/4 9/16
**billed [4]** 32/11 32/12 32/14 63/11
**billion [10]** 69/20 69/21 70/5 70/20 72/6 72/6 81/22 87/5 87/7 91/8
**bills [1]** 8/19
**biographical [1]** 75/17
**Biscayne [2]** 1/23 83/9
**bit [5]** 8/21 26/5 50/6 53/3 71/14
**bitterness [1]** 55/6
**blame [1]** 20/23
**blessing [2]** 83/14 89/20
**blind [2]** 83/13 86/24
**Blue [6]** 9/23 9/23 10/3 10/12 26/10 101/7
**board [5]** 16/15 35/24 35/24 36/6 36/7
**boats [1]** 78/10
**body [1]** 87/12
**BOER [11]** 1/14 3/6 5/6 11/8 20/12 31/16 37/10 41/11 45/16 46/3 94/24
**bond [2]** 50/13 59/16
**born [2]** 47/10 54/11
**both [18]** 5/24 6/25 8/11 17/7 18/8 28/16 37/6 45/6 62/8 62/22 64/12 64/16 65/11 83/14 94/20 96/24 98/24 102/24
**bottom [1]** 77/24
**Boulevard [2]** 1/23 83/9
**bound [1]** 55/9
**box [1]** 91/2
**boys [1]** 52/20
**brazenness [1]** 89/2
**break [2]** 13/8 84/7
**breaks [1]** 47/22
**Brian [1]** 80/17
**bribe [2]** 26/1 26/2
**bribes [1]** 25/23
**bridge [1]** 35/6
**briefed [1]** 91/14
**briefing [3]** 91/16 92/6 92/10
**briefly [3]** 4/11 76/20 88/12

## B

**bring [7]** 57/6 58/5 59/7 59/14 61/24 78/17 102/8
**bringing [1]** 54/18
**brokers [1]** 62/5
**brother [6]** 46/19 47/12 49/7 51/4 51/8 51/10
**brothers [2]** 49/5 49/14
**brought [4]** 10/18 22/13 56/5 80/2
**building [2]** 52/22 55/10
**built [1]** 55/24
**bump [2]** 17/1 22/19
**bumped [2]** 16/24 22/24
**bumping [1]** 22/1
**bunch [1]** 73/16
**burden [1]** 13/10
**Bureau [3]** 95/13 95/19 96/9
**business [12]** 12/16 37/11 38/13 38/14 74/14 74/24 74/25 75/11 76/4 78/14 78/15 83/16
**button [1]** 37/18
**bye [1]** 57/5

## C

**cafe [1]** 47/16
**cage [1]** 91/2
**calculate [3]** 7/22 23/23 23/24
**calculated [7]** 8/8 9/6 13/4 23/2 23/10 24/10 101/24
**calculating [2]** 7/10 7/11
**calculation [7]** 8/14 15/2 16/8 18/3 23/5 24/12 24/24
**calculations [1]** 13/9
**call [10]** 16/11 22/17 22/25 26/23 29/4 32/11 32/25 44/24 45/2 63/8
**called [4]** 16/12 16/13 22/22 54/9
**calling [1]** 28/21
**calls [2]** 84/2 85/11
**came [4]** 11/24 23/8 55/3 90/20
**can [36]** 3/4 10/16 13/14 18/5 20/20 25/6 29/2 31/22 34/5 34/8 35/20 35/25 37/5 44/13 44/21 44/21 46/12 47/10 49/23 50/20 54/2 61/18 67/12 70/4 71/6 76/23 87/24 91/17 91/18 92/14 98/4 98/5 98/6 98/8 102/8 102/20
**can't [5]** 14/10 20/7 37/8 48/10 48/25
**canceled [3]** 8/24 11/17 12/2
**cancellations [1]** 11/13
**cancels [1]** 10/5
**cancer [1]** 63/12
**cannot [6]** 37/7 53/8 60/22 61/21 61/24 62/1
**cap [1]** 19/24
**capability [1]** 27/15
**capacity [1]** 54/20
**capped [1]** 54/15
**car [1]** 52/19
**care [22]** 7/20 14/15 15/13 17/8 23/5 24/11 27/7 31/3 33/24 39/13 39/18 54/18 60/12 61/17 63/19 74/23 75/10 76/13 78/13 78/19 94/3 94/8
**cared [1]** 19/2
**careers [1]** 51/20
**caring [1]** 53/6
**carry [1]** 58/25
**cars [1]** 78/10
**case [73]** 1/3 3/2 3/3 3/23 6/2 6/24 10/20 12/6 14/17 15/16 24/25 28/1 29/3 31/5 32/9 32/10 32/10 34/1 43/23 52/8 61/24 62/2 62/13 62/19 62/24 63/3 63/10 63/14 63/16 63/21 63/22 63/23 65/22 68/12 68/17 68/23 69/20 69/22 70/7 70/9 70/11 70/18 71/9 71/11 71/15 72/12 72/15 72/16 73/9 73/10 73/11 73/11 73/12 73/18 73/25 74/7 74/17 78/8 78/9 79/7 79/13 82/23 85/10 85/10 87/13 89/10 91/8 93/19 94/25 97/25 101/3 101/19 102/1
**cases [23]** 19/15 32/19 60/15 61/17 63/1 69/15 69/17 70/4 71/7 71/7 72/7 73/3 73/13 74/11 74/12 78/21 79/14 81/22 82/6 82/14 82/21 83/6 84/23
**casualty [1]** 75/1
**catastrophic [1]** 80/3
**category [3]** 44/12 72/17 93/12
**Catholic [2]** 47/4 47/4
**caught [2]** 62/6 62/21
**cause [1]** 87/2
**caused [2]** 39/7 57/9
**causes [2]** 21/13 48/9
**caution [1]** 100/9
**center [2]** 29/4 32/25
**centers [2]** 32/11 63/8
**central [1]** 102/19
**certain [2]** 16/22 101/23
**certainly [8]** 25/9 27/18 32/24 39/11 43/20 74/4 74/23 98/6
**certify [1]** 103/7
**chain [1]** 12/19
**chance [3]** 80/19 81/11 92/19
**change [3]** 21/9 77/3 96/11
**changes [1]** 21/12
**changing [3]** 49/8 89/11 89/11
**character [9]** 46/25 50/4 51/6 53/7 53/18 54/25 55/16 55/19 90/12
**characteristics [3]** 45/21 73/6 78/25
**charge [1]** 12/21
**charged [4]** 42/20 42/23 43/19 43/21
**charity [1]** 47/6
**Charlie [1]** 80/1
**chart [4]** 36/5 36/10 42/4 81/14
**checked [2]** 14/22 14/22
**child [1]** 52/25
**child's [1]** 56/22
**childhood [1]** 57/22
**children [20]** 47/7 47/20 48/7 53/9 53/13 54/7 55/6 55/19 55/25 56/2 56/12 57/22 58/8 58/17 59/12 59/19 59/23 75/24 81/5 90/22
**children who [1]** 56/12
**children's [4]** 50/17 53/14 56/20 58/20
**choice [4]** 60/16 64/18 64/22 95/2
**choices [1]** 46/12
**choose [2]** 68/13 93/4
**chose [1]** 89/24
**Christmas [4]** 57/7 57/19 57/20 58/1
**Christmas didn't [1]** 58/1
**chronic [2]** 26/20 27/13
**church [5]** 47/6 79/10 79/11 79/12 79/24
**Circuit [1]** 29/3
**circumstance [6]** 5/1 26/15 27/2 48/16 55/10 86/8
**circumstances [16]** 16/21 18/15 29/21 30/23 32/4 70/19 78/1 84/15 84/21 85/14 87/4 90/12 93/20 94/2 96/25 101/17
**cite [2]** 67/11 92/14
**cited [1]** 37/22
**cites [1]** 94/15
**citizens [1]** 52/10
**citizenship [1]** 11/17
**civilly [1]** 101/21
**claim [4]** 10/20 10/21 11/1 11/2
**claims [6]** 5/13 9/4 11/4 52/18 73/23 73/25
**clarification [1]** 99/25
**clarified [1]** 54/22
**clarified it [1]** 54/22
**clarify [1]** 100/5
**class [1]** 51/10
**classic [1]** 20/23
**classically [1]** 101/24
**clawback [1]** 10/3
**clawbacks [1]** 10/10
**clawed [3]** 10/4 10/11 11/14
**clear [13]** 6/6 10/9 10/11 13/1 14/20 26/25 31/10 31/23 41/4 67/4 77/16 88/14 91/25
**clearly [3]** 25/12 95/4 95/6
**Clerk [1]** 96/15
**clicking [1]** 37/18
**client [4]** 69/6 88/23 89/24 89/25
**client's [1]** 19/12
**clock [5]** 64/15 74/21 79/21 79/22 87/19
**close [4]** 16/20 57/3 102/14 102/23
**closest [1]** 55/21
**closing [2]** 25/24 29/14
**CLOUSER [2]** 1/13 3/8
**clustering [1]** 93/23

C

**CMS [24]** 7/19 9/6 9/15 9/17 9/18 9/22 10/7 19/6 19/8 20/16 20/18 20/22 20/24 21/11 24/10 30/24 36/14 36/25 37/20 38/20 38/23 38/25 64/2 64/21
**CMS' [8]** 14/2 14/8 14/9 14/21 15/4 15/6 21/3 64/7
**co [2]** 7/7 95/25
**co-conspirator [1]** 95/25
**co-defendant [1]** 7/7
**coaching [1]** 56/21
**coconspirators [1]** 26/4
**cocounsel [1]** 92/12
**Code [1]** 65/24
**cogent [1]** 27/6
**coherent [1]** 27/5
**coincidental [1]** 17/4
**collar [6]** 60/13 84/13 84/20 85/2 86/13 86/14
**colleague [1]** 3/13
**collect [2]** 11/6 12/17
**collected [1]** 12/25
**collecting [1]** 73/14
**college [3]** 51/15 75/22 81/25
**combined [1]** 100/13
**come [7]** 7/14 15/13 22/21 46/2 47/24 66/24 82/9
**comes [3]** 19/11 35/2 78/11
**comfort [3]** 55/20 56/5 58/15
**coming [3]** 22/18 51/4 51/23
**comments [1]** 73/7
**commercial [1]** 31/6
**commission [4]** 12/23 12/24 75/15 75/19
**commissioner [1]** 80/11
**commissions [10]** 9/21 9/23 9/25 10/4 10/9 40/6 40/8 40/14 85/24 101/9
**commit [4]** 66/1 74/13 75/18 85/8
**commitment [3]** 55/7 55/25 59/19
**committed [8]** 58/11 59/5 84/19 85/1 89/17 95/6 95/13 95/19
**committing [2]** 85/20 95/2
**communicated [1]** 34/10
**communities [1]** 62/10
**community [10]** 51/14 51/25 52/10 53/20 79/6 79/12 80/21 82/8 84/16 95/6
**companies [1]** 74/13
**companion [1]** 55/21
**company [7]** 11/13 75/10 77/13 78/2 78/12 78/22 85/24
**comparable [4]** 60/14 63/2 63/3 83/6
**compare [2]** 69/16 70/4
**compassion [2]** 51/13 59/21
**compassionate [1]** 58/10
**complaints [1]** 64/21
**complete [2]** 18/20 59/2
**completely [7]** 23/4 26/24 27/6 61/9 67/6 68/1 78/23
**complex [1]** 39/8
**complicit [1]** 41/3
**complicity [1]** 90/9
**comply [2]** 97/12 97/14
**component [4]** 24/2 34/16 35/8 35/14
**computed [1]** 83/24
**conceal [1]** 71/20
**concealing [1]** 37/1
**concealment [1]** 39/10
**concern [1]** 97/17
**concerning [2]** 100/11 100/23
**conclude [2]** 18/5 26/16
**concluded [1]** 103/5
**concludes [1]** 45/13
**conclusion [2]** 35/3 42/24
**conclusions [2]** 46/2 100/11
**concurrent [1]** 96/18
**concurrently [6]** 95/15 95/17 95/22 96/22 97/6 97/8
**condition [2]** 26/21 83/14
**conditions [3]** 27/18 97/12 97/15
**condo [2]** 83/11 83/17
**condos [1]** 83/10
**conduct [27]** 31/20 33/9 37/16 38/21 38/21 38/24 39/7 39/9 53/18 60/10 60/24 62/18 63/15 63/24 64/2 66/7 67/14 70/6 70/21 71/21 74/22 78/23 81/11 89/5 89/7 89/15 97/2
**confidence [3]** 48/1 59/17 80/20
**confident [1]** 47/25
**confines [1]** 33/1
**conformed [1]** 89/5
**confused [1]** 58/5
**confusion [1]** 57/9
**Congress [3]** 24/1 24/3 54/14
**connection [1]** 37/2
**consequences [2]** 20/9 82/14
**conservative [1]** 24/20
**conserve [1]** 94/9
**consider [10]** 5/15 48/6 49/24 55/17 60/9 61/12 76/23 81/11 87/4 93/20
**consideration [4]** 53/24 83/7 89/19 91/16
**considered [6]** 25/6 43/7 43/9 43/16 43/18 93/8
**Considering [1]** 93/18
**consistency [2]** 14/7 55/25
**consistent [1]** 24/15
**consisting [1]** 7/18
**consists [3]** 95/14 95/20 97/5
**console [1]** 80/4
**conspiracy [5]** 65/25 66/10 66/17 66/22 94/22
**conspirator [2]** 28/2 95/25
**constitute [2]** 99/2 102/11
**constitutes [2]** 33/10 36/25
**constituting [1]** 39/7
**construct [1]** 39/25
**constructed [1]** 36/17
**construed [1]** 35/25
**construes [1]** 40/12
**consult [1]** 92/11
**consumer [5]** 21/5 21/8 22/15 22/15 74/4
**consumer's [1]** 21/9
**consumers [14]** 16/11 16/13 22/5 22/15 25/19 27/24 29/18 29/25 32/24 41/24 60/24 65/1 65/5 94/1
**contacted [1]** 63/18
**contend [1]** 64/9
**contending [1]** 42/11
**contention [1]** 40/14
**context [5]** 8/18 9/3 9/15 9/18 40/6
**continue [3]** 4/22 38/24 59/25
**continued [5]** 34/10 36/15 51/19 64/3 95/2
**continues [1]** 80/25
**contract [2]** 8/24 10/2
**contracted [2]** 48/20 63/8
**contracts [1]** 71/20
**contradicts [1]** 14/8
**contributed [2]** 48/4 62/9
**control [2]** 61/3 61/20
**convenient [1]** 86/6
**conventional [1]** 55/24
**convey [1]** 76/14
**conveyed [2]** 73/16 74/4
**convicted [8]** 34/15 45/22 64/3 68/17 68/19 69/11 75/21 90/2
**conviction [2]** 88/15 98/25
**convincing [1]** 79/7
**cooperated [2]** 77/18 88/2
**cooperation [2]** 77/9 94/21
**coparents [1]** 55/8
**copay [6]** 11/3 29/20 30/12 30/19 30/25 31/4
**copays [4]** 25/18 27/1 30/13 32/3
**corner [2]** 48/23 56/11
**correct [12]** 6/6 8/6 8/13 8/14 20/16 26/13 84/3 85/3 85/5 87/20 99/9 103/7
**corrected [1]** 6/13
**correction [1]** 66/13
**CORY [12]** 1/7 3/3 3/12 78/2 78/13 79/2 80/7 80/24 80/25 81/5 81/10 95/13
**cost [1]** 55/4
**could [43]** 10/4 12/13 13/10 13/24 20/24 22/6 28/11 29/3 29/11 29/24 30/5 32/1 32/1 32/3 33/24 34/9 37/4 38/11 43/9 43/18 43/21 47/25 51/2 51/17 53/25 54/1 56/6 64/11 64/19 68/14 70/16 70/23 72/8 76/1 78/1 78/3 82/19 83/11 84/6 86/25 98/10 99/21 101/21
**couldn't [7]** 12/22 15/8 15/23 25/18 25/18 58/5 79/17
**counsel [8]** 39/16 65/16 81/6 88/13 88/22 89/25 91/4 98/16
**counselor [1]** 49/7
**count [9]** 29/3 42/18 43/19 66/1 81/8 95/16 95/21 95/22 96/17

C

**countless [2]** 56/19 80/3
**country [4]** 18/24 70/18 72/11 81/22
**country it [1]** 18/24
**country's [1]** 69/17
**counts [10]** 12/11 45/23 64/4 66/1 95/15 95/20 97/6 97/7 97/20 97/22
**couple [5]** 16/7 16/13 71/16 80/16 98/19
**course [11]** 12/5 43/6 43/15 63/6 68/10 68/25 70/24 76/16 84/11 94/18 101/18
**COURT [50]** 1/1 2/9 4/11 4/24 4/25 5/19 8/16 20/3 20/10 23/15 24/1 31/18 32/19 34/2 37/5 39/22 40/15 41/19 43/3 49/16 55/16 60/9 60/21 61/23 62/25 63/25 83/6 84/4 84/6 85/22 86/23 87/2 88/6 88/16 89/2 89/18 89/19 90/7 90/14 90/25 93/16 95/12 95/19 96/15 100/8 100/24 101/11 102/3 102/17 103/12
**Court's [4]** 53/17 98/17 100/10 100/20
**courtroom [3]** 10/17 48/10 81/17
**Courts [2]** 32/17 60/14
**cover [1]** 4/2
**coverage [24]** 11/10 15/22 16/3 17/8 17/20 18/14 18/15 18/23 21/21 25/17 26/7 26/9 27/15 30/8 31/3 31/6 31/8 31/9 31/15 35/18 48/24 49/8 49/11 73/22
**covered [6]** 11/19 17/15 29/17 29/23 49/2 49/3
**covers [1]** 4/9
**COVID [6]** 48/13 48/15 48/17 48/21 52/6 52/7
**COVID-19 [2]** 48/15 48/17
**CR [2]** 1/3 96/1
**cream [1]** 47/16
**create [3]** 58/18 84/25 93/25
**creating [1]** 56/10
**creator [1]** 58/2
**credibility [1]** 78/6
**credible [2]** 41/20 43/1
**credit [13]** 11/9 13/4 14/5 24/4 24/6 24/6 30/12 30/21 31/23 32/4 32/5 88/3 88/17
**credits [2]** 25/14 73/21
**crime [9]** 68/19 75/18 85/20 87/16 89/17 91/7 93/20 93/20 95/2
**crimes [1]** 85/2
**criminal [24]** 1/15 40/13 41/6 41/8 41/14 41/16 41/18 41/21 42/2 42/7 42/7 42/12 42/14 44/11 67/7 67/14 71/21 72/17 81/11 83/19 90/9 93/11 97/2 101/18
**criminally [5]** 40/22 41/2 42/21 42/23 101/13
**critical [4]** 48/8 53/14 60/25 63/19
**cross [1]** 35/6
**crowded [1]** 3/15
**crying [1]** 52/2
**culpability [1]** 87/23
**curb [1]** 50/12
**curious [1]** 7/8
**curl [1]** 56/13
**current [2]** 21/23 21/24
**currently [1]** 75/22
**curse [1]** 83/14
**custodial [1]** 65/7
**customary [1]** 54/22
**cut [1]** 19/21
**Cutter [2]** 12/20 17/22
**cynical [1]** 93/21
**cynicism [1]** 93/24

D

**dad [2]** 81/25 81/25
**daddy [3]** 57/12 58/5 59/9
**Dafud [10]** 11/12 40/24 40/24 65/10 76/20 77/1 78/5 87/8 89/11 95/25
**Dafud's [2]** 77/20 77/24
**daily [2]** 42/3 59/24
**Dallas [4]** 102/16 102/21 102/22 102/23
**Dallas/Fort [2]** 102/16 102/22
**danger [1]** 53/19
**Daniela [1]** 22/21
**DAREN [2]** 1/18 3/9
**darkest [2]** 55/14 58/12
**data [29]** 7/18 7/19 7/23 7/24 11/23 14/5 14/7 14/15 14/19 14/24 15/7 16/6 16/9 19/12 20/20 21/4 21/19 28/10 69/10 71/10 72/9 72/10 72/11 74/3 75/14 75/19 76/19 82/5 82/20
**date [5]** 35/25 36/1 36/10 83/1 103/10
**daughter [9]** 54/12 57/2 58/4 58/13 59/9 81/24 82/2 82/10 82/12
**daughters [1]** 36/7
**DAVID [3]** 2/1 2/1 3/17
**day [16]** 19/1 51/18 52/11 56/4 56/19 56/19 57/7 59/14 60/18 60/18 64/17 68/4 68/9 81/1 81/17 102/3
**day-to-day [1]** 56/19
**days [12]** 11/16 15/25 15/25 16/3 57/4 79/21 83/22 84/12 86/15 98/7 98/8 99/1
**DC [1]** 1/16
**de [11]** 1/14 3/5 5/6 11/8 20/12 31/16 37/10 41/11 45/16 46/3 94/24
**deadline [3]** 21/10 21/13 64/7
**deal [3]** 12/8 84/9 98/15
**dealing [2]** 62/2 90/17
**death [1]** 79/1
**debt [1]** 97/16
**decade [3]** 75/9 76/15 78/12
**decades [1]** 79/9
**deceive [1]** 17/1
**December [1]** 37/22
**deceptively [1]** 63/8
**decide [2]** 25/11 82/25
**decided [1]** 16/11
**decides [1]** 88/1
**decision [1]** 76/22
**declarative [1]** 37/2
**dedication [1]** 59/18
**deductible [1]** 31/4
**deductibles [2]** 27/1 32/2
**deduction [2]** 23/13 23/14
**deem [1]** 87/20
**deemed [1]** 88/18
**deep [1]** 55/12
**deeply [3]** 53/9 53/16 58/10
**defendant [21]** 1/20 2/1 7/7 33/8 39/6 46/5 63/4 63/6 63/12 64/18 65/5 66/20 67/16 69/19 75/20 78/25 95/13 97/19 97/23 101/19 101/25
**defendant there [1]** 67/16
**defendants [39]** 1/9 5/24 7/2 7/14 8/1 8/3 21/2 28/16 43/23 45/6 45/18 46/2 60/8 60/16 62/9 63/25 65/11 72/14 72/21 83/5 85/1 87/22 91/9 93/16 94/17 94/23 95/1 95/1 95/23 96/2 96/6 96/14 96/24 97/3 97/9 97/11 97/14 98/17 98/24
**Defendants' [2]** 7/11 60/23
**defense [10]** 6/13 20/10 20/23 88/13 88/22 89/22 89/25 90/1 90/6 91/18
**defenses [1]** 6/9
**define [1]** 36/20
**defined [3]** 40/21 90/13 95/7
**defines [1]** 43/4
**definition [1]** 29/9
**defrauded [1]** 70/12
**degree [3]** 69/11 69/11 87/23
**deliberate [1]** 95/2
**deliver [1]** 52/11
**DELLABETTA [2]** 1/21 3/12
**demand [1]** 67/17
**demonstrates [1]** 85/11
**denial [4]** 22/8 33/16 33/25 34/21
**denials [14]** 11/5 22/4 28/13 33/12 34/9 35/5 37/4 38/2 38/5 38/14 38/16 39/16 39/23 40/2
**denied [7]** 25/16 28/10 35/1 35/18 35/19 43/25 88/16
**denies [1]** 11/4
**deny [4]** 6/22 28/16 32/23 93/9
**department [3]** 1/14 7/20 12/12
**departure [1]** 84/8
**depend [1]** 53/21
**dependence [1]** 60/25
**depending [2]** 15/23 32/4
**depends [1]** 30/22
**depreciations [1]** 44/7
**depression [1]** 58/21
**depth [1]** 61/18

**D**

**derived [5]** 74/2 75/4 78/18 78/21 101/14
**derived proceeds [1]** 101/14
**derives [1]** 8/7
**describe [1]** 17/12
**described [2]** 11/8 62/18
**describing [1]** 43/11
**description [2]** 6/24 16/5
**deserves [1]** 77/14
**deserving [3]** 55/15 63/22 88/3
**design [1]** 39/25
**designated [1]** 99/16
**designed [4]** 37/21 38/10 58/18 94/5
**desperate [1]** 94/2
**desperately [2]** 48/24 59/8
**desperately need [1]** 59/8
**despite [8]** 57/17 58/9 64/19 64/20 64/20 64/21 64/21 100/7
**detail [3]** 23/15 72/12 102/2
**detailed [2]** 15/5 60/20
**detect [1]** 38/25
**detection [1]** 37/1
**determination [3]** 9/14 9/18 11/19
**determinative [1]** 31/7
**determine [3]** 5/23 27/15 86/7
**determined [2]** 85/23 101/13
**determines [1]** 9/17
**deterred [1]** 61/11
**deterrence [12]** 60/11 60/11 61/13 62/23 75/16 76/5 76/11 82/7 94/6 94/8 94/10 97/2
**deterrent [3]** 61/19 86/11 86/12
**deterring [1]** 62/4
**devastating [1]** 54/11
**develop [1]** 85/3
**developers [1]** 58/18
**developing [1]** 91/4
**development [1]** 53/12
**developmental [1]** 53/21
**devised [1]** 86/3
**devoted [3]** 52/20 53/20 55/23
**devout [1]** 47/4
**did [34]** 4/18 4/22 6/6 7/9 12/4 15/17 16/18 16/19 17/12 22/3 23/3 23/5 27/11 28/3 34/17 38/11 39/15 39/16 40/16 40/25 52/1 62/20 62/25 63/18 64/10 71/24 73/21 73/22 80/21 87/19 92/15 93/25 94/23 99/25
**didn't [42]** 7/3 11/18 11/20 12/1 12/5 15/7 16/15 16/18 17/11 17/14 17/22 18/23 23/14 26/11 27/14 27/17 27/18 27/25 29/1 30/23 33/15 34/18 48/23 58/1 58/1 70/6 70/14 72/5 72/5 74/5 74/20 77/6 77/7 77/19 77/23 79/20 81/11 87/9 94/21 94/22 96/17 102/10
**didn't end [1]** 17/14
**died [2]** 54/12 80/6
**difference [7]** 7/12 75/11 87/6 87/7 87/17 87/25 88/3
**differences [2]** 45/18 45/20
**different [9]** 7/7 24/2 26/5 31/2 32/8 73/10 73/18 74/7 84/15
**differs [1]** 73/9
**difficult [5]** 54/3 57/19 62/14 62/17 84/21
**digital [1]** 23/4
**dime [1]** 87/13
**diminish [1]** 54/20
**diminished [1]** 67/23
**dire [1]** 80/24
**direct [2]** 8/15 42/4
**directly [9]** 4/14 14/8 23/2 42/12 54/24 56/20 61/5 74/2 90/11
**disagree [1]** 29/8
**disagreed [1]** 17/21
**disappeared [1]** 67/23
**disaster [1]** 79/5
**discipline [1]** 81/4
**disclosure [2]** 89/23 97/16
**disclosures [1]** 4/20
**discovery [3]** 4/16 4/18 4/24
**discrepancies [1]** 6/21
**discuss [1]** 33/15
**discussed [2]** 33/16 62/3
**Discussing [1]** 33/18
**discussion [1]** 23/18
**disease [1]** 26/20
**diseases [1]** 27/13
**disingenuous [1]** 36/12
**disparities [2]** 87/24 88/7
**disparity [1]** 88/10
**displayed [1]** 95/5
**disprove [1]** 15/18
**dispute [4]** 13/25 41/17 43/1 43/1
**disputes [1]** 74/2
**disputing [1]** 42/6
**distance [1]** 57/3
**distancing [1]** 84/4
**distinct [1]** 9/15
**distinction [1]** 12/11
**district [9]** 1/1 1/1 1/11 60/15 63/2 73/13 74/11 94/15 97/10
**disturbing [1]** 93/24
**DIVISION [2]** 1/2 1/15
**divorced [1]** 54/19
**DMA [1]** 19/13
**DMI [5]** 14/11 15/8 15/9 19/14 19/14
**do [65]** 5/3 5/3 5/10 5/10 10/14 11/23 12/1 13/7 16/18 17/11 20/9 21/7 24/17 25/1 31/24 32/20 34/8 34/9 37/23 38/2 38/2 38/3 38/5 38/13 38/16 40/16 41/13 42/18 42/18 43/12 44/15 44/16 44/17 44/18 44/24 45/9 49/13 50/10 50/17 55/13 58/11 59/16 64/3 64/9 65/13 65/13 67/8 68/3 68/7 72/12 74/22 77/19 78/24 80/14 81/8 89/8 89/18 91/15 95/2 98/9 98/19 99/19 100/10 102/2 102/12
**Docket [1]** 96/1
**doctors [4]** 16/12 28/9 61/5 94/3
**documents [1]** 89/12
**does [30]** 4/2 4/3 4/10 4/14 6/2 11/7 11/16 20/16 20/21 20/25 21/24 21/25 33/20 35/3 35/9 36/20 37/12 39/1 42/5 43/12 54/20 72/11 77/15 78/4 86/19 86/19 87/21 94/25 98/16 101/23
**doesn't [17]** 15/18 18/2 18/24 19/6 24/23 30/25 32/16 33/18 35/14 58/4 68/19 69/5 76/1 83/18 85/4 86/20 89/21
**doing [10]** 20/22 36/8 36/18 36/22 38/22 55/3 67/9 74/21 79/6 86/24
**dollar [9]** 9/6 26/1 29/18 70/20 71/7 81/22 87/20 91/8 100/12
**dollars [10]** 17/21 28/1 29/18 31/11 60/23 75/3 87/5 87/6 94/1 100/25
**don't [61]** 5/20 6/11 7/2 10/6 10/8 13/8 15/14 15/19 18/3 19/20 20/2 23/20 23/21 24/13 24/14 26/2 26/22 28/5 28/11 28/19 29/8 29/21 29/24 31/6 31/14 36/2 42/15 43/10 44/9 44/20 44/22 44/24 45/2 45/13 45/16 46/6 49/22 53/19 68/24 76/5 76/7 76/14 79/2 81/16 83/8 87/2 88/16 88/18 89/9 89/10 90/7 91/13 94/9 95/10 96/4 96/12 101/11 101/19 101/21 102/8 102/19
**don't work [1]** 96/4
**DONALD [2]** 1/10 2/10
**done [5]** 20/7 33/19 79/11 81/17 84/15
**door [3]** 11/18 11/20 15/21
**doubt [3]** 25/13 38/6 42/15
**down [8]** 7/14 12/19 19/21 44/8 48/17 72/10 89/9 102/2
**Dr [1]** 11/11
**drama [1]** 47/25
**dramatically [4]** 76/15 76/16 76/17 82/18
**dressed [1]** 74/8
**drive [2]** 51/21 56/2
**driven [2]** 59/5 93/13
**driving [1]** 80/11
**drop [1]** 12/15
**dropped [2]** 51/10 80/5
**drug [3]** 26/20 28/8 87/13
**drugs [1]** 27/13
**Ducum [1]** 80/16
**due [4]** 55/15 57/3 59/1 101/20
**during [11]** 28/14 43/6 43/15 52/4 52/4 52/6 66/22 74/17 76/21 79/20 96/2
**dust [1]** 51/18

E
each [16] 22/16 46/5 60/8 62/11 64/18 65/5 65/9 72/12 95/14 95/15 95/20 95/25 97/5 97/20 97/22 97/23
earlier [1] 87/19
early [1] 10/5
earn [3] 12/23 76/17 96/3
earned [3] 78/8 78/20 96/4
earnings [1] 96/8
ears [1] 90/5
economic [1] 63/24
education [3] 33/20 56/20 75/23
effect [1] 86/12
effective [1] 90/25
efficient [1] 45/4
effort [4] 21/15 23/24 34/3 38/24
efforts [4] 20/24 32/11 32/12 57/16
egging [1] 37/23
egregious [5] 70/6 70/12 70/20 71/21 93/21
eight [3] 47/20 57/1 87/7
either [5] 14/4 25/16 28/23 72/15 81/3
elderly [2] 48/21 73/16
eldest [1] 47/3
element [3] 27/21 29/10 30/6
elephants [1] 78/7
Eleventh [1] 29/3
elicited [1] 6/14
eligibility [2] 34/6 35/12
eligible [3] 17/11 35/3 67/19
eliminates [1] 91/7
Elizabeth [1] 70/7
else [4] 13/13 79/13 86/16 93/19
elsewhere [1] 94/15
email [1] 40/1
emails [3] 33/16 89/3 93/22
Emily [2] 9/10 10/7
emotional [4] 53/21 54/2 56/14 56/16
emphasize [1] 60/13
employees [4] 37/17 38/5 38/9 41/25
employees' [1] 38/23
empty [2] 73/17 73/17
encourage [2] 39/16 61/12
encouragement [1] 39/12
encouraging [1] 40/2
end [13] 17/14 32/5 37/10 49/21 53/23 64/17 66/23 77/24 78/24 80/25 81/19 85/9 90/25
ended [13] 25/17 48/22 49/9 67/3 70/15 77/1 77/2 84/13 84/14 84/17 84/21 85/23 101/25
ending [1] 49/8
ends [1] 94/12
endure [1] 55/5
endured [3] 57/17 58/9 58/17
enforcement [1] 81/4
engage [4] 31/19 36/14 36/15 64/23
engaged [5] 31/20 33/9 39/6 70/20 86/2
engagement [1] 33/14
engaging [3] 22/2 88/22 89/16
enhancement [24] 27/8 29/6 31/23 32/9 32/17 33/1 33/5 33/8 37/8 38/19 39/3 39/20 40/19 40/20 42/6 42/25 77/6 77/8 77/8 100/11 100/13 100/14 100/15 100/16
enhancements [1] 44/9
enjoyment [1] 95/8
enough [6] 3/14 4/20 16/17 18/4 57/11 73/7
enraged [1] 71/15
enroll [1] 22/8
enrolled [5] 7/20 9/8 9/13 22/12 29/19
enrollee [1] 35/24
enrollees [2] 35/13 36/19
enrollment [9] 7/19 22/5 22/9 35/1 37/24 39/18 40/3 61/17 74/20
enrollments [3] 37/24 39/1 40/9
ensuring [1] 62/5
enter [1] 74/14
enterprise [3] 37/14 37/17 43/24
entire [7] 11/10 43/6 43/15 56/4 62/12 83/4 89/3
entirety [1] 34/16
entrusted [1] 52/10
episode [2] 90/13 95/7
equal [1] 87/10
equate [1] 20/21
Equifax [2] 14/5 14/23
equitable [2] 69/2 101/16
err [1] 20/10
error [1] 100/19
Escobar [1] 80/17
Esformes [2] 70/19 71/1
especially [7] 27/11 39/8 39/8 48/8 74/12 87/4 91/8
ESQ [5] 1/20 1/21 1/21 2/1 2/5
essential [4] 53/15 56/17 62/7 64/16
essentially [5] 19/23 36/24 74/8 84/19 91/2
establish [1] 34/24
established [1] 37/3
estimate [5] 18/3 18/5 20/5 22/18 24/17
estimated [1] 20/4
ethic [1] 53/7
evade [1] 40/2
even [47] 12/21 15/12 16/25 20/16 20/24 21/16 21/22 22/5 22/20 23/5 24/22 26/7 29/18 31/11 43/19 47/17 55/3 55/14 56/9 57/2 57/18 59/22 63/14 63/15 63/23 68/18 70/1 70/11 71/7 73/18 74/23 75/10 76/7 76/15 77/20 77/23 78/13 78/17 81/3 81/5 81/20 82/4 82/9 84/2 84/3 85/11 89/21
event [4] 23/25 43/22 67/19 76/4
ever [3] 70/18 74/19 75/25
every [20] 11/2 12/9 15/12 15/13 19/1 21/2 21/15 23/3 23/5 31/5 52/11 56/1 59/14 65/5 72/11 78/9 81/17 86/4 86/18 101/4
everybody [6] 17/23 41/1 46/1 48/3 48/11 86/15
everyday [1] 56/24
everyone [4] 3/22 11/12 26/21 26/22
everything [8] 3/21 4/9 6/16 6/17 64/21 78/21 80/5 93/19
evidence [18] 14/13 17/13 19/6 20/8 21/1 29/14 35/16 60/21 66/6 66/8 67/13 72/3 73/8 73/24 75/4 79/15 89/11 90/5
evident [1] 89/3
ex [3] 54/22 90/19 90/20
ex-spouse [1] 54/22
ex-wife [2] 90/19 90/20
exact [1] 76/25
exactly [2] 62/23 74/18
example [5] 12/18 32/9 67/21 73/11 80/1
exceeded [1] 80/21
excellent [2] 93/7 103/4
except [3] 9/9 20/2 69/22
excess [1] 84/10
excitement [1] 57/23
excluded [1] 23/4
execution [1] 39/9
Executive [1] 77/7
exercised [1] 6/17
exhausting [1] 55/2
exhibit [7] 8/7 14/14 38/4 66/8 66/15 66/17 66/19
exhibits [2] 38/12 78/9
exist [1] 49/23
existing [1] 54/15
expects [1] 88/16
experience [2] 48/12 82/12
experiencing [2] 58/19 61/3
explain [2] 13/15 13/24
explanation [1] 62/20
explore [1] 101/21
exposed [1] 89/15
exposes [1] 68/23
exposure [1] 40/13
expressed [1] 12/21
extended [3] 25/14 39/18 66/22
extension [1] 92/16
extensive [12] 41/16 41/22 42/8 42/15 42/24 43/2 43/4 43/5 43/9 43/13 43/14 43/18
extent [13] 31/21 33/19 34/17 34/23 35/10 35/20 41/1 74/5 84/6 90/8 92/2 94/10 101/24
extraordinarily [1] 68/12
extremely [1] 54/2
eye [1] 74/19

**F**

**face [1]** 64/19
**faced [2]** 72/25 94/2
**facilities [1]** 102/15
**facility [2]** 99/17 99/22
**facing [3]** 77/13 79/5 84/22
**fact [45]** 4/24 10/8 17/2 18/9 19/7 31/19 33/13 34/25 35/8 35/23 38/8 42/4 42/5 49/2 50/8 60/11 60/16 63/25 72/4 73/1 73/22 73/23 73/24 74/8 75/22 75/23 75/23 77/10 77/22 78/11 78/13 78/17 85/6 85/19 86/23 87/3 87/11 87/21 88/1 90/19 90/22 90/22 98/17 100/10 100/18
**factor [2]** 72/12 90/8
**factors [11]** 45/15 65/4 68/11 68/25 71/25 72/2 75/16 75/24 93/15 93/18 96/25
**facts [1]** 52/7
**factual [5]** 6/7 6/21 6/24 33/11 35/23
**failure [2]** 20/9 99/1
**fair [5]** 5/2 26/22 69/3 82/23 101/16
**fairly [2]** 43/12 49/23
**faith [4]** 47/6 49/20 57/16 59/17
**fall [4]** 30/5 32/25 43/12 43/20
**fallacy [1]** 18/20
**false [4]** 17/10 28/10 70/14 71/24
**falsified [1]** 71/19
**familiar [3]** 8/18 69/20 72/9
**familiarity [1]** 74/15
**families [4]** 58/19 58/25 62/10 95/9
**family [27]** 23/6 47/6 47/7 48/3 49/5 49/6 50/21 52/22 53/20 55/9 55/10 55/23 56/18 58/12 58/14 59/8 59/17 59/21 59/25 62/16 75/23 76/18 78/14 90/11 90/12 90/16 95/5
**far [14]** 31/23 63/24 69/6 69/7 69/21 72/23 72/23 80/21 81/12 81/12 81/13 81/13 91/9 93/14
**fast [1]** 55/3
**father [22]** 47/19 48/7 48/9 49/19 49/19 50/15 52/20 53/6 53/9 53/13 54/7 55/23 56/6 56/12 57/2 57/4 57/15 57/25 58/2 59/14 82/12 82/13
**favorite [1]** 57/20
**FCI [1]** 99/17
**February [3]** 1/8 7/16 54/12
**February 2025 [1]** 7/16
**Federal [13]** 16/20 16/22 18/10 18/17 18/18 19/3 23/8 25/13 67/7 71/19 88/24 96/3 103/11
**feel [8]** 6/11 47/25 48/11 56/7 56/16 58/1 59/4 73/7
**feels [1]** 59/10
**fell [1]** 56/12
**felony [1]** 68/17
**felt [2]** 47/23 58/6
**few [5]** 5/18 13/8 46/9 51/5 83/20
**fight [1]** 68/21
**figure [13]** 15/11 19/18 19/19 19/24 20/13 24/14 24/20 24/21 24/25 71/15 74/2 87/1 101/6
**figured [1]** 51/20
**figures [2]** 8/2 15/6
**file [9]** 91/17 91/22 92/18 98/3 98/4 98/8 99/1 102/5 102/7
**filed [4]** 3/22 14/1 30/20 99/1
**filings [1]** 4/2
**filled [2]** 56/3 56/8
**final [1]** 18/7
**finally [3]** 23/12 27/17 36/13
**financial [9]** 25/12 31/22 31/24 32/7 40/8 63/14 96/5 96/13 97/15
**find [6]** 17/4 24/18 39/11 68/3 72/19 79/5
**finding [2]** 93/16 100/12
**findings [4]** 93/8 98/17 100/10 100/18
**fine [3]** 44/20 93/17 99/7
**finish [1]** 59/3
**Fiorella [23]** 9/24 9/24 10/3 10/10 10/12 12/3 12/7 21/6 21/12 21/15 22/1 22/6 22/19 23/3 29/16 31/20 33/14 38/16 39/24 41/25 64/6 74/18 75/6
**Fiorella took [1]** 21/15
**fire [3]** 51/20 51/21 93/23
**firearms [1]** 54/16
**firmly [1]** 53/17
**first [30]** 5/21 6/7 6/11 10/25 16/3 25/11 26/6 27/21 33/12 39/15 44/15 44/17 44/19 46/7 47/3 47/10 47/16 50/8 51/9 67/5 68/1 69/11 71/13 71/17 75/21 87/11 90/14 90/17 93/8 99/10
**firsthand [3]** 61/23 62/11 79/1
**fish [1]** 53/2
**fit [2]** 55/24 72/21
**five [15]** 17/21 23/8 26/1 28/1 42/9 42/12 42/14 42/17 47/12 47/13 51/4 51/18 77/3 86/14 87/7
**fix [3]** 12/12 21/7 64/5
**FL [6]** 1/7 1/19 1/24 2/3 2/7 2/9
**flat [1]** 73/15
**flipped [1]** 64/14
**Floor [1]** 1/16
**FLORIDA [17]** 1/1 7/20 9/23 9/23 10/2 10/12 14/15 15/13 18/17 23/5 24/10 26/10 57/6 69/10 78/19 99/22 101/7
**flowed [1]** 66/19
**flowing [1]** 64/9
**focusing [1]** 37/5
**folks [2]** 18/23 73/17
**following [3]** 54/17 96/25 97/14
**folly [1]** 68/23
**force [1]** 49/9
**foregoing [1]** 103/7
**foreseeable [1]** 27/19
**forfeit [2]** 67/12 67/14
**forfeiture [24]** 65/10 65/18 65/19 65/22 65/25 66/2 66/11 67/3 67/6 67/11 68/2 68/8 82/24 91/13 91/21 92/20 98/2 98/2 98/14 100/1 100/1 100/6 102/4 102/7
**forget [1]** 87/4
**forgot [1]** 7/6
**form [2]** 34/24 35/15
**formalized [1]** 90/6
**former [1]** 54/23
**formula [1]** 69/6
**formulaic [1]** 69/4
**Fort [2]** 102/16 102/22
**forth [2]** 6/15 93/22
**forward [5]** 46/13 55/11 59/25 92/7 92/9
**forwarded [1]** 96/15
**found [7]** 48/15 66/3 71/9 71/17 71/25 80/23 80/23
**foundation [1]** 55/10
**foundational [1]** 52/9
**founder [1]** 54/8
**four [3]** 64/23 100/13 100/16
**four-level [2]** 100/13 100/16
**fox [1]** 79/4
**frame [2]** 66/16 66/22
**FRANCIS [1]** 1/21
**Frank [1]** 3/14
**frankly [1]** 23/1
**fraud [45]** 1/15 8/18 9/3 10/19 10/25 20/25 37/1 43/7 43/16 60/15 61/10 61/14 61/14 61/17 61/18 61/21 61/25 63/5 64/16 65/25 66/1 66/1 66/10 69/18 70/8 70/17 70/20 72/15 73/13 74/12 74/14 75/4 75/13 78/9 78/20 78/21 79/14 81/22 85/16 86/2 87/11 87/22 89/3 94/8 102/1
**frauds [2]** 84/20 91/8
**fraudulent [17]** 15/14 16/16 17/2 18/10 19/20 21/25 22/16 24/10 35/4 35/10 35/15 35/17 37/6 39/1 64/24 73/19 78/16
**fraudulently [3]** 9/8 32/13 65/6
**Friday [2]** 4/15 4/18
**Fried [5]** 69/19 69/23 70/1 71/23 73/12
**Frieds [1]** 87/5
**friend [1]** 55/21
**friends [3]** 50/12 56/9 95/5
**fro [1]** 50/10
**from experiencing [1]** 58/19
**front [2]** 25/24 64/22
**fruits [1]** 94/22
**frustration [1]** 12/21
**Ft [2]** 2/9 2/9
**FTX [1]** 69/18

**F**

**fudged [1]** 14/18
**full [6]** 11/6 12/5 12/17 24/4 29/17 89/23
**fully [1]** 55/1
**functioning [1]** 56/17
**fundamental [1]** 29/15
**fundamentally [3]** 73/10 73/18 74/7
**funded [4]** 18/16 18/18 19/3 24/7
**further [6]** 12/19 19/21 60/4 95/23 96/23 97/19
**future [1]** 52/22

**G**

**gain [3]** 39/12 62/6 94/22
**gains [1]** 96/13
**game [1]** 36/6
**gap [1]** 23/19
**Garcia [1]** 11/12
**gather [1]** 56/9
**gave [6]** 71/24 77/12 80/17 80/18 80/19 89/20
**general [3]** 61/14 76/5 76/11
**generalizations [1]** 17/19
**generally [1]** 82/8
**generate [2]** 20/20 22/4
**generated [2]** 14/25 21/5
**generational [1]** 78/14
**generosity [2]** 47/6 48/3
**generous [4]** 79/15 79/16 79/16 79/18
**genetic [3]** 63/5 63/12 74/15
**gentlemen [1]** 78/8
**geographic [1]** 99/19
**Georgia [1]** 99/22
**get [29]** 9/12 10/21 15/22 22/7 22/20 30/20 35/18 47/5 47/16 47/17 47/24 47/25 48/1 52/6 53/25 62/21 69/14 72/11 73/22 77/6 77/7 77/23 81/6 83/11 85/12 87/14 88/8 89/10 93/22
**gets [1]** 38/20
**getting [5]** 34/3 70/21 76/3 84/20 85/9
**girl's [1]** 36/5
**give [11]** 44/21 71/16 84/7 84/8 86/4 86/15 92/2 92/5 98/5 98/6 98/21
**given [1]** 87/21
**glimmer [1]** 74/19
**go [26]** 11/18 11/20 12/4 17/5 17/9 17/24 18/25 21/7 22/14 30/25 32/1 39/21 40/18 45/8 46/13 48/23 50/12 51/6 51/13 65/14 68/5 70/16 71/4 75/14 81/5 102/4
**goal [2]** 74/13 74/16
**goals [1]** 42/1
**God [4]** 49/1 49/22 57/12 57/16
**goes [10]** 11/2 14/4 16/10 18/7 21/12 75/15 77/4 83/13 89/14 90/8
**going [40]** 5/4 8/20 9/16 9/17 9/19 11/1 11/13 12/10 12/23 14/9 15/22 24/4 24/18 24/24 28/16 31/12 44/24 46/4 47/20 48/9 48/9 48/17 66/13 66/13 67/15 72/19 74/25 76/8 76/12 76/21 78/9 78/25 82/13 84/7 85/23 89/23 91/20 92/8 92/10 102/4
**gone [5]** 7/25 11/10 47/21 57/8 80/9
**good [25]** 3/1 3/5 3/7 3/11 3/15 3/17 3/19 3/20 46/22 46/23 49/19 50/2 51/1 52/4 52/9 52/15 52/16 57/5 65/15 80/20 81/18 84/9 84/15 102/24 103/3
**good-bye [1]** 57/5
**goods [2]** 29/11 30/1
**got [13]** 16/3 33/2 44/7 49/9 70/1 71/4 77/10 80/15 81/20 84/11 84/12 85/4 101/8
**gotten [1]** 53/3
**Government [92]** 4/1 4/7 4/15 5/7 5/8 6/1 7/1 7/4 7/12 8/5 8/7 14/14 15/14 16/10 17/17 17/18 17/24 18/4 18/10 18/13 18/17 18/18 18/19 19/3 19/10 20/8 21/15 22/14 22/18 24/2 24/22 25/6 25/13 25/22 27/2 27/22 28/3 29/13 29/24 29/25 30/10 31/10 33/11 34/23 35/20 38/4 40/11 44/20 60/9 65/2 65/7 65/17 66/8 66/15 67/20 69/13 70/2 70/16 71/10 72/24 73/20 73/24 74/2 74/5 75/2 76/25 77/12 77/18 78/9 78/15 78/18 81/20 84/1 84/4 85/13 86/3 86/9 86/12 86/24 88/1 91/12 92/18 93/25 94/5 94/11 94/15 96/12 98/3 101/4 101/10 101/21 102/4
**Government's [14]** 4/7 7/3 12/6 13/10 14/13 14/17 16/7 17/5 17/21 19/4 25/21 26/3 29/22 40/23
**grab [1]** 51/2
**grade [1]** 50/9
**grandmother [1]** 47/8
**granted [2]** 34/15 49/22
**granting [1]** 59/21
**grateful [1]** 53/24
**great [5]** 47/18 47/19 49/19 52/3 81/14
**greater [6]** 8/16 65/3 82/3 93/14 94/10 94/12
**greed [1]** 95/3
**grew [1]** 51/9
**grieve [1]** 58/16
**grieving [1]** 80/4
**gross [3]** 13/4 96/7 101/8
**ground [2]** 52/7 90/4
**group [3]** 8/8 12/6 12/7
**groups [1]** 79/11
**GROVE [3]** 1/18 3/9 65/11
**growing [1]** 50/7
**guardian [1]** 81/1
**guess [5]** 8/24 36/16 45/24 45/25 95/3
**guidance [1]** 91/5
**guide [1]** 53/13
**guideline [14]** 5/25 6/10 24/24 39/5 43/11 44/11 68/12 73/1 74/6 77/8 77/21 81/13 82/18 93/12
**guidelines [30]** 5/22 8/11 8/12 8/14 8/15 17/25 22/17 24/12 24/23 30/4 33/7 34/13 41/13 44/3 44/4 44/10 68/24 69/4 71/8 73/3 76/23 77/24 83/23 84/1 84/3 84/18 85/3 85/12 86/21 93/9
**guidepost [1]** 72/8
**guilty [5]** 7/7 57/11 66/4 77/17 90/3
**guitar [3]** 53/3 56/11 56/13
**gun [1]** 58/22
**guy [4]** 26/11 26/14 78/21 87/9
**guys [1]** 14/17

**H**

**had [62]** 3/25 4/19 7/18 7/23 10/3 11/9 12/12 12/15 14/18 16/13 16/17 17/7 17/8 18/14 18/15 22/21 25/17 26/8 26/15 27/18 28/9 28/18 29/16 29/18 31/12 31/20 35/20 35/23 36/14 36/25 36/25 41/3 41/4 41/5 44/9 44/23 47/17 49/2 50/9 57/4 57/7 59/11 67/21 67/22 67/22 68/17 68/18 70/13 70/14 72/14 73/23 74/22 78/12 80/18 81/4 83/4 84/15 84/16 84/21 90/14 92/20 99/10
**Haley [3]** 54/12 58/13 59/11
**Haley's [1]** 54/9
**hand [2]** 95/1 95/4
**handed [1]** 72/10
**handle [1]** 52/19
**handled [1]** 56/19
**hang [2]** 50/12 51/15
**happen [4]** 38/8 61/18 67/10 76/18
**happened [4]** 6/23 57/8 64/11 101/3
**happening [1]** 38/7
**happy [2]** 23/15 65/11
**hard [4]** 75/9 76/3 76/12 93/22
**harder [1]** 38/25
**harm [4]** 48/10 60/24 70/12 94/1
**Harris [1]** 80/2
**has [70]** 3/22 7/25 12/16 18/3 18/4 20/7 20/9 24/3 24/20 26/20 26/25 32/9 32/18 37/3 39/22 40/15 44/20 47/11 47/14 47/22 48/2 49/20 52/4 52/25 54/21 55/7 55/8 55/18 55/21 55/22 56/14 56/15 57/9 57/20 65/16 67/9 68/19 73/6 75/22 75/23 75/24 78/5 78/15 79/9 79/11 79/15 79/16 79/18 80/9 81/8 81/17 82/16 82/24 82/25 83/23 85/14 85/23 86/3

**H**

**has... [12]** 88/16 90/14 90/19 90/23 91/3 91/23 95/5 98/3 98/16 99/4 101/13 101/22
**hasn't [2]** 23/23 32/18
**have [162]**
**haven't [3]** 42/20 92/14 101/19
**having [5]** 34/21 36/10 38/5 48/7 48/18
**he [224]**
**he is [1]** 53/9
**he's [1]** 81/14
**health [7]** 54/14 54/18 56/20 61/1 63/19 73/22 73/23
**healthcare [8]** 8/18 9/3 60/15 61/14 61/15 63/1 74/12 74/14
**healthy [1]** 48/16
**hear [18]** 6/25 7/3 44/13 44/15 44/19 44/22 44/25 45/14 45/17 45/17 46/1 46/1 46/11 46/14 62/15 72/7 79/14 88/25
**heard [23]** 10/16 11/11 11/11 11/12 12/20 17/15 25/5 26/23 27/4 28/8 47/11 51/6 61/4 61/8 74/17 79/1 79/20 80/5 80/10 80/22 81/2 81/10 94/3
**hearing [4]** 50/1 50/18 102/3 103/5
**hearings [1]** 79/3
**heart [5]** 38/25 47/2 47/22 50/1 55/15
**heartbreaking [2]** 57/14 57/18
**heavily [1]** 47/14
**heavy [1]** 56/7
**held [2]** 29/13 71/13
**Hello [1]** 50/25
**help [8]** 49/14 54/15 58/19 59/25 79/24 81/6 81/6 94/5
**helped [10]** 39/25 47/11 48/3 49/5 49/12 49/14 49/20 50/9 58/14
**helpful [1]** 44/19
**helping [3]** 52/5 52/6 56/21
**her [9]** 48/4 54/3 59/9 59/10 59/15 80/24 80/25 81/25 81/25
**here [40]** 3/14 8/21 9/2 9/5 10/16 11/7 14/12 25/5 28/18 42/24 44/18 45/25 49/15 50/18 51/4 52/1 52/8 62/2 63/15 63/17 63/21 63/24 70/10 72/2 72/13 72/22 72/24 73/21 74/9 74/17 76/12 79/7 83/11 84/11 85/22 86/16 86/24 90/2 92/1 102/1
**hero [1]** 50/10
**herself [2]** 80/23 80/23
**hey [2]** 21/11 86/17
**Hi [1]** 50/3
**high [9]** 5/22 15/12 19/16 49/7 51/14 68/12 69/16 73/3 81/24
**higher [5]** 68/23 71/11 78/3 78/3 78/4
**highest [1]** 71/7
**highly [1]** 52/23
**him [43]** 26/11 26/19 27/20 35/7 37/8 37/12 38/2 44/8 47/9 47/14 49/18 50/6 50/19 50/19 50/20 50/22 51/18 52/1 52/12 53/22 54/20 54/21 54/25 55/5 55/8 55/18 55/19 56/14 57/3 59/7 59/17 75/25 77/12 80/2 80/4 81/12 82/2 86/3 86/4 87/19 88/25 90/6 91/1
**him is [1]** 54/25
**himself [2]** 33/9 69/25
**hired [1]** 86/1
**his [115]**
**his strengths [1]** 53/13
**history [8]** 44/12 53/18 69/17 70/18 72/17 78/12 78/24 93/12
**hit [2]** 30/20 51/11
**HIV [2]** 61/3 70/14
**hocus [1]** 77/5
**hocus-pocus [1]** 77/5
**hold [3]** 27/22 52/23 55/3
**holding [2]** 101/9 101/13
**holds [1]** 54/17
**holes [1]** 79/5
**holidays [2]** 57/18 57/24
**Holmes [1]** 70/7
**home [8]** 56/8 56/24 57/9 57/13 58/5 59/7 59/14 63/18
**homeless [6]** 26/21 26/22 28/6 63/20 80/23 93/23
**HON [1]** 2/10
**honest [2]** 75/5 75/9
**honestly [2]** 55/1 78/6
**honesty [1]** 55/12
**Honor [87]** 3/5 3/7 3/9 3/11 3/17 3/19 4/4 4/10 5/9 5/15 6/5 6/20 7/9 8/6 9/1 10/14 10/18 12/24 15/19 16/6 16/23 19/16 20/1 20/14 24/8 25/11 26/18 28/25 30/16 31/18 32/3 33/4 41/13 42/19 44/18 46/4 46/16 50/3 50/25 52/13 52/16 54/6 59/20 60/4 60/6 61/12 65/2 65/13 65/15 67/2 67/8 67/13 68/2 68/10 68/16 68/22 71/3 72/9 73/6 74/11 75/15 76/6 76/19 78/1 79/3 81/8 82/22 83/3 90/11 91/6 91/17 91/25 92/11 92/13 92/15 96/20 98/5 98/10 98/19 99/7 99/9 99/12 99/21 100/23 101/23 102/14 102/25
**HONORABLE [2]** 1/10 46/23
**honored [1]** 59/16
**hook [6]** 30/11 30/19 30/24 31/11 32/2 70/19
**hope [5]** 5/15 10/21 50/17 50/20 58/24
**hopeful [1]** 58/9
**hopefully [4]** 47/21 59/20 67/12 95/8
**hoping [1]** 6/12
**horrible [1]** 49/11
**hospital [3]** 19/1 48/22 48/24
**hospitalized [1]** 61/2
**hospitals [1]** 48/18
**hours [4]** 80/3 80/12 97/9 98/5
**house [2]** 56/8 80/24
**household [1]** 56/24
**households [1]** 23/7
**how [52]** 11/6 12/18 17/13 23/10 27/12 27/13 27/13 27/17 27/18 28/11 28/18 28/19 29/24 33/19 34/2 35/25 36/4 36/16 38/2 38/2 38/10 39/17 43/10 46/13 48/11 50/19 50/21 51/8 51/11 51/12 51/13 52/1 53/2 57/12 58/7 66/9 66/9 66/17 70/23 72/18 73/7 73/9 76/13 79/15 80/5 80/20 83/25 84/11 98/9 101/11 101/22 102/8
**how it [1]** 83/25
**HOWARD [8]** 2/1 2/1 3/17 32/20 33/3 39/21 99/6 100/7
**however [8]** 6/9 8/14 53/17 54/23 68/2 72/12 92/2 94/14
**huge [2]** 41/25 78/22
**human [2]** 81/14 83/14
**hundred [2]** 86/22 87/6
**hurting [1]** 68/20
**husband [3]** 49/19 52/20 53/6
**hypothetical [2]** 19/5 23/16
**hypothetically [1]** 24/4

**I**

**I have [1]** 93/8
**I'm [4]** 28/23 30/15 49/15 78/1
**ice [1]** 47/16
**idea [1]** 73/7
**ideation [1]** 58/22
**identical [1]** 20/2
**identified [2]** 20/24 41/9
**identify [1]** 41/8
**illness [2]** 26/20 54/10
**illnesses [1]** 28/8
**imagination [1]** 75/12
**imagine [1]** 48/11
**immediate [1]** 34/21
**immense [1]** 41/24
**immunized [1]** 42/19
**impact [5]** 5/23 44/3 44/10 56/14 101/22
**impacts [1]** 6/10
**impaired [1]** 27/14
**imperfect [3]** 88/12 90/1 90/4
**implicate [1]** 35/7
**implicated [1]** 40/22
**implies [1]** 21/11
**important [6]** 14/11 61/9 68/25 69/1 79/18 80/15
**importantly [2]** 53/4 55/22
**impose [8]** 68/13 76/6 81/21 82/4 82/15 82/23 91/6 94/9
**imposed [9]** 72/22 72/23 76/20 94/14 95/16 97/1 98/16

**I**

**imposed... [2]** 98/25 100/19
**imposition [3]** 5/19 65/17 66/5
**imprisonment [2]** 97/3 97/24
**improper [1]** 68/7
**improperly [2]** 22/7 22/8
**imputed [1]** 37/8
**inability [2]** 59/2 59/3
**incarceration [4]** 56/1 59/1 96/2 96/6
**incidents [1]** 81/2
**include [3]** 6/13 23/3 23/5
**included [7]** 15/25 23/6 23/10 32/24 64/5 65/18 99/13
**including [4]** 58/12 65/23 70/21 82/21
**including Theranos [1]** 82/21
**inclusion [1]** 28/10
**income [29]** 11/22 11/23 12/1 14/3 14/6 14/10 14/10 14/16 14/18 14/18 14/22 15/8 15/9 16/17 16/20 17/14 17/15 21/12 21/19 21/20 22/1 22/6 22/10 22/19 22/23 23/7 23/9 64/8 96/14
**incomplete [1]** 58/7
**inconsistencies [1]** 14/19
**inconsistency [6]** 14/16 14/24 20/20 20/21 21/4 21/11
**inconsistent [1]** 69/15
**incorrectly [1]** 25/22
**independent [1]** 39/2
**indicated [1]** 68/11
**indicates [2]** 36/10 75/17
**indicating [1]** 100/7
**indicative [2]** 89/4 90/21
**indicted [1]** 7/16
**indictment [3]** 7/14 65/23 67/18
**individual [2]** 22/7 48/2
**individualized [1]** 86/7
**individually [1]** 22/16
**individuals [9]** 7/15 28/7 31/21 42/22 62/3 62/4 62/9 62/14 62/18
**induce [1]** 29/10
**Industries [1]** 96/3
**industry [2]** 76/6 76/8
**infamous [2]** 69/18 70/7
**infected [1]** 48/21
**infections [1]** 61/3
**infer [1]** 16/23
**inference [2]** 27/3 27/3
**infirmities [1]** 24/21
**inflation [1]** 22/1
**influence [1]** 53/7
**influential [1]** 54/14
**information [19]** 6/8 14/8 14/11 15/6 20/17 20/18 21/6 21/16 21/22 24/15 35/2 35/11 44/14 64/8 72/4 75/17 87/20 99/13 99/13
**informative [1]** 72/13
**informs [1]** 38/2
**initial [2]** 11/19 67/5
**initially [1]** 39/16
**initials [2]** 17/6 17/7
**injuries [1]** 19/1
**injury [1]** 94/4
**injustice [1]** 88/10
**inquisition [1]** 64/20
**inside [3]** 83/15 83/16 83/19
**installed [1]** 58/20
**instance [1]** 9/10
**instances [2]** 8/20 26/8
**instead [7]** 13/5 13/10 16/18 17/12 56/13 58/6 67/24
**instilled [1]** 52/23
**instruct [1]** 40/25
**instruction [1]** 17/1
**instructors [1]** 51/23
**instrument [1]** 73/15
**instrumental [1]** 101/3
**insurance [29]** 17/23 25/16 25/25 27/1 27/7 27/25 30/8 30/13 30/18 30/18 31/1 31/5 31/19 31/21 36/19 48/15 48/18 48/19 49/4 49/11 52/6 61/9 62/5 73/22 73/23 74/18 75/1 75/6 76/2
**insured [1]** 11/25
**insureds [1]** 27/24
**intact [1]** 21/14
**integrity [3]** 51/24 55/14 59/18
**intend [3]** 5/3 12/4 100/1
**intended [18]** 8/3 8/15 8/16 8/17 8/25 9/5 10/19 10/22 13/3 13/11 17/1 24/9 24/18 24/25 64/24 85/19 100/6 100/12
**intending [1]** 11/6
**intends [1]** 88/15
**intent [1]** 12/4
**intention [3]** 6/20 12/15 12/16
**intentionally [2]** 39/6 60/17
**interacted [1]** 42/2
**interactions [1]** 41/20
**interest [1]** 96/9
**interesting [2]** 26/14 71/10
**interfere [2]** 21/2 21/15
**internalize [1]** 76/12
**internet [1]** 29/8
**intricate [1]** 39/9
**intrinsic [1]** 54/24
**invalid [1]** 18/6
**invalidation [1]** 20/13
**invest [1]** 73/14
**investigated [1]** 71/18
**investigation [4]** 3/24 4/6 7/24 71/20
**investigators [2]** 71/19 72/3
**invited [1]** 83/10
**inviting [1]** 24/1
**involuntary [1]** 54/17
**involve [2]** 42/17 68/19
**involved [29]** 10/24 31/9 33/13 33/19 33/21 34/20 35/4 35/21 40/22 41/2 41/23 42/14 42/22 42/23 43/6 43/15 43/22 48/11 53/9 56/18 79/10 79/10 79/11 81/3 87/10 87/22 88/4 101/2 101/15
**involvement [1]** 39/24
**involves [4]** 39/5 39/5 43/7 43/16
**involving [1]** 70/5
**Irish [1]** 47/7
**irreplaceable [1]** 56/25
**IRS [4]** 14/4 14/22 24/5 25/13
**is [520]**
**isn't [2]** 33/25 80/12
**issue [19]** 5/25 11/24 14/7 16/6 16/9 16/10 19/13 28/24 45/20 67/3 68/9 88/11 91/7 91/13 92/20 92/21 98/2 98/13 102/2
**issued [5]** 14/11 15/8 15/9 17/3 60/14
**issues [3]** 5/25 6/7 98/20
**it [296]**
**it's [2]** 78/14 86/17
**Italian [1]** 47/7
**Italian-Irish [1]** 47/7
**its [7]** 27/22 29/13 34/16 36/24 37/7 39/12 74/3
**itself [11]** 6/12 6/14 34/25 37/6 39/2 40/7 40/13 40/23 61/8 84/4 88/9
**Ivan [1]** 8/7
**IVF [1]** 48/4
**Iza [11]** 7/12 7/17 11/12 40/24 65/10 76/20 78/5 87/8 88/8 96/1 101/1
**Iza's [2]** 7/10 94/18

**J**

**Jackson [1]** 19/1
**Jacksonville [1]** 26/11
**jail [4]** 68/22 70/22 82/2 82/10
**JAMIE [2]** 1/14 3/5
**January [1]** 38/1
**Jason [4]** 72/9 72/11 82/5 82/20
**Jeannie [1]** 96/17
**Jessup [1]** 99/17
**job [4]** 47/16 82/15 96/3 96/4
**JOHN [3]** 2/5 2/5 3/18
**joint [2]** 65/9 95/25
**jointly [1]** 100/25
**jokes [1]** 56/3
**Joseph [4]** 26/18 27/4 27/5 51/3
**joy [4]** 56/5 57/21 58/6 59/24
**judge [8]** 1/11 46/23 49/22 71/15 71/22 71/25 88/24 100/7
**judges [1]** 72/25
**judgment [12]** 65/18 66/2 66/12 67/15 67/17 67/17 67/19 67/24 68/6 95/12 95/18 98/14
**judgments [3]** 65/10 65/19 98/3
**June [1]** 7/13
**jurisdiction [1]** 67/21
**jury [3]** 25/24 27/23 101/13

**J**

**jury's [1]** 89/17
**just [46]** 5/8 5/17 6/19 11/8 16/23 18/11 19/18 20/5 29/4 35/12 39/23 43/19 47/1 47/8 47/18 48/2 48/4 48/5 48/6 49/9 49/15 50/12 51/5 61/24 62/10 62/11 65/3 66/16 66/22 68/6 69/8 71/23 73/15 73/16 75/12 83/12 85/1 85/2 85/11 88/24 98/21 100/1 100/21 101/16 103/1 103/2
**justice [8]** 1/14 49/23 50/20 69/2 83/19 86/20 94/12 96/9
**justified [1]** 82/19
**justify [3]** 21/25 70/23 78/3

**K**

**keep [2]** 45/9 64/8
**keeping [3]** 36/1 36/8 36/9
**keeps [1]** 56/23
**KEITH [2]** 1/13 3/7
**kept [2]** 61/1 61/3
**kick [3]** 21/10 50/11 64/7
**kickback [1]** 72/16
**kicked [1]** 21/14
**kids [7]** 50/15 76/17 79/17 80/16 82/1 91/3 91/3
**kilo [1]** 87/14
**Kimberly [1]** 11/12
**kind [9]** 27/16 31/21 37/3 40/7 50/8 50/13 61/6 77/15 89/25
**King [1]** 49/22
**Kirov [1]** 11/11
**Kirov's [1]** 8/7
**kissed [1]** 57/5
**knew [14]** 11/13 12/14 12/21 26/8 27/19 33/24 35/9 35/12 38/6 39/15 39/17 41/25 62/3 79/25
**know [52]** 7/1 9/16 10/6 10/9 13/8 15/9 16/9 18/24 23/20 23/21 28/11 29/24 31/14 35/14 36/2 36/6 40/5 44/20 44/24 45/14 46/6 47/6 47/10 47/11 47/18 48/6 48/7 48/25 49/11 52/3 55/1 57/12 58/10 62/5 67/16 69/5 69/5 69/21 71/6 72/25 74/5 83/13 84/7 85/13 86/10 89/2 89/8 92/23 98/24 100/24 101/11 102/19
**knowing [2]** 64/19 64/20
**knowingly [1]** 35/4
**knowledge [1]** 35/20
**known [4]** 12/3 12/18 18/16 79/1
**knows [2]** 34/4 35/8
**Kolaya [1]** 1/22

**L**

**lab [3]** 32/13 63/5 63/7
**lack [2]** 16/4 88/18
**ladder [1]** 51/21
**laid [2]** 48/14 49/2
**landfill [2]** 83/9 83/17
**language [2]** 19/8 29/6
**lapse [1]** 19/8
**large [13]** 16/13 19/3 19/7 26/17 27/10 28/3 29/10 30/5 43/23 63/9 69/17 84/22 101/3
**largely [1]** 23/17
**larger [2]** 64/4 66/15
**largest [2]** 69/21 70/17
**Larissa [1]** 54/8
**last [1]** 30/15
**later [2]** 47/6 57/5
**laughable [1]** 69/25
**laughter [2]** 56/3 56/14
**launched [1]** 72/18
**laundering [2]** 45/24 66/3
**law [10]** 2/5 29/3 49/17 52/21 60/14 62/1 80/6 81/4 87/12 100/11
**law-abiding [1]** 52/21
**laws [2]** 54/15 62/6
**lawyer [3]** 88/21 89/19 89/23
**lawyers [3]** 44/16 46/15 93/13
**lead [7]** 35/3 40/25 51/23 55/14 69/5 70/6 100/18
**leader [2]** 42/13 42/16
**leaders [1]** 54/14
**leadership [1]** 41/4
**leads [1]** 40/20
**league [2]** 80/11 81/3
**learn [4]** 11/3 52/1 80/20 80/20
**learned [1]** 26/6
**least [4]** 13/2 32/18 43/23 83/21
**leaves [1]** 21/17
**led [1]** 70/11
**left [5]** 51/17 56/16 68/9 73/17 80/6
**Legacy [1]** 54/9
**legal [2]** 36/23 59/18
**legality [1]** 88/25
**legislators [1]** 54/13
**legitimate [2]** 35/19 74/25
**Leiva [1]** 22/21
**leniency [2]** 55/15 59/22
**less [5]** 9/2 70/1 72/23 91/9 94/19
**lesser [2]** 84/17 94/10
**let [11]** 3/21 5/3 6/14 6/25 7/5 47/1 65/11 71/15 91/12 98/24 98/24
**let's [12]** 6/25 7/4 10/24 11/16 31/23 44/25 46/14 47/24 69/16 86/4 86/17 99/10
**letter [3]** 11/24 21/5 80/1
**letters [6]** 3/25 4/7 45/5 62/16 80/10 80/16
**letting [1]** 50/4
**level [13]** 17/14 44/8 44/11 72/14 72/17 72/19 93/11 99/18 100/13 100/14 100/15 100/16 101/14
**levels [1]** 88/17
**liability [3]** 31/22 31/25 32/7
**liable [4]** 29/22 31/4 32/4 71/13
**license [3]** 36/14 39/1 76/2
**licensed [2]** 31/20 62/5
**licenses [1]** 38/23
**lie [5]** 70/21 71/18 72/3 72/5 89/12
**life [18]** 48/19 48/25 51/7 51/8 52/22 53/2 55/18 56/24 59/14 75/23 76/10 76/16 79/2 90/13 90/24 91/1 91/2 91/7
**light [2]** 83/8 91/8
**lights [1]** 57/23
**like [45]** 4/10 6/2 7/2 8/3 10/18 11/5 14/5 14/5 21/18 22/21 26/10 26/19 29/4 29/4 37/12 46/1 47/23 47/24 48/12 48/16 51/17 51/25 52/19 53/2 53/23 56/5 59/10 60/12 62/4 64/8 67/2 68/10 70/4 70/6 71/23 75/20 82/12 82/14 84/9 85/7 86/1 88/12 89/4 92/22 102/16
**likelihood [2]** 8/19 75/25
**likely [1]** 6/18
**likes [1]** 90/13
**Likewise [4]** 11/21 18/23 81/2 99/15
**limit [2]** 16/21 16/22
**limited [3]** 5/12 7/18 7/23
**line [5]** 23/8 48/25 81/21 82/5 82/6
**list [1]** 70/16
**listened [1]** 51/5
**little [14]** 3/15 10/23 26/5 47/5 49/21 50/4 50/6 51/7 53/3 57/10 75/25 77/3 86/23 102/2
**live [1]** 85/7
**lived [2]** 47/15 80/24
**lives [7]** 53/15 55/12 58/24 59/6 85/9 95/8 95/9
**living [4]** 26/12 52/21 57/3 76/18
**LLOYD [62]** 1/7 1/21 3/3 3/12 4/3 6/17 12/14 12/19 18/14 25/1 26/8 27/19 33/17 34/10 37/13 37/16 37/20 37/23 37/24 38/1 38/2 38/22 39/17 40/3 40/24 41/18 42/6 44/6 45/23 64/4 64/4 64/10 66/6 66/10 70/2 72/2 74/18 75/17 75/21 77/2 77/14 77/19 77/23 79/7 79/8 79/16 80/14 80/22 81/5 81/10 81/12 81/23 82/8 82/17 89/24 92/22 95/13 97/5 99/15 99/16 99/24 101/1
**Lloyd's [11]** 3/23 3/24 6/5 12/4 37/17 38/9 38/23 82/13 97/21 98/1 99/8
**locked [1]** 48/17
**log [1]** 21/8
**logical [1]** 37/2
**logically [1]** 36/17
**long [6]** 12/9 48/8 48/20 76/12 78/12 83/15
**longer [2]** 11/6 39/1
**look [13]** 6/2 17/13 25/20 26/19 29/6 42/19 50/20 51/25 71/6 72/8 72/14 75/20 82/20
**looked [4]** 8/3 44/2 94/14

**L**

**looked... [1]** 94/18
**lose [2]** 12/10 73/3
**losing [2]** 60/25 63/19
**loss [81]** 6/25 7/1 7/3 7/4 7/6 7/8 7/10 7/11 7/18 7/22 7/25 8/3 8/4 8/15 8/15 8/16 8/25 9/5 10/13 10/19 10/22 12/10 13/3 13/11 13/16 13/21 13/23 16/7 18/8 18/21 19/5 19/22 20/4 20/8 20/25 22/18 23/2 23/4 23/11 24/4 24/9 24/11 24/19 24/25 54/11 55/5 57/15 58/13 58/13 58/19 59/4 60/23 63/14 63/24 64/25 64/25 68/25 69/17 69/20 69/21 70/5 70/9 71/13 72/6 73/3 76/21 77/1 77/2 77/4 80/3 80/4 85/16 85/17 85/19 85/20 85/22 93/13 93/25 94/3 100/12 101/6
**lost [5]** 26/7 59/13 80/7 82/13 92/8
**lot [11]** 5/24 23/18 37/16 60/2 69/7 74/11 79/13 80/10 81/17 81/18 90/14
**lots [1]** 32/6
**love [4]** 50/19 52/12 54/20 55/9
**loving [2]** 55/23 58/2
**lovingly [1]** 57/24
**low [5]** 22/20 40/8 40/9 40/11 99/17
**loyal [1]** 50/13
**luck [1]** 102/24
**luckily [1]** 48/23
**lunch [1]** 88/25

**M**

**made [18]** 9/14 16/23 23/23 31/10 40/24 52/3 57/18 60/17 62/22 73/6 75/3 76/22 78/2 79/23 79/24 79/24 89/2 95/1
**Madoff [1]** 69/22
**magic [3]** 57/22 57/25 58/2
**mail [1]** 29/8
**majority [1]** 28/7
**make [23]** 3/21 5/18 5/24 6/6 6/16 11/25 13/3 38/24 40/16 45/4 46/12 48/20 57/24 62/22 67/4 68/8 77/15 83/8 88/14 92/23 100/21 101/15 102/12
**makes [3]** 14/3 26/25 75/11
**making [2]** 4/23 47/24
**malicious [1]** 52/5
**man [6]** 49/19 49/20 52/3 53/1 53/20 68/16
**managerial [1]** 36/21
**managing [1]** 56/22
**mandatory [2]** 65/21 97/12
**manifested [1]** 83/23
**manipulation [1]** 87/12
**manner [6]** 35/10 35/15 35/17 83/23 90/23 98/18
**manslaughter [1]** 85/9
**many [32]** 17/13 22/9 23/16 27/12 27/13 27/14 27/17 27/19 28/11 31/25 42/2 43/8 43/17 45/24 47/11 47/11 49/1 49/20 61/16 67/9 67/9 72/18 73/12 73/22 78/15 80/9 81/15 81/15 93/13 93/21 94/2 95/7
**March [1]** 103/10
**mark [2]** 12/20 19/17
**marketer [2]** 34/21 35/25
**marketers [6]** 12/20 32/25 33/22 38/15 42/18 42/21
**marketing [20]** 25/3 28/18 28/20 28/24 29/1 29/2 29/4 29/7 31/17 31/22 32/11 32/12 32/17 32/23 33/1 34/11 37/12 41/24 77/8 100/15
**marketplace [4]** 11/22 14/4 15/5 17/2
**married [2]** 75/24 82/1
**Mart [1]** 26/12
**mass [14]** 25/2 28/18 28/20 28/24 29/1 29/3 31/22 32/11 32/12 32/17 32/23 33/1 77/8 100/15
**massive [2]** 70/8 70/8
**match [6]** 7/25 14/15 14/19 14/24 16/6 16/9
**matching [3]** 14/7 20/20 21/4
**material [2]** 57/21 96/11
**mathematical [1]** 69/4
**matrix [1]** 87/21
**Matt [1]** 3/12
**matter [6]** 4/11 4/13 4/14 36/9 68/13 103/8
**matters [2]** 62/23 99/11
**MATTHEW [2]** 1/21 52/17
**maturing [1]** 91/4
**maximize [1]** 31/14
**maximum [1]** 13/23
**may [19]** 4/24 4/25 5/22 10/10 13/25 40/5 41/3 53/3 54/22 55/23 65/19 68/12 74/1 85/10 87/24 89/5 92/11 96/8 101/20
**me [54]** 3/21 5/3 6/25 7/5 8/24 13/17 13/20 15/1 44/17 44/20 47/1 47/11 48/19 48/22 48/25 49/12 50/4 50/9 50/10 50/11 51/10 51/11 51/11 51/12 52/9 52/23 53/2 53/5 53/5 54/6 59/11 65/13 68/23 70/25 71/15 71/16 71/21 73/10 73/18 81/20 83/10 83/20 86/15 90/7 91/12 92/4 96/17 98/5 98/21 98/24 99/19 101/12 102/12 102/19
**mean [9]** 18/25 21/24 33/18 33/20 35/9 40/12 47/21 83/8 85/4
**meaning [1]** 73/4
**meaningful [1]** 53/15
**means [15]** 9/20 20/10 29/9 33/2 33/5 33/10 37/8 37/14 38/18 39/6 39/7 39/8 39/20 58/8 100/16
**measure [7]** 8/14 24/11 37/7 87/10 87/23 89/4 89/14
**median [1]** 72/23
**Medicaid [35]** 10/24 18/14 18/17 18/24 22/4 22/7 23/13 23/17 23/19 23/21 23/22 23/24 23/25 25/17 26/7 26/9 28/9 28/12 28/13 31/5 33/12 33/16 33/25 34/20 35/1 35/5 35/18 37/4 37/19 38/2 38/5 38/14 39/15 39/23 40/2
**medical [3]** 31/3 73/25 94/3
**medically [1]** 63/11
**Medicare [21]** 9/15 10/19 11/3 11/4 18/15 18/16 18/24 31/5 32/8 32/10 32/12 32/15 32/15 34/9 38/16 63/5 63/7 63/8 63/11 63/17 70/17
**medication [2]** 60/25 61/1
**medications [1]** 61/2
**meet [1]** 93/15
**member [1]** 23/6
**members [2]** 49/6 54/13
**memo [6]** 4/6 4/8 60/20 63/1 69/9 102/7
**memorable [1]** 57/24
**memorandum [2]** 3/25 37/22
**memories [1]** 56/10
**memory [2]** 50/8 51/9
**mental [4]** 28/8 54/10 54/14 61/1
**mention [1]** 96/17
**mentioned [5]** 68/22 76/19 82/6 89/11 93/13
**mentor [1]** 51/23
**mentored [1]** 90/23
**mercy [2]** 49/23 52/9
**mere [3]** 34/25 36/20 87/17
**mere,y [1]** 6/15
**merit [1]** 24/13
**message [4]** 38/12 61/19 76/12 76/15
**messages [4]** 38/3 41/19 64/13 89/3
**met [1]** 22/6
**method [1]** 100/4
**methodology [4]** 7/9 7/10 7/22 77/1
**methods [1]** 29/7
**Miami [4]** 1/19 1/24 2/3 2/7
**middle [1]** 90/4
**MIDDLEBROOKS [3]** 1/3 1/10 2/10
**middleman [3]** 36/19 36/20 36/24
**might [11]** 8/23 8/24 9/16 11/1 23/13 24/3 44/24 69/19 74/16 80/1 100/8
**Miguel [1]** 80/16
**Miller [3]** 26/18 27/4 27/5
**million [49]** 8/4 8/5 9/5 9/12 11/8 12/11 13/5 13/6 13/12 13/24 15/1 15/10 15/11 15/17 15/20 16/2 19/17 19/18 19/24 20/12 24/9 24/14 24/18 24/25 60/23 63/4 63/7 64/24 64/25 65/8 66/13 70/9 71/14 72/6 73/25 77/2 77/3 85/22 85/25 86/1 86/3 87/6 94/1 100/12 100/24 101/6 101/7 101/8 101/9
**millions [4]** 49/12 62/22

## M


**millions... [2]** 75/3 75/3
**mind [4]** 10/14 15/11 49/22 90/9
**mindful [1]** 86/23
**minds [1]** 57/10
**mine [1]** 53/12
**minimize [1]** 68/24
**minimum [2]** 22/20 22/24
**ministry [2]** 79/10 80/2
**minutes [4]** 5/15 83/12 83/13 83/18
**misdemeanor [1]** 68/18
**miss [1]** 48/9
**missing [1]** 59/6
**mission [1]** 54/11
**mistake [4]** 52/3 60/17 64/17 90/7
**mitigating [1]** 79/14
**mix [1]** 16/4
**model [1]** 47/15
**mold [1]** 55/24
**moment [3]** 38/9 55/16 74/13
**moments [4]** 55/14 56/10 58/12 82/11
**mommy [1]** 59/10
**money [39]** 9/9 9/11 10/11 11/14 11/15 11/18 12/2 17/23 18/19 23/25 24/3 45/24 62/21 64/8 65/10 65/18 65/19 66/2 66/3 66/3 66/9 66/12 66/19 67/15 67/17 67/17 67/19 67/21 67/24 68/6 70/13 73/14 78/2 78/8 79/16 79/17 98/3 98/14 101/9
**money was [1]** 66/9
**monitor [1]** 96/10
**month [2]** 38/1 95/16
**monthly [1]** 96/7
**months [25]** 44/9 44/12 68/22 72/22 72/23 73/2 77/10 77/13 77/21 77/25 80/25 83/21 83/22 88/8 93/12 94/18 95/14 95/14 95/20 95/20 95/21 95/21 96/20 96/21 97/24
**moot [1]** 19/23
**Moran [2]** 32/10 94/17
**more [48]** 7/18 7/23 7/25 8/17 8/21 10/19 10/23 12/2 18/1 19/5 24/20 29/9 42/9 42/14 42/17 45/4 51/19 52/13 53/18 55/22 55/22 57/18 64/3 64/18 69/6 69/7 69/7 70/11 71/8 75/9 78/2 80/7 80/15 81/12 81/13 82/5 82/6 82/7 84/21 85/24 86/1 86/23 89/4 92/3 92/4 98/6 102/2 102/19
**more participants [1]** 42/14
**Moreover [1]** 20/23
**morning [3]** 14/1 56/1 57/4
**mornings [1]** 56/7
**most [15]** 15/10 16/21 22/22 37/13 44/19 53/4 53/22 58/15 61/7 63/2 63/3 69/16 69/18 71/21 79/18
**mother [10]** 46/16 46/24 47/7 48/21 50/7 50/17 54/2 54/5 80/7 80/23
**mother's [2]** 47/19 50/1
**motion [8]** 37/21 67/10 91/17 91/22 92/19 98/4 102/4 102/7
**motivated [1]** 95/3
**motorcycle [1]** 53/4
**move [3]** 6/25 55/11 59/25
**Mr [139]**
**Mr. [2]** 42/6 69/23
**Mr. Bankman-Fried [1]** 69/23
**Mr. Lloyd [1]** 42/6
**Ms [12]** 5/6 11/8 14/2 20/12 20/15 20/19 31/16 37/10 41/11 45/16 46/3 94/24
**much [22]** 5/22 9/2 12/19 13/1 40/10 48/10 50/19 50/21 57/12 58/7 59/12 62/8 64/18 66/9 66/9 79/18 80/15 83/25 86/14 86/14 91/7 98/9
**multi [3]** 78/12 78/14 81/22
**multi-billion [1]** 81/22
**multi-decade [1]** 78/12
**multi-generational [1]** 78/14
**multiple [3]** 25/9 71/18 78/4
**multiples [1]** 78/5
**multiplied [2]** 15/2 19/18
**murder [2]** 69/11 69/11
**MURRAY [2]** 1/21 3/14
**music [1]** 56/8
**musician [1]** 53/12
**must [9]** 33/9 48/11 49/16 57/11 57/12 62/7 96/3 96/5 99/1
**mutual [1]** 55/24
**my [61]** 3/13 15/11 17/9 25/22 36/7 46/25 47/2 47/3 47/3 47/7 47/10 47/22 48/3 48/19 48/21 48/21 49/5 49/6 49/13 49/18 50/7 50/8 50/9 50/9 50/17 51/3 51/7 51/7 51/9 51/9 51/10 51/17 52/16 52/22 52/25 53/7 53/7 53/25 54/2 54/5 54/6 54/8 54/11 54/20 54/21 54/25 55/15 55/17 55/21 55/23 58/4 58/4 58/13 67/5 68/1 68/21 69/6 83/4 88/18 92/25 102/10
**myself [2]** 48/15 53/14


## N


**N.W [1]** 1/15
**Nadler [1]** 1/22
**name [9]** 7/7 35/24 35/25 36/1 36/10 51/3 52/16 54/8 69/19
**Natalie [2]** 27/4 27/5
**nature [5]** 36/24 73/5 87/8 93/19 96/25
**NE [1]** 1/19
**near [1]** 15/15
**necessarily [4]** 15/25 19/19 26/23 35/3
**necessary [10]** 19/21 22/20 65/3 71/8 76/14 82/3 86/12 93/15 94/12 95/11
**need [16]** 6/11 27/25 41/8 45/2 48/1 48/23 59/8 60/10 60/13 61/13 78/4 82/16 94/6 97/1 101/14 102/2
**needed [11]** 17/20 27/15 28/1 30/12 30/17 48/4 48/24 49/14 58/15 79/23 81/7
**needing [1]** 91/4
**needs [7]** 22/14 61/1 61/10 61/11 86/7 86/10 86/23
**negate [1]** 87/21
**Neither [2]** 8/10 8/13
**nephew [1]** 80/6
**nervous [2]** 46/24 48/18
**net [2]** 13/5 101/8
**never [7]** 11/15 29/22 68/17 68/18 75/18 76/18 83/11
**new [3]** 1/15 74/14 97/16
**newcomers [1]** 51/22
**newspaper [1]** 69/25
**next [4]** 17/2 21/20 38/1 88/24
**nexus [1]** 67/13
**nickel [1]** 101/4
**niece [1]** 48/3
**nights [1]** 79/22
**nine [2]** 36/5 47/7
**no [43]** 1/3 6/20 9/17 11/6 11/17 12/2 12/15 14/10 14/24 15/19 19/12 19/14 20/22 25/12 26/8 31/9 32/22 37/2 38/6 38/9 39/1 41/4 41/17 41/20 42/11 42/25 44/6 67/16 71/2 72/3 73/16 74/14 79/4 83/12 85/15 86/5 86/19 88/23 91/17 93/3 97/16 98/19 100/3
**no data [1]** 19/12
**noble [1]** 59/3
**nobody [3]** 12/15 17/19 90/13
**non [2]** 5/25 54/8
**non-guideline [1]** 5/25
**non-profit [1]** 54/8
**none [6]** 6/9 25/24 41/9 49/16 72/2 98/22
**nonsense [1]** 75/10
**nonviolent [1]** 85/6
**nose [2]** 83/13 86/24
**not [196]**
**not permissible [1]** 22/11
**note [4]** 5/21 24/22 43/4 43/13
**noted [1]** 6/21
**notes [2]** 43/3 43/11
**nothing [4]** 35/21 60/4 73/16 74/22
**notice [5]** 4/16 14/1 67/16 99/1 99/2
**notion [12]** 18/18 36/13 36/18 36/21 39/24 86/17 86/20 87/11 87/17 88/7 88/12 88/20
**notwithstanding [2]** 77/10 85/19
**November [1]** 57/5
**November 17th [1]** 57/5
**now [20]** 38/22 44/13 46/12 50/15 56/7 56/11 56/13 57/10 58/25 65/13 68/19 69/5 77/12 78/1 81/24 82/11 86/21 87/9 87/20 98/16
**nuanced [1]** 10/24

N

**numb [1]** 87/2
**number [23]** 3/3 3/25 7/25 8/25 13/12 13/20 15/18 16/24 23/9 24/23 26/6 26/17 27/10 28/4 29/10 41/25 43/23 45/5 66/16 66/18 77/12 96/1 100/14
**numbers [3]** 16/1 30/5 72/7

O

**Obama [7]** 17/7 33/24 39/12 39/18 74/23 75/10 94/8
**object [5]** 41/10 91/15 98/17 100/10 100/19
**objection [3]** 28/17 39/17 40/16
**objections [16]** 3/24 4/6 5/21 5/22 5/24 6/7 6/15 6/19 6/22 44/1 93/10 98/23 100/8 100/21 103/1 103/1
**objects [1]** 19/10
**obligated [1]** 5/23
**obligation [1]** 54/25
**obligations [1]** 96/5
**obtain [3]** 28/13 85/18 86/13
**obtained [1]** 7/24
**obtaining [1]** 35/5
**obvious [2]** 69/18 76/2
**obviously [1]** 26/19
**occurred [2]** 85/15 91/24
**off [6]** 48/15 49/3 51/10 74/16 100/1 100/6
**offenders [4]** 60/13 85/8 90/15 90/17
**offense [18]** 39/5 39/9 39/10 43/6 43/15 47/3 49/24 60/22 66/7 73/6 74/22 75/21 85/6 85/15 86/13 93/11 97/1 100/17
**offenses [3]** 61/22 66/3 85/2
**offer [1]** 16/15
**offered [1]** 23/9
**offering [1]** 58/14
**office [6]** 1/18 79/22 96/9 96/10 97/10 99/4
**Offices [1]** 2/5
**Official [2]** 2/9 103/11
**often [4]** 73/13 79/21 84/15 101/24
**oh [1]** 86/9
**okay [9]** 3/21 5/2 13/19 45/7 48/16 48/16 54/5 62/5 103/2
**old [11]** 36/5 52/17 57/1 57/1 59/9 68/16 75/22 81/24 82/2 82/10 84/12
**older [1]** 50/11
**oldest [2]** 54/11 58/13
**once [5]** 31/3 49/9 56/12 60/17 74/23
**one [65]** 5/11 7/3 8/10 8/13 9/13 10/6 10/6 10/9 10/9 12/7 12/20 13/2 15/12 15/14 16/16 18/7 22/5 22/16 23/16 26/10 26/24 27/8 27/10 28/23 32/1 33/16 34/4 37/25 38/8 40/16 40/16 42/19 44/6 47/7 47/13 47/13 47/14 47/16 49/1 50/8 51/10 51/11 51/12 51/15 51/23 52/13 55/24 61/20 61/24 65/5 69/8 69/18 72/8 74/13 75/16 77/17 77/18 78/7 81/14 90/15 94/17 94/24 95/1 99/12 99/25
**ones [8]** 15/3 17/10 17/11 25/14 37/18 64/12 64/14 64/15
**ones' [1]** 57/10
**ongoing [1]** 7/23
**only [41]** 5/13 9/19 11/3 14/14 14/16 14/18 15/3 16/2 16/11 17/20 23/6 25/6 25/25 27/17 29/10 30/23 43/7 43/16 47/19 49/1 49/18 49/24 53/15 55/7 55/17 56/5 57/14 58/16 59/4 60/11 61/20 62/20 70/1 70/8 70/12 70/22 75/6 78/18 82/7 86/25 100/6
**open [5]** 22/9 28/13 37/24 39/18 40/2
**opening [2]** 25/24 29/14
**operate [2]** 34/5 34/11
**operated [1]** 63/7
**operating [1]** 36/22
**operation [6]** 34/11 41/24 43/2 64/4 64/5 83/16
**operative [1]** 20/5
**opine [1]** 88/25
**opinion [1]** 25/22
**opioid [1]** 60/25
**opportunity [5]** 4/19 54/6 59/13 68/4 92/24
**oppose [1]** 68/4
**opposed [3]** 6/23 34/21 84/20
**or services [1]** 29/12
**order [13]** 13/22 35/6 40/10 45/14 64/8 65/8 67/10 85/24 91/21 101/15 101/16 101/22 102/9
**ordered [5]** 95/23 96/23 97/19 100/3 100/24
**orders [1]** 65/20
**org [1]** 42/4
**organization [2]** 43/5 43/14
**organizational [1]** 41/5
**organize [2]** 40/25 94/22
**organized [5]** 40/20 41/18 42/2 42/7 63/6
**organizer [3]** 41/16 42/13 42/16
**other [50]** 3/25 5/13 9/19 13/7 16/7 18/15 19/22 25/1 26/16 27/10 28/14 29/9 30/6 32/11 35/23 37/19 38/3 40/16 40/21 40/21 41/14 43/10 44/14 47/13 47/13 48/16 49/5 49/6 50/12 54/14 58/19 58/25 60/14 60/15 65/9 68/25 70/4 72/7 74/25 77/17 88/11 94/14 94/18 95/4 95/15 95/25 98/22 99/11 99/25 101/20
**others [7]** 16/14 22/21 43/20 58/23 61/4 67/22 73/9
**otherwise [14]** 36/23 39/5 41/16 41/21 42/8 42/15 42/24 43/2 43/4 43/5 43/13 43/14 67/23 75/5
**ought [5]** 15/1 15/2 16/23 74/10 75/8
**our [45]** 6/7 6/19 20/1 37/22 48/3 50/16 50/21 51/8 51/20 54/19 55/10 55/25 56/1 56/8 56/11 56/18 56/20 56/21 56/23 57/1 57/9 57/22 58/12 58/12 58/14 58/17 59/6 59/8 59/9 59/16 59/19 59/21 59/25 60/20 61/7 61/21 61/25 62/25 69/9 88/11 98/22 100/8 100/8 100/18 103/1
**out [68]** 5/13 7/21 9/6 9/7 9/9 9/11 11/9 11/15 11/18 11/18 11/20 11/24 12/2 12/5 13/22 15/20 17/24 18/20 21/10 21/14 21/17 23/13 23/22 23/24 24/3 24/22 26/18 32/3 32/12 38/13 38/14 39/16 40/5 41/19 44/2 49/14 50/12 51/13 51/15 51/20 58/16 58/18 60/18 61/21 61/25 64/7 66/16 66/21 69/10 71/15 71/16 71/17 71/18 72/17 72/19 72/20 73/9 73/15 74/1 79/13 80/9 81/5 81/21 82/10 83/4 83/24 89/20 101/5
**outlandish [2]** 87/1 87/3
**outrageous [1]** 89/9
**outrageously [1]** 71/24
**outside [6]** 22/9 33/23 34/5 37/24 67/21 79/12
**outsiders [2]** 43/9 43/18
**outweighs [1]** 93/19
**over [23]** 4/18 12/14 16/8 18/18 18/21 25/23 25/23 39/17 41/3 41/5 45/9 53/3 59/11 63/6 68/22 72/10 83/11 85/4 86/22 89/12 89/18 89/18 94/1
**overall [3]** 35/8 39/11 45/19
**overstated [4]** 53/8 60/22 62/2 82/19
**own [19]** 12/6 14/2 15/4 15/7 17/5 17/21 18/11 31/11 40/23 50/15 57/22 62/10 64/19 74/3 75/4 77/11 81/5 85/21 90/22
**owner [1]** 78/2

P

**PA [1]** 2/1
**packed [2]** 16/20 17/13
**pages [2]** 6/7 6/11
**paid [42]** 5/13 7/20 8/4 8/20 8/22 8/23 9/4 9/6 9/7 9/9 9/11 9/17 9/21 9/22 9/23 10/21 10/22 11/1 11/9 11/15 11/18 12/2 12/5 12/25 17/20 18/11 18/19 23/13 23/22 23/24 24/3 24/21 25/23 26/1 63/4 73/20 74/1 95/24 101/4 101/8 101/10 101/25
**pain [3]** 57/20 58/16 58/25
**painful [3]** 55/2 56/15 58/7
**painfully [1]** 56/8
**pains [1]** 81/20

**P**

**PALM [4]** 1/2 1/7 2/9 51/22
**panic [1]** 86/15
**papers [3]** 88/11 91/14 100/8
**par [2]** 63/15 63/23
**paragraph [1]** 33/6
**parameters [2]** 72/21 72/21
**Pardon [1]** 70/25
**parent [1]** 56/19
**parents [1]** 58/21
**part [19]** 14/17 16/13 19/3 25/8 29/23 30/15 47/9 49/12 51/13 52/23 64/9 64/10 65/18 71/22 74/24 78/2 91/23 97/13 101/4
**participants [13]** 40/21 40/21 41/6 41/8 41/12 41/15 42/10 42/12 42/14 42/18 43/8 43/17 43/24
**participate [3]** 34/17 34/18 99/15
**participates [1]** 53/11
**participating [3]** 34/12 34/15 35/7
**participation [3]** 34/1 34/3 34/14
**particular [9]** 5/12 26/14 32/16 39/13 45/14 61/13 73/15 83/16 86/8
**particularly [1]** 54/15
**parties [1]** 5/3
**partly [1]** 84/14
**partner [1]** 54/23
**parts [4]** 26/14 27/8 78/15 93/21
**passed [2]** 47/8 59/11
**passing [1]** 61/4
**passion [1]** 51/24
**passports [1]** 99/5
**past [2]** 21/19 93/22
**Patel [9]** 32/10 63/3 63/16 63/20 63/23 71/9 71/13 89/11 94/16
**patient [1]** 60/24
**patients [4]** 26/7 61/5 94/1 94/2
**pattern [3]** 11/5 17/12 20/7
**Pauline [2]** 2/9 103/11
**pay [18]** 9/18 9/19 15/17 17/23 18/19 25/18 25/18 29/18 30/13 31/11 31/12 93/17 95/23 96/3 96/5 96/7 96/11 97/19
**payable [3]** 65/9 96/15 100/25
**paying [3]** 30/25 31/1 85/25
**payment [3]** 10/21 96/10 100/4
**payments [2]** 10/1 96/12
**pays [3]** 11/3 32/12 32/15
**PB [1]** 17/6
**peace [1]** 59/24
**Pedneau [4]** 9/10 10/7 20/15 20/19
**Pedneau's [1]** 14/2
**pen [1]** 84/14
**people [82]** 5/4 12/9 12/19 12/22 15/21 15/23 16/2 17/13 17/16 17/23 18/14 18/25 18/25 22/9 22/22 23/16 23/20 25/15 25/23 25/25 27/5 27/12 27/18 28/6 28/9 28/11 28/19 30/5 31/10 31/12 33/23 35/1 35/2 35/13 39/12 41/1 41/3 41/5 44/25 46/9 46/14 48/3 48/17 49/1 49/12 49/20 51/12 52/5 52/6 61/6 68/20 70/12 70/13 73/2 73/14 73/22 73/23 74/12 76/11 79/1 79/5 79/14 79/23 79/24 79/25 80/9 80/12 81/2 81/4 81/16 81/18 84/13 84/16 84/19 84/21 85/8 86/1 86/17 88/4 89/8 89/12 94/6
**people's [1]** 85/9
**per [1]** 96/5
**percent [24]** 11/3 11/4 11/4 12/14 14/14 14/16 14/18 14/20 15/3 15/11 18/18 19/7 19/14 23/8 75/6 77/3 77/12 78/3 78/4 78/18 84/8 88/4 96/4 96/7
**percentage [4]** 15/3 16/22 19/7 19/18
**perfect [1]** 49/16
**perfectly [1]** 36/23
**perhaps [5]** 24/20 28/5 45/18 45/20 101/21
**period [15]** 11/2 22/5 22/9 28/15 33/23 33/23 34/5 39/18 40/3 48/8 66/20 74/20 95/3 96/2 99/2
**periods [1]** 35/1
**perjured [1]** 69/25
**permissible [2]** 22/11 97/17
**permitted [1]** 20/3
**perpetrate [1]** 75/12
**persist [1]** 89/6
**person [23]** 10/24 11/16 12/1 36/2 36/10 48/5 49/18 49/25 50/21 52/13 68/18 71/4 76/6 77/13 79/8 79/15 80/2 81/12 82/17 85/18 90/21 90/24 97/10
**person's [1]** 90/16
**personal [3]** 45/21 48/12 55/4
**personality [1]** 79/9
**persons [3]** 29/10 43/6 43/15
**perspective [8]** 6/6 53/25 68/15 69/8 75/2 78/10 81/19 82/9
**pertain [2]** 4/20 4/25
**pertaining [1]** 39/9
**Philip [1]** 70/19
**phon [1]** 80/16
**phone [1]** 26/23
**phones [1]** 58/20
**picked [1]** 51/10
**picture [1]** 62/17
**piece [1]** 59/6
**pieces [1]** 13/8
**Pierce [1]** 2/9
**pile [1]** 27/3
**piling [1]** 64/22
**pillar [1]** 50/16
**place [3]** 74/21 75/2 89/21
**placed [1]** 97/4
**places [2]** 53/20 89/17
**Plaintiff [2]** 1/5 1/13
**plan [5]** 5/10 9/11 10/4 39/25 64/14
**planned [3]** 21/20 41/19 64/12
**plans [5]** 9/7 9/13 9/14 9/20 64/6
**play [5]** 44/21 53/2 72/2 83/23 87/9
**played [5]** 36/7 45/12 53/1 64/9 101/2
**player [1]** 101/2
**playing [1]** 53/4
**plea [4]** 7/8 7/12 77/11 94/20
**please [3]** 3/1 3/4 21/12
**pleasure [1]** 79/2
**pled [2]** 7/7 77/17
**plenty [3]** 74/25 75/19 79/3
**PLLC [1]** 1/22
**plumbers [1]** 49/6
**plus [1]** 30/12
**pockets [1]** 85/21
**pocus [1]** 77/5
**podium [1]** 10/15
**point [23]** 9/13 13/3 13/25 15/1 17/22 18/7 19/21 26/16 27/11 29/22 43/3 44/2 45/3 62/25 66/14 67/7 71/10 73/8 76/19 84/6 86/22 92/7 92/9
**pointed [2]** 26/18 32/3
**points [4]** 6/13 13/2 39/16 77/22
**policies [13]** 7/19 7/21 7/25 15/13 17/19 18/6 19/8 19/20 23/6 23/7 24/11 29/17 74/1
**policy [6]** 11/10 17/3 23/4 23/6 25/17 34/22
**Ponzi [2]** 70/5 73/11
**pool [1]** 53/4
**population [1]** 39/13
**populations [1]** 63/20
**portion [3]** 78/22 83/4 100/1
**position [6]** 10/13 67/5 83/15 91/19 100/18 100/24
**positions [2]** 20/1 67/4
**positive [1]** 48/2
**possession [2]** 35/11 99/4
**possible [3]** 23/22 102/15 102/24
**possibly [2]** 13/24 69/22
**pot [1]** 23/25
**potential [4]** 32/6 35/24 36/19 58/21
**potentially [2]** 30/12 85/2
**poverty [3]** 16/21 16/22 23/8
**powerful [1]** 61/19
**practical [2]** 53/2 56/23
**practice [4]** 22/19 22/25 23/3 28/12
**pray [2]** 49/25 52/8
**prayer [1]** 57/16
**praying [1]** 57/11
**pre [4]** 3/23 4/6 93/9 97/13
**pre-sentence [4]** 3/23 4/6

**P**

**pre-sentence... [2]** 93/9 97/13
**precisely [1]** 12/8
**preclude [1]** 96/12
**predated [2]** 33/14 39/23
**predicate [2]** 35/23 37/9
**predicated [1]** 33/6
**predicates [2]** 20/8 33/11
**preference [1]** 44/21
**pregnant [1]** 70/14
**preliminary [1]** 67/10
**premise [1]** 19/20
**premised [1]** 18/9
**premium [8]** 11/9 13/4 25/14 29/17 29/23 31/12 32/2 73/20
**prepared [4]** 42/21 92/13 92/20 98/14
**presence [4]** 53/15 56/24 58/8 59/4
**present [8]** 5/14 13/8 44/13 44/14 53/12 55/23 79/14 90/6
**presentation [1]** 83/5
**presentations [3]** 46/12 93/7 103/4
**presented [7]** 6/9 21/1 24/15 29/15 38/3 52/4 84/15
**presenting [1]** 5/18
**preserve [1]** 6/19
**preserved [4]** 6/16 98/22 100/22 102/25
**presided [1]** 89/18
**President [1]** 77/7
**pressing [3]** 37/18 38/8 38/9
**pressing send [1]** 38/8
**presumably [2]** 10/20 15/22
**presumes [1]** 15/12
**presumptively [1]** 84/3
**pretend [1]** 21/7
**pretty [6]** 18/15 48/22 72/20 76/2 80/16 91/7
**prevail [1]** 74/6
**prevention [2]** 54/10 54/17
**previously [1]** 59/15
**pride [1]** 52/21
**primarily [1]** 37/4
**primary [1]** 25/12
**principles [1]** 55/7
**prior [5]** 5/19 21/22 68/16 69/15 77/9
**Prisons [4]** 95/13 95/19 96/3 96/9
**probably [6]** 10/16 24/17 43/21 45/17 76/18 81/25
**Probation [3]** 96/9 97/10 99/4
**problem [1]** 101/1
**procedural [1]** 100/19
**procedurally [2]** 68/7 101/11
**procedure [2]** 67/7 89/20
**proceed [1]** 89/1
**proceedings [4]** 1/10 6/18 101/15 103/8
**proceeds [2]** 66/9 101/14
**process [24]** 15/4 15/4 16/19 20/20 21/18 23/2 33/13 33/14 33/21 34/15 34/25 35/4 35/22 37/6 38/6 38/7 39/23 52/4 55/2 59/23 64/5 64/10 76/13 90/10
**processes [1]** 21/3
**processing [1]** 12/7
**processors [2]** 21/8 64/6
**produced [2]** 72/4 73/24
**profile [1]** 69/16
**profit [2]** 40/11 54/8
**profound [4]** 53/21 55/3 56/15 58/24
**program [18]** 19/2 24/6 24/6 37/21 58/18 58/20 61/8 61/10 61/19 62/7 63/15 94/5 94/5 94/8 99/15 99/23 102/17 102/18
**programs [2]** 60/12 61/15
**Progressive [1]** 52/18
**project [3]** 58/25 59/4 72/18
**projected [3]** 11/22 14/21 21/20
**projection [3]** 14/3 22/1 23/9
**prompt [1]** 28/13
**prongs [1]** 42/17
**pronounced [1]** 98/18
**pronunciation [1]** 7/6
**proof [12]** 11/17 12/1 15/15 16/10 16/15 18/4 22/13 25/21 26/8 27/12 27/23 27/23
**proper [1]** 4/22
**property [1]** 74/25
**proportionality [1]** 82/16
**proposal [1]** 19/4
**proposed [1]** 87/18
**prosecute [2]** 61/21 61/24
**prosecuted [1]** 101/19
**prosecution [2]** 61/17 61/20
**prosecutions [1]** 61/16
**protect [1]** 60/12
**protected [1]** 61/10
**protector [1]** 57/15
**prove [7]** 13/11 22/16 27/17 27/18 35/20 37/5 67/20
**proved [2]** 18/12 22/19
**proven [1]** 55/19
**proves [1]** 75/5
**provide [4]** 55/25 56/6 56/23 94/7
**provider [1]** 9/16
**provision [1]** 10/3
**proximity [1]** 88/20
**PSI [9]** 6/1 6/12 6/15 6/24 33/6 33/12 40/23 84/2 99/13
**psychiatric [1]** 54/17
**public [3]** 60/12 61/15 63/15
**published [2]** 72/10 75/14
**publishes [1]** 75/19
**pull [1]** 58/14
**purchase [2]** 29/11 30/1
**purchasing [4]** 29/25 30/7 31/9 31/15
**purely [1]** 30/3
**purpose [4]** 45/3 55/13 59/5 80/17
**purposes [4]** 10/19 24/24 74/6 90/3
**pursuant [1]** 72/4
**pursue [1]** 89/24
**purview [2]** 41/2 41/6
**pushing [1]** 37/25
**put [14]** 6/15 60/24 63/18 64/14 68/15 69/10 78/10 82/2 82/8 86/21 89/9 100/1 100/6 103/2
**putting [5]** 22/10 69/8 81/19 83/10 91/2

**Q**

**qualified [3]** 23/17 23/21 28/12
**qualifies [1]** 36/13
**qualify [3]** 16/17 29/2 35/14
**qualifying [2]** 28/15 34/5
**qualities [1]** 81/15
**quandary [1]** 84/22
**quantify [1]** 23/14
**quantum [2]** 16/10 22/13
**quarter [1]** 96/5
**querying [1]** 21/18
**question [6]** 12/24 17/2 22/10 31/8 42/17 91/12
**questions [2]** 25/10 27/1
**quiet [3]** 56/8 56/13 58/7
**quite [5]** 7/13 34/2 36/16 54/24 71/14
**quotas [1]** 28/19

**R**

**raise [3]** 83/19 98/20 99/11
**raised [4]** 47/4 55/18 88/11 91/13
**raising [1]** 47/12
**ran [1]** 64/4
**range [8]** 6/10 21/23 68/12 73/1 73/2 77/9 77/21 82/18
**raping [1]** 93/22
**rapists [2]** 85/7 85/8
**rate [1]** 96/7
**rather [3]** 38/21 55/9 92/4
**rational [1]** 26/24
**rationale [1]** 68/5
**RDAP [4]** 99/15 99/23 102/17 102/18
**re [3]** 6/2 6/16 20/2
**re-argue [2]** 6/16 20/2
**re-arguing [1]** 6/2
**reach [1]** 20/4
**reached [4]** 7/12 7/17 58/18 90/5
**reaches [1]** 48/10
**reaction [1]** 84/18
**read [5]** 31/22 45/5 69/24 71/14 80/1
**ready [1]** 50/11
**real [3]** 19/5 23/9 23/9
**reality [2]** 16/25 18/25
**really [12]** 6/19 21/6 42/25 47/24 48/4 48/10 50/17 62/13 78/4 80/14 86/10 93/18
**reason [18]** 6/4 6/15 9/4 15/23 17/17 18/22 25/25 28/12 33/25 34/9 36/6 37/3 51/4 67/6 76/1 86/5 86/19 95/10
**reasonable [5]** 18/3 18/5

## R


**reasonable... [3]** 20/4 20/5 22/18
**reasonably [1]** 27/19
**reasons [11]** 8/23 9/1 16/7 16/11 19/16 24/8 34/4 39/19 44/1 76/3 93/10
**recall [2]** 14/2 17/5
**recalls [1]** 60/21
**receive [1]** 88/5
**received [6]** 4/17 4/24 33/20 63/12 91/9 101/7
**recent [2]** 63/1 63/3
**recipient [1]** 101/4
**recision [1]** 9/10
**recognize [5]** 3/13 20/3 20/7 73/2 90/17
**recommend [5]** 99/19 99/20 99/21 102/17 102/18
**recommendation [3]** 65/16 99/14 99/16
**recommendations [5]** 44/13 44/16 45/17 46/3 102/12
**recommended [1]** 84/9
**recommending [2]** 46/5 60/8
**recommends [1]** 60/7
**record [11]** 6/12 6/14 6/19 14/11 36/9 66/7 66/7 71/16 100/10 103/2 103/8
**records [3]** 14/5 14/22 14/23
**recouped [1]** 9/19
**recoupment [1]** 10/8
**recreating [1]** 57/22
**redeeming [1]** 81/15
**reducing [1]** 20/25
**reduction [4]** 77/9 77/12 77/22 84/8
**reference [2]** 84/6 86/22
**referenced [1]** 97/13
**references [1]** 40/23
**referral [2]** 36/2 36/23
**referred [2]** 27/24 36/11
**referring [2]** 38/15 40/7
**refers [2]** 29/7 29/7
**reflect [1]** 94/25
**reflects [1]** 15/20
**reform [1]** 54/18
**regain [1]** 59/23
**regarding [4]** 4/11 19/4 38/12 48/12
**registration [3]** 36/14 36/25 38/20
**reiterate [2]** 20/3 39/23
**rejected [1]** 32/18
**relate [2]** 4/14 11/7
**related [8]** 14/19 54/16 60/15 61/14 63/1 75/7 87/12 97/16
**relates [1]** 18/8
**relating [1]** 66/2
**relationship [2]** 76/16 88/23
**release [8]** 59/22 96/6 96/24 97/3 97/4 97/9 97/11 97/25
**released [1]** 97/11
**relied [1]** 47/14
**relies [1]** 20/18
**religion [1]** 79/5
**religious [1]** 49/21
**rely [2]** 19/8 19/11
**relying [4]** 6/23 19/10 42/9 89/23
**remain [3]** 21/14 44/5 58/9
**remained [1]** 44/4
**remains [1]** 59/1
**remanded [3]** 57/6 57/7 59/10
**remember [1]** 84/11
**remind [1]** 82/23
**reminded [1]** 79/4
**reminder [1]** 58/7
**removed [1]** 15/24
**reoffend [1]** 76/1
**reoffending [1]** 75/25
**repay [1]** 32/5
**repeatedly [1]** 25/22
**report [7]** 3/24 14/5 50/10 93/9 96/11 97/10 97/13
**reported [1]** 23/7
**Reporter [3]** 2/9 103/11 103/12
**representation [1]** 4/23
**represented [3]** 21/19 21/23 22/23
**representing [2]** 68/16 88/14
**reputed [1]** 77/11
**request [5]** 11/25 21/13 67/17 89/13 91/15
**requested [3]** 5/2 94/11 99/5
**require [2]** 18/1 41/14
**required [2]** 15/5 92/23
**requirement [3]** 35/12 41/7 97/16
**requirements [1]** 62/7
**requires [4]** 33/7 40/20 41/15 89/22
**rescinded [2]** 9/11 9/20
**reservation [1]** 55/1
**residence [1]** 102/15
**resonates [1]** 84/5
**resources [1]** 61/23
**respect [25]** 4/5 5/17 20/14 24/5 28/16 40/17 41/12 45/6 45/15 51/24 53/16 55/9 55/25 60/13 62/1 83/5 93/9 95/18 96/17 96/24 97/5 97/6 98/2 99/5 102/13
**respected [1]** 62/7
**respectfully [1]** 59/20
**respects [1]** 45/24
**respond [5]** 64/7 91/18 91/22 92/19 98/9
**responds [1]** 40/3
**response [6]** 4/1 4/7 20/12 31/16 40/23 102/7
**responsibilities [2]** 53/17 56/19
**responsibility [8]** 32/16 53/8 77/23 86/6 87/15 88/2 88/17 88/19
**responsibility for [1]** 32/16
**responsible [2]** 36/2 52/21
**rest [2]** 14/20 91/3
**restitution [21]** 65/8 65/20 93/17 95/24 96/7 96/10 96/14 96/23 97/17 97/24 100/2 100/3 100/23 100/25 101/7 101/15 101/16 101/20 101/22 101/24 102/9
**restore [1]** 59/24
**restricting [1]** 54/16
**restriction [2]** 97/16 97/17
**result [9]** 39/14 39/21 60/23 69/5 71/11 87/24 88/9 93/14 101/25
**resulted [2]** 14/15 83/25
**results [1]** 70/15
**retained [1]** 85/25
**retirement [1]** 73/17
**return [2]** 30/20 59/7
**returned [1]** 99/6
**revenue [3]** 75/6 78/18 78/23
**review [1]** 4/19
**reviewed [1]** 3/23
**revoked [1]** 38/20
**rhyme [2]** 86/5 86/19
**ride [1]** 50/9
**riding [1]** 53/4
**right [41]** 5/16 5/20 6/17 8/5 13/22 19/25 20/11 30/9 39/4 40/3 40/18 41/11 43/12 43/25 46/18 46/20 55/13 58/1 58/11 60/5 65/14 66/25 67/6 68/2 69/5 71/4 83/2 85/4 85/12 91/11 92/10 92/18 92/22 93/6 98/11 98/13 98/25 99/3 99/23 102/23 103/3
**rip [1]** 74/16
**rip-off [1]** 74/16
**risk [9]** 40/7 40/8 40/11 53/19 60/24 62/23 63/19 76/8 76/9
**risky [6]** 37/25 37/25 40/4 40/12 62/4 64/20
**ritual [1]** 56/2
**road [1]** 102/3
**robbed [1]** 84/12
**Roberts [2]** 27/4 27/5
**role [16]** 24/1 36/20 36/21 36/23 40/17 40/20 41/4 41/5 42/25 47/14 53/1 77/6 87/10 94/21 100/17 101/3
**roles [1]** 12/7
**room [2]** 3/14 78/8
**root [1]** 55/7
**rooted [1]** 54/25
**round [4]** 28/14 34/8 34/9 34/11
**routine [1]** 56/4
**routines [2]** 56/23 59/25
**Ruiz [3]** 71/15 71/22 71/25
**rule [4]** 60/14 62/1 67/7 92/20
**ruled [2]** 39/22 40/15
**rules [1]** 92/14
**ruling [2]** 98/13 100/5
**run [2]** 97/6 97/7
**RYAN [2]** 1/20 3/11


## S


**safety [1]** 59/24
**said [20]** 6/9 14/3 17/22 20/2 25/22 25/23 27/23 29/24 46/25 50/7 50/18 51/9 51/17 59/10 64/11 82/13 83/11

**S**

**said... [3]** 83/12 86/13 94/24
**sake [1]** 31/24
**Sam [2]** 69/19 73/12
**same [22]** 6/20 7/10 7/22 17/13 38/21 38/22 44/4 44/5 46/5 49/25 58/19 63/16 68/8 72/21 76/15 76/25 87/9 87/10 87/10 87/22 87/23 88/4
**sample [1]** 72/20
**sanctioning [1]** 88/21
**Santa [2]** 58/4 58/5
**sat [1]** 90/14
**satisfied [1]** 61/1
**satisfy [3]** 29/20 65/4 96/14
**Saturday [1]** 4/15
**save [2]** 12/12 58/24
**saw [7]** 41/20 61/23 62/15 62/18 64/13 76/21 91/14
**Sawyer [1]** 57/1
**say [24]** 10/24 11/16 11/25 17/14 18/2 19/12 24/2 26/22 29/1 36/3 42/21 46/10 47/10 47/19 49/15 49/15 50/18 51/5 76/8 78/2 78/20 81/20 84/7 89/7
**saying [12]** 17/9 29/15 37/25 40/10 49/21 77/14 77/16 79/2 79/4 89/16 90/2 90/4
**says [4]** 6/1 7/1 14/9 29/3
**scale [5]** 38/11 61/10 61/18 63/2 63/9
**schedule [1]** 96/8
**scheme [26]** 10/25 29/16 29/16 33/16 34/12 34/16 34/16 35/8 38/10 38/11 38/20 39/11 60/10 60/16 61/7 61/14 63/5 63/6 64/11 64/13 64/16 64/23 65/6 70/5 75/4 75/7
**schemes [2]** 61/14 66/10
**scholarships [1]** 79/17
**school [11]** 47/5 47/23 47/24 48/1 49/7 51/14 53/10 56/2 56/21 81/3 81/24
**schools [1]** 49/9
**scientific [1]** 18/2
**score [4]** 36/6 36/7 72/19 77/22
**scored [1]** 72/17
**scoring [1]** 81/13
**scratch [1]** 83/4
**scripts [1]** 22/25
**SE [2]** 2/2 2/6
**search [1]** 97/17
**season [2]** 57/20 58/6
**seated [2]** 3/1 3/13
**second [4]** 27/11 38/18 69/11 98/21
**section [3]** 1/15 6/24 33/6
**sector [1]** 54/15
**secure [2]** 25/16 48/19
**securities [1]** 73/12
**security [4]** 48/24 56/5 99/17 99/18
**Sedona [1]** 47/15
**see [23]** 4/20 11/5 24/13 28/19 36/3 36/6 43/10 44/2 45/24 49/18 50/15 50/16 50/21 57/2 57/14 62/14 66/15 73/13 74/11 74/12 87/13 101/21 102/8
**seeing [3]** 50/18 50/19 59/5
**seek [4]** 4/22 31/3 67/6 67/15
**seeking [8]** 5/14 31/10 35/13 66/2 67/14 67/24 72/24 80/7
**seeks [2]** 65/8 86/13
**seem [1]** 84/4
**seems [5]** 8/19 8/21 26/10 37/12 71/21
**seen [5]** 3/21 52/7 55/5 57/4 62/11
**sees [1]** 57/23
**sell [2]** 31/21 78/22
**selling [3]** 31/19 34/21 87/13
**semblance [1]** 73/3
**Senators [1]** 54/13
**send [3]** 37/18 38/8 38/9
**Sending [1]** 61/19
**sense [8]** 29/2 37/17 53/8 55/13 56/5 59/24 77/15 80/18
**sent [1]** 21/5
**sentence [57]** 3/23 4/6 5/19 46/5 60/7 60/8 63/13 63/22 65/3 65/4 65/7 65/17 65/19 68/21 71/7 71/12 71/25 72/22 72/23 76/7 76/10 76/14 76/20 77/13 77/21 78/3 81/21 81/23 82/4 82/5 82/9 82/15 82/19 82/23 84/13 87/18 87/25 90/14 91/1 91/6 93/9 93/14 94/7 94/10 94/11 94/16 94/19 95/11 95/11 97/1 97/13 97/23 98/16 98/18 98/25 100/19 100/20
**sentenced [5]** 63/4 70/3 70/22 72/15 78/5
**sentences [9]** 60/14 70/6 72/10 84/17 84/22 85/9 86/7 91/9 94/14
**sentencing [30]** 1/10 3/2 3/25 4/6 4/7 4/15 4/21 4/23 4/25 5/14 17/25 22/17 24/12 30/4 37/22 41/13 45/20 59/22 60/20 63/1 68/24 69/9 73/1 74/6 75/15 75/19 79/3 81/13 87/12 90/3
**SEP [2]** 34/6 34/7
**separate [2]** 23/25 65/20
**separation [2]** 54/19 55/6
**September [2]** 66/21 66/23
**September 9 [1]** 66/21
**serial [1]** 85/8
**serious [2]** 86/10 93/21
**seriously [1]** 61/13
**seriousness [3]** 53/16 60/9 60/22
**serve [3]** 69/12 80/25 94/12
**served [5]** 4/16 95/15 95/16 95/22 96/21
**service [8]** 31/1 32/13 51/21 51/25 53/24 79/6 79/12 95/6
**services [5]** 29/12 30/2 43/8 43/17 74/1
**serving [1]** 80/11
**set [6]** 7/18 7/23 37/20 56/3 68/3 92/17
**set and [1]** 7/23
**sets [1]** 102/3
**setting [1]** 74/12
**several [5]** 9/1 25/5 60/18 65/9 78/4
**severally [2]** 95/25 100/25
**severe [1]** 20/9
**sexual [1]** 85/8
**shall [7]** 96/6 96/10 96/14 97/3 97/9 97/12 97/14
**shall also [1]** 97/14
**shaping [1]** 53/1
**share [5]** 48/12 51/7 53/25 54/1 54/6
**shared [2]** 55/18 56/3
**she [6]** 14/3 40/3 59/10 70/12 70/15 80/24
**shelter [2]** 26/21 26/23
**shelters [2]** 28/6 93/23
**shoes [1]** 50/9
**shop [1]** 47/17
**shopping [1]** 26/25
**short [3]** 5/14 48/20 78/19
**shorthand [1]** 16/19
**should [28]** 6/4 6/8 7/5 8/10 9/6 9/7 13/3 13/5 17/17 19/13 19/23 20/10 23/12 23/14 29/13 31/6 44/15 58/6 68/3 68/4 68/9 70/2 71/11 82/21 83/6 87/2 89/2 90/8
**shouldn't [1]** 73/20
**show [14]** 14/14 15/15 16/16 16/21 17/10 17/12 18/25 28/3 53/18 67/13 69/9 75/24 77/4 78/9
**showed [10]** 7/19 7/20 16/20 18/13 21/2 38/13 51/11 51/12 52/9 73/25
**shows [7]** 15/7 66/8 66/19 66/20 69/3 73/2 80/9
**siblings [1]** 90/23
**sic [1]** 86/22
**sick [1]** 30/18
**side [7]** 7/3 20/10 23/4 37/13 37/17 80/4 95/4
**sides [1]** 7/1
**sign [1]** 27/25
**signature [2]** 59/15 103/12
**signed [3]** 17/20 25/25 59/15
**signed a [1]** 59/15
**significance [1]** 45/19
**significant [5]** 7/15 39/14 53/1 74/24 95/11
**significantly [1]** 44/10
**signing [2]** 30/8 33/22
**signs [1]** 58/21
**silence [2]** 56/15 102/10
**silenced [1]** 56/11
**similar [2]** 45/25 51/21
**similarly [7]** 64/1 77/16 83/5 85/1 87/8 87/22 94/20
**simple [4]** 16/24 36/9 56/4 58/24
**simply [10]** 7/23 20/15 22/11

**S**

**simply... [7]** 23/10 38/22 61/21 61/24 69/3 73/3 74/8
**since [3]** 52/25 56/10 57/4
**singing [1]** 56/9
**single [7]** 12/9 15/12 15/13 23/6 52/11 70/17 72/11
**sir [4]** 32/22 46/9 92/22 93/5
**sister [7]** 46/17 47/12 50/4 51/9 51/17 59/13 80/6
**sister-in-law [1]** 80/6
**sisters [1]** 48/22
**sit [2]** 84/6 87/14
**sits [1]** 56/11
**sitting [1]** 88/24
**situated [7]** 64/1 77/17 83/5 85/1 87/8 87/22 94/20
**situation [4]** 11/7 11/21 45/25 83/8
**situations [1]** 10/23
**six [1]** 87/7
**sixth [1]** 50/9
**size [1]** 72/20
**skills [1]** 53/2
**skip [1]** 13/22
**slap [2]** 76/9 84/20
**sleep [1]** 79/20
**Sloman [1]** 1/22
**small [1]** 26/6
**smell [2]** 83/12 83/18
**SMITH [1]** 96/1
**so [88]** 5/22 6/19 7/13 8/24 9/10 9/15 9/25 10/3 10/8 10/22 11/3 12/3 12/12 13/2 13/17 14/18 15/19 15/21 16/6 16/9 18/8 19/22 20/6 20/9 20/22 21/4 21/22 22/9 23/3 23/8 23/20 23/25 24/18 24/23 27/14 32/5 37/4 37/12 38/6 38/24 39/2 39/24 41/9 42/9 42/23 45/25 47/25 48/9 49/1 49/21 52/19 55/3 57/23 59/5 59/12 59/16 61/9 61/12 62/4 63/22 64/18 65/2 66/21 68/15 71/15 72/8 72/15 74/4 75/8 77/12 80/9 81/8 82/11 83/15 84/18 84/22 85/19 86/2 86/10 86/17 87/1 88/6 88/17 90/15 97/23 101/9 101/19 102/20
**so well [1]** 12/3
**sobeit [1]** 92/9
**soccer [7]** 36/5 36/7 79/17 80/11 80/13 80/21 81/3
**society [2]** 50/21 61/7
**solicited [1]** 30/1
**soliciting [2]** 29/11 73/14
**solid [1]** 86/25
**Solomon [1]** 49/22
**some [52]** 4/16 4/16 5/25 6/2 6/4 6/13 8/20 10/4 10/10 13/9 13/25 14/1 17/23 18/14 20/24 23/13 24/21 26/13 28/5 31/1 31/21 32/5 34/24 35/15 41/3 44/14 45/18 45/18 45/20 46/2 54/1 58/12 69/16 70/6 70/20 73/7 73/24 74/5 75/14 79/23 82/4 82/16 82/20 87/23 87/24 88/18 91/16 91/21 92/5 99/11 101/14 102/6
**somebody [8]** 14/3 44/23 44/23 83/10 84/12 85/20 86/2 87/13
**somehow [3]** 49/8 77/1 79/22
**someone [5]** 23/8 26/19 29/11 55/18 88/20
**something [14]** 9/16 13/12 13/14 21/9 21/13 21/23 29/4 36/1 46/10 47/25 69/14 81/9 88/25 89/8
**sometimes [2]** 79/6 90/16
**somewhat [3]** 77/4 89/14 100/24
**son [7]** 46/25 47/18 49/18 49/19 52/20 57/1 58/4
**son's [1]** 47/3
**songs [1]** 56/13
**soon [1]** 52/19
**Sophia [2]** 57/2 58/4
**sophisticated [23]** 33/2 33/5 33/10 34/12 35/7 35/21 36/1 36/4 36/9 36/11 36/21 37/7 37/8 37/11 37/14 38/18 39/2 39/6 39/7 39/8 39/11 39/20 100/16
**sophistication [5]** 34/24 37/1 37/13 60/10 60/21
**sorry [14]** 28/21 28/23 30/15 40/18 46/24 51/19 52/2 52/2 53/5 53/5 57/17 60/2 66/12 98/14
**sort [4]** 10/8 73/12 88/18 91/21
**sought [2]** 33/8 51/15
**soundest [1]** 42/24
**sounds [2]** 26/24 84/9
**sources [1]** 11/23
**SOUTHERN [1]** 1/1
**space [1]** 61/21
**spare [1]** 58/25
**speak [16]** 5/4 10/14 17/19 28/24 44/23 44/25 45/3 47/1 50/4 50/6 54/23 65/11 68/14 90/20 90/23 92/22
**speaks [2]** 54/24 90/24
**special [11]** 22/5 34/5 34/25 56/2 57/24 79/8 97/15 97/18 97/19 97/21 98/1
**specific [4]** 33/8 67/24 68/6 75/16
**specifically [5]** 7/5 65/25 66/5 66/8 66/19
**specifies [1]** 67/8
**speculative [2]** 8/21 9/2
**spend [1]** 79/22
**spending [1]** 40/10
**spent [1]** 80/3
**spoke [1]** 90/11
**spoken [1]** 92/25
**sport [1]** 80/15
**sports [1]** 53/11
**spouse [1]** 54/22
**square [2]** 62/14 62/17
**squarely [1]** 64/2
**stability [3]** 56/17 58/14 59/7
**stable [2]** 52/22 75/23
**stage [1]** 53/14
**stand [10]** 6/14 17/18 27/6 46/24 50/18 54/21 69/24 71/23 72/5 77/11
**standard [2]** 67/24 97/12
**standing [4]** 68/15 68/20 69/13 90/2
**stands [3]** 6/12 59/17 79/13
**Stanford [2]** 70/5 73/11
**starkly [1]** 85/11
**start [7]** 7/4 13/5 45/16 67/3 69/17 74/20 79/6
**started [7]** 74/18 74/23 75/10 75/12 77/9 78/13 83/21
**starting [3]** 13/3 15/1 77/21
**state [8]** 18/17 19/2 38/13 38/14 69/10 69/12 90/9 100/9
**stated [4]** 16/8 18/21 44/1 93/10
**statement [3]** 37/2 40/6 40/13
**statements [3]** 5/19 6/1 62/15
**states [14]** 1/1 1/4 1/11 1/18 3/2 3/6 3/8 3/10 38/17 60/7 65/24 94/16 94/17 96/15
**station [1]** 36/20
**statute [3]** 15/5 65/22 65/25
**statutory [1]** 67/11
**stay [1]** 99/18
**steady [2]** 56/24 58/10
**stealing [1]** 73/15
**stemming [1]** 6/18
**step [1]** 21/2
**stepchild [1]** 90/20
**stepchildren [1]** 90/20
**stepfather [1]** 52/25
**Stepping [1]** 27/21
**stepson [3]** 46/17 52/14 52/17
**Steve [2]** 50/10 55/21
**Steve's [1]** 54/24
**STEVEN [25]** 1/8 3/3 3/18 37/23 38/1 38/4 38/14 46/24 47/1 50/3 51/3 52/24 52/25 54/7 54/19 55/2 55/12 56/1 56/8 56/17 58/10 58/13 58/16 59/16 59/22
**Steven filled [1]** 56/8
**Steven's [5]** 52/17 53/17 57/20 58/8 59/1
**still [4]** 20/7 84/5 84/9 85/14
**Stipes [2]** 2/9 103/11
**stole [1]** 63/7
**stood [2]** 58/11 71/16
**stop [1]** 94/8
**stopped [1]** 87/18
**stopping [1]** 38/21
**stories [1]** 56/3
**story [2]** 48/20 61/8
**strain [1]** 53/21
**strains [1]** 78/6
**straits [1]** 80/24
**strategic [1]** 16/11
**street [13]** 1/19 28/19 29/2

**S**

**street... [10]** 30/5 32/25 33/22 34/11 34/21 37/12 38/15 41/24 42/18 42/20
**strength [2]** 58/14 60/1
**strengthened [1]** 55/8
**strengths [1]** 53/13
**stretch [1]** 75/12
**strikes [1]** 101/12
**strives [1]** 55/13
**STRONG [53]** 1/8 2/1 3/3 3/18 4/5 5/17 9/24 10/10 10/12 33/12 37/14 37/20 37/23 38/1 38/4 38/15 38/19 38/20 39/15 41/14 41/15 41/17 41/25 42/12 44/7 45/22 46/6 47/1 51/3 54/7 54/8 64/1 64/9 66/3 66/11 66/14 66/20 84/5 88/9 88/14 88/15 89/5 90/12 90/19 93/2 95/18 96/18 97/7 97/19 97/25 99/5 101/1 102/13
**Strong's [12]** 33/6 37/10 39/24 41/12 46/16 46/24 50/3 51/3 52/14 84/2 85/24 91/23
**stronger [1]** 55/10
**structure [1]** 56/21
**struggle [1]** 57/14
**stuff [1]** 85/21
**STUMPHAUZER [13]** 1/20 1/22 3/12 5/10 21/17 22/3 22/13 23/12 23/23 67/1 86/11 91/20 99/10
**Stumphauzer's [1]** 91/15
**subject [2]** 37/14 39/19
**subjective [1]** 12/4
**submit [6]** 10/20 10/25 11/17 11/25 27/11 67/12
**submitted [8]** 8/19 10/20 15/6 15/15 18/4 27/23 62/17 73/23
**submitting [5]** 20/17 20/19 28/12 34/20 73/21
**subpoena [2]** 72/4 89/13
**subpoenaed [1]** 89/10
**subsequently [1]** 17/8
**subsidiary [1]** 25/9
**subsidies [13]** 7/20 8/4 8/22 8/23 9/7 9/14 9/22 12/10 12/15 21/14 24/10 31/14 39/14
**subsidy [10]** 9/18 12/10 12/12 15/24 21/7 22/20 24/5 32/1 64/5 64/8
**Substance [1]** 97/15
**substantial [2]** 87/6 93/25
**substantially [1]** 94/19
**substantively [1]** 100/20
**subtract [1]** 66/16
**subtracting [1]** 66/21
**succeed [1]** 38/11
**such [7]** 20/9 47/18 50/16 57/9 96/4 96/8 97/7
**sudden [2]** 57/15 58/13
**suddenly [1]** 57/6
**suffered [2]** 27/13 80/3
**suffering [4]** 26/19 54/10 55/20 58/13
**sufficient [4]** 17/15 82/3 82/7 100/9
**suggest [3]** 35/16 75/3 86/9
**suggested [5]** 21/22 22/14 23/12 71/11 92/5
**suggesting [1]** 70/2
**suicide [4]** 54/10 54/12 54/17 58/21
**suit [1]** 86/7
**Suite [3]** 1/23 2/2 2/6
**summarily [1]** 28/10
**summary [1]** 8/8
**superseding [1]** 65/23
**supervise [2]** 40/20 40/25
**supervised [8]** 41/9 41/14 42/12 59/22 96/23 97/4 97/11 97/25
**supervision [1]** 97/13
**supervisor [1]** 42/5
**supervisory [2]** 41/4 41/6
**supplemental [1]** 14/1
**support [8]** 54/20 54/25 56/20 56/23 59/8 62/11 80/8 99/14
**supported [1]** 19/5
**supporters [2]** 5/18 62/16
**supporting [1]** 15/7
**supportive [1]** 90/16
**supports [1]** 53/10
**suppose [1]** 22/5
**supposed [3]** 13/16 67/8 88/6
**sure [12]** 3/21 6/16 34/2 36/16 45/19 54/4 68/5 72/9 78/1 88/15 92/23 100/21
**surprised [1]** 91/12
**surprisingly [1]** 78/24
**suspended [2]** 36/15 36/25
**sustained [2]** 24/5 55/8
**switch [1]** 64/15
**symptoms [1]** 61/4
**system [7]** 50/20 59/18 62/6 74/16 81/13 83/20 94/13

**T**

**table [1]** 69/7
**tabs [1]** 36/8
**tabulation [1]** 36/8
**tack [1]** 86/18
**tailor [1]** 86/20
**take [18]** 5/20 5/25 6/4 19/6 24/1 28/14 42/5 46/7 52/21 55/7 72/5 74/10 75/8 76/10 77/20 83/6 89/19 99/10
**taken [3]** 40/5 44/8 85/16
**takes [2]** 53/10 57/21
**taking [3]** 15/10 70/13 89/21
**talk [6]** 51/18 51/24 52/8 68/10 71/9 73/5
**talking [4]** 9/3 38/4 40/14 56/12
**target [2]** 61/15 63/8
**targeted [2]** 61/6 63/20
**targeting [1]** 39/13
**task [2]** 20/6 57/7
**taught [3]** 53/2 53/5 53/5
**tax [14]** 11/9 13/4 14/4 21/19 21/22 24/6 24/6 25/14 30/12 30/20 30/21 32/4 32/5 73/20
**teacher [2]** 47/5 48/14
**team [1]** 36/8
**teammate [1]** 80/20
**tears [1]** 59/10
**tedious [1]** 20/6
**teen [1]** 47/21
**telemarketing [1]** 63/9
**telephone [1]** 29/8
**tell [11]** 8/24 12/18 13/17 13/20 13/23 17/18 44/17 54/2 57/7 89/22 102/19
**telling [2]** 82/1 89/12
**tells [1]** 96/17
**temporarily [1]** 54/16
**ten [15]** 29/18 31/11 47/13 50/11 51/20 74/19 74/21 76/7 76/10 78/3 82/4 82/19 85/10 86/13 96/7
**ten-year [2]** 76/10 82/4
**tendency [1]** 85/4
**tends [1]** 86/9
**tennis [3]** 47/23 47/25 56/22
**tens [3]** 41/23 41/23 64/23
**term [5]** 20/16 95/14 95/16 95/20 97/4
**terms [20]** 8/4 28/8 30/11 30/24 37/11 40/12 43/21 45/19 45/23 45/25 46/12 46/13 63/23 67/16 70/12 76/11 94/20 94/21 97/7 100/3
**terrible [1]** 63/18
**terribly [1]** 25/4
**test [3]** 32/13 32/16 70/14
**testified [12]** 9/10 10/7 16/12 17/6 17/7 17/16 17/22 20/16 28/7 71/23 77/18 94/4
**testify [3]** 12/20 22/22 76/21
**testimony [11]** 5/12 8/7 11/11 14/3 20/19 21/1 42/20 55/17 69/25 71/24 81/10
**testing [2]** 63/5 74/15
**tests [2]** 63/12 70/13
**Texas [5]** 54/9 57/3 70/5 102/15 102/19
**text [7]** 30/3 38/3 38/12 41/19 64/13 89/3 89/9
**textual [1]** 28/25
**than [32]** 8/21 8/22 9/2 19/5 28/14 32/8 38/21 43/10 55/9 55/22 63/23 64/4 64/18 65/3 69/6 69/7 70/2 71/8 72/23 75/9 80/8 81/12 81/13 82/3 82/7 91/9 92/4 93/15 94/10 94/12 98/6 98/22
**thank [30]** 10/13 19/25 20/11 24/13 32/20 33/4 37/10 39/4 45/11 46/21 49/1 50/1 50/2 50/4 50/23 50/24 51/2 52/12 53/23 54/6 60/2 60/3 60/5 60/6 66/25 83/2 83/3 91/11 93/6 103/3
**Thanksgiving [1]** 57/19
**that [658]**
**that's [1]** 103/2
**the commissions [1]** 9/25

**T**

**the income [1]** 22/1
**the typical [1]** 78/20
**their [67]** 11/17 12/7 12/10 18/11 20/9 22/23 26/7 28/9 31/11 31/13 37/21 41/19 41/20 42/4 45/25 47/21 48/9 49/8 53/10 53/11 54/23 56/2 56/4 56/6 56/9 56/12 56/13 56/24 57/2 57/4 57/15 57/15 57/16 57/16 57/23 57/25 58/2 59/13 59/13 59/14 59/23 59/24 61/1 61/3 62/3 62/10 62/10 63/18 64/13 64/19 64/22 67/6 68/2 69/15 74/13 74/16 75/4 77/19 80/19 82/12 85/21 90/13 95/5 95/8 95/9 95/9 102/7
**them [48]** 14/20 15/14 25/5 26/10 27/13 29/21 30/24 30/24 33/14 42/20 44/6 45/24 47/22 47/22 51/6 53/10 53/10 56/5 57/5 57/6 57/7 57/14 58/1 59/13 59/14 61/2 61/3 62/11 63/19 64/12 64/22 72/4 80/17 80/18 80/19 81/6 81/6 81/6 84/16 87/15 88/23 90/23 91/21 91/22 92/3 92/5 95/5 101/20
**themselves [4]** 19/12 57/11 57/12 58/22
**then [23]** 9/11 9/24 9/25 10/9 11/4 15/9 15/17 22/8 22/24 25/16 37/7 37/25 41/3 44/15 45/1 46/1 46/14 66/11 77/23 82/11 89/23 92/19 98/13
**theory [3]** 26/3 29/14 29/22
**Theranos [2]** 70/7 82/21
**there [144]**
**thereabouts [1]** 86/3
**thereafter [1]** 36/15
**thereby [1]** 87/15
**therefore [7]** 10/22 16/23 35/13 41/2 41/9 87/19 95/12
**Thereupon [2]** 45/12 103/5
**these [60]** 5/22 6/18 7/11 7/14 7/15 8/1 8/2 12/15 14/17 15/6 16/16 18/10 18/14 18/23 19/7 19/14 19/16 20/24 22/5 22/7 22/8 22/9 22/16 23/16 23/20 25/14 25/23 25/25 27/12 27/18 29/16 29/18 29/24 31/21 35/2 35/5 42/17 44/9 51/25 52/22 57/10 59/12 61/5 61/22 62/9 62/9 63/11 71/7 72/25 73/2 73/20 74/1 76/23 78/8 78/19 84/17 84/22 84/23 94/23 96/12
**they [203]**
**they designed [1]** 37/21
**they have [1]** 67/5
**thing [8]** 5/13 11/1 22/3 38/22 47/19 48/5 74/10 93/18
**things [15]** 11/5 21/18 44/15 51/25 52/19 57/21 61/6 69/8 69/9 71/16 75/20 76/23 84/25 85/7 94/24
**think [117]**
**thinking [2]** 57/10 57/11
**thinks [1]** 86/24
**this [182]**
**thoroughly [1]** 4/19
**those [34]** 5/23 7/21 8/8 9/13 9/13 12/23 16/1 24/8 26/7 27/4 28/11 32/19 35/13 38/16 39/19 40/21 41/1 41/3 41/5 52/1 52/11 52/11 53/21 54/9 54/16 56/7 71/25 72/2 72/21 75/24 85/1 98/22 100/18 100/21
**though [7]** 25/9 78/11 83/22 83/22 84/2 84/3 85/11
**thought [9]** 6/8 27/14 33/15 40/12 62/21 70/13 72/18 89/5 94/7
**thoughts [2]** 54/1 54/7
**thousand [4]** 68/22 86/4 86/18 86/18
**thousands [5]** 41/23 41/24 60/19 60/19 64/24
**threats [1]** 58/22
**three [16]** 10/25 16/11 32/3 33/11 42/22 43/7 43/13 43/16 43/19 43/23 63/6 77/22 88/17 97/4 97/5 97/24
**threshold [1]** 22/6
**through [25]** 7/23 9/19 13/9 15/4 15/13 20/24 32/11 37/3 38/15 39/13 42/24 47/21 53/25 55/19 56/21 59/6 59/23 63/9 66/21 95/15 95/21 97/6 97/7 97/20 97/22
**throughout [10]** 41/19 41/20 51/5 51/14 55/2 55/16 62/12 81/22 90/9 90/24
**throw [3]** 17/24 51/12 83/21
**thus [3]** 7/25 43/7 43/16
**tidbit [1]** 51/7
**tie [1]** 50/9
**tied [1]** 23/3
**time [45]** 5/3 7/15 7/17 10/25 11/5 12/14 22/11 22/22 48/8 48/8 48/19 51/6 51/6 52/5 53/24 56/2 59/8 60/2 60/3 66/16 66/20 66/22 70/17 76/3 79/19 79/21 79/23 79/24 79/24 80/8 80/12 82/1 82/22 83/25 87/14 89/6 90/15 90/17 91/3 92/3 92/4 92/16 95/3 96/8 98/9
**time you [1]** 11/5
**times [4]** 15/2 15/10 47/11 51/18
**tissue [1]** 51/2
**title [2]** 65/23 77/6
**to implicate [1]** 35/7
**to purchase [1]** 30/1
**to see [1]** 57/2
**to validate [1]** 19/13
**today [17]** 3/15 5/14 46/25 49/25 50/5 50/18 52/10 53/1 61/8 62/12 68/7 68/13 91/10 92/2 92/16 98/15 100/25
**together [7]** 41/18 42/6 46/11 49/24 56/9 58/14 64/12
**told [9]** 19/18 27/6 59/9 59/11 71/18 72/3 75/5 76/25 80/17
**ton [1]** 79/11
**tone [1]** 56/4
**tons [1]** 74/21
**too [10]** 10/5 40/10 49/13 54/3 73/13 83/25 86/14 86/14 86/16 101/14
**took [10]** 14/21 21/2 21/15 47/22 56/1 61/24 69/23 71/22 71/22 80/24
**total [5]** 11/9 18/20 97/21 97/22 97/23
**totally [3]** 35/19 69/14 81/21
**touted [1]** 70/17
**toward [1]** 58/22
**towards [1]** 96/5
**track [1]** 36/1
**tracked [1]** 35/24
**traditional [2]** 9/3 10/19
**tragedy [2]** 62/13 94/25
**train [1]** 51/22
**traits [1]** 95/7
**tranche [1]** 4/17
**transcript [1]** 103/7
**transferred [1]** 67/22
**transporting [1]** 80/12
**trashing [1]** 91/1
**treasured [1]** 56/10
**Treasury [3]** 24/5 24/7 65/9
**treat [1]** 51/12
**treated [1]** 19/2
**treatment [1]** 97/15
**trial [28]** 6/9 6/14 6/16 6/17 6/23 11/11 11/24 14/13 16/12 21/2 23/18 24/15 25/21 27/23 27/25 28/7 51/6 60/21 62/12 66/7 73/8 74/17 76/21 77/18 79/20 81/17 89/18 94/4
**tried [2]** 11/22 30/18
**trouble [1]** 81/4
**truck [1]** 51/21
**true [5]** 18/11 18/12 18/12 53/18 94/25
**truly [3]** 58/8 68/23 70/20
**trust [2]** 55/9 82/22
**trusted [1]** 11/23
**trusts [1]** 20/18
**truth [2]** 55/3 59/18
**try [6]** 12/12 14/9 30/17 53/25 58/1 88/6
**trying [11]** 25/16 31/14 38/13 47/8 58/11 68/21 70/21 80/4 80/14 84/25 85/12
**tune [2]** 60/18 64/23
**tuned [1]** 48/23
**turned [1]** 89/12
**turns [1]** 72/20
**twelve [2]** 57/1 59/9
**twice [2]** 60/17 70/9
**two [23]** 7/15 16/12 17/4 27/8 32/2 42/17 44/7 45/22 48/21 49/6 52/20 54/7 62/2 62/14 67/4 77/13 84/24 86/15 94/17 94/25 98/8 100/14

**T**

**two... [1]** 100/15
**two-level [2]** 100/14 100/15
**type [7]** 48/5 61/13 61/25 62/23 73/11 73/15 93/20
**types [1]** 61/22
**typical [3]** 36/5 78/20 85/16
**typically [1]** 67/9

**U**

**U.S [4]** 1/14 65/9 75/15 96/10
**ultimate [1]** 100/20
**ultimately [3]** 7/24 15/2 68/13
**unable [2]** 11/23 14/6
**unanticipated [1]** 96/13
**unbeknownst [1]** 18/13
**uncertainty [1]** 55/5
**under [17]** 5/15 19/2 30/5 34/12 35/14 38/22 41/1 49/2 70/18 71/8 72/15 74/1 76/23 78/1 85/14 87/3 101/16
**underscores [1]** 61/18
**understand [14]** 8/11 19/10 40/15 49/16 50/19 53/16 67/20 76/22 78/7 82/14 82/15 84/24 86/21 87/24
**understandable [1]** 88/24
**understanding [2]** 49/23 89/1
**understood [3]** 12/22 18/16 89/6
**underway [1]** 71/20
**undisputed [2]** 23/1 23/18
**unemployment [1]** 49/3
**unexpected [1]** 96/13
**unfinished [1]** 59/1
**uniformity [1]** 84/25
**unimaginable [1]** 57/19
**uninsured [1]** 19/1
**unique [2]** 79/8 100/24
**unit [1]** 56/18
**UNITED [13]** 1/1 1/4 1/11 1/18 3/2 3/6 3/8 3/9 60/7 65/24 94/15 94/16 96/15
**unjustified [1]** 88/7
**unknowing [2]** 43/8 43/17
**unknowingly [1]** 48/21
**unless [3]** 37/5 44/4 81/17
**unlike [2]** 78/20 89/10
**unnecessary [1]** 63/12
**unpaid [1]** 97/17
**unreasonable [1]** 100/21
**unrelated [1]** 78/23
**until [5]** 57/6 74/20 82/2 87/14 96/8
**untreated [1]** 18/25
**unvalidated [1]** 19/19
**unwarranted [1]** 88/10
**unwavering [1]** 59/19
**unwilling [1]** 68/2
**unwittingly [2]** 40/22 41/2
**up [48]** 3/14 6/4 7/25 10/19 16/24 16/24 17/1 17/14 17/18 17/20 18/25 22/1 22/13 22/18 22/19 22/24 25/17 25/25 27/25 28/13 30/8 32/19 33/22 48/22 50/13 51/4 51/9 51/11 56/13 57/23 64/22 66/24 69/13 70/15 74/8 74/13 75/10 77/1 77/2 81/20 83/10 84/13 84/14 84/17 84/21 85/23 101/25 102/8
**upbringing [1]** 47/4
**upheld [1]** 32/18
**uphold [1]** 49/17
**upon [9]** 20/8 74/6 89/13 96/6 97/3 100/12 100/13 100/15 100/15
**urges [1]** 60/9
**us [11]** 3/13 19/10 49/16 50/7 50/14 50/16 50/18 50/22 51/17 55/8 56/15
**use [16]** 7/5 8/10 8/25 9/4 19/23 20/16 22/4 22/8 24/24 30/13 30/17 30/18 32/25 39/12 40/2 73/23
**used [9]** 7/7 7/11 7/22 13/10 43/8 43/17 71/10 76/25 84/14
**useful [1]** 90/25
**uses [1]** 53/13
**using [3]** 8/2 64/19 96/13
**usually [4]** 8/18 79/15 85/17 85/20

**V**

**vacuum [1]** 23/23
**validate [13]** 11/22 14/6 14/9 14/10 14/23 14/24 15/8 19/13 20/17 21/16 21/25 30/23 30/24
**validated [8]** 12/22 15/4 15/9 15/21 15/23 15/24 16/2 19/7
**validation [7]** 16/4 20/15 20/21 20/22 21/3 21/18 24/14
**value [3]** 9/6 73/16 74/4
**values [6]** 51/24 52/1 52/9 52/11 52/11 52/23
**variety [1]** 8/23
**vast [1]** 28/7
**verdict [1]** 89/18
**verify [4]** 14/4 15/6 21/12 64/7
**versus [6]** 3/3 9/4 87/5 87/6 94/16 94/17
**very [22]** 16/10 16/20 26/6 36/24 37/11 46/24 47/15 48/7 51/21 52/23 61/5 61/12 62/8 62/14 62/17 75/25 78/12 79/8 79/8 79/9 93/21 94/4
**Vice [1]** 77/7
**Vice-President [1]** 77/7
**victim [14]** 19/11 20/23 25/2 25/6 25/10 25/12 25/12 27/9 27/9 27/21 28/2 28/17 77/7 96/16
**victims [10]** 25/5 25/19 26/3 26/17 28/4 32/24 63/16 69/1 100/13 100/14
**video [10]** 5/14 44/14 44/19 45/1 45/3 45/12 45/13 57/3 62/15 69/6
**viewed [1]** 84/19
**violence [2]** 58/22 68/20
**violent [2]** 85/2 85/15
**virtually [1]** 20/1
**vital [2]** 64/16 94/4
**voice [1]** 55/18
**voices [1]** 56/13
**void [1]** 56/16
**volumes [1]** 54/24
**vouch [1]** 84/16
**vulnerable [16]** 25/2 25/4 25/10 26/17 26/23 27/9 27/22 28/4 28/6 28/17 61/7 63/16 63/20 77/7 100/13 100/14

**W**

**wages [2]** 96/3 96/4
**wait [2]** 83/12 87/14
**waiting [2]** 91/21 91/22
**waived [6]** 67/6 68/1 82/24 82/25 92/1 92/14
**waiver [5]** 91/21 92/8 92/10 99/2 102/11
**waiver of [1]** 91/21
**Wal [1]** 26/12
**Wal-Mart [1]** 26/12
**walk [2]** 13/9 47/17
**wallets [1]** 73/17
**want [50]** 3/13 4/25 6/6 13/7 13/8 16/25 20/2 25/1 27/25 32/20 44/16 44/17 44/19 44/24 44/25 45/9 46/6 46/9 46/11 46/13 48/6 49/15 50/6 51/5 51/7 57/12 65/13 67/4 68/24 71/9 73/5 75/14 78/10 78/24 79/14 81/19 88/14 88/16 88/18 89/19 90/7 92/2 92/23 98/9 98/20 99/19 100/9 102/10 102/12 103/1
**wanted [13]** 4/23 13/2 17/19 17/23 25/25 38/7 44/14 45/14 49/13 68/14 99/11 100/5 100/21
**wanting [1]** 92/5
**wants [5]** 17/24 23/15 28/24 44/22 101/11
**warned [1]** 64/2
**warning [1]** 58/21
**warnings [1]** 64/21
**warrant [1]** 20/25
**warranted [1]** 96/24
**was [267]**
**was a [1]** 78/2
**Washington [1]** 1/16
**wasn't [14]** 12/22 16/17 35/11 45/23 52/5 69/2 70/24 71/1 80/15 89/2 89/7 90/5 98/14 102/1
**waste [1]** 83/25
**watched [1]** 55/2
**watching [1]** 69/6
**water [2]** 17/25 19/17
**way [24]** 4/21 10/7 11/14 17/9 21/25 26/5 33/13 35/18 36/4 36/10 42/5 49/14 61/21 61/25 63/17 68/21 69/8 70/11 71/8 79/23 80/9 81/6 90/6 94/23
**ways [4]** 31/25 32/6 60/11 61/20

**W**

**we [185]**
**We'd [1]** 19/8
**we'll [1]** 92/19
**website [7]** 14/2 14/9 14/9 14/21 15/7 19/9 19/12
**week [4]** 51/19 98/10 98/11 98/12
**weekend [1]** 4/18
**weeks [1]** 81/10
**well [23]** 3/21 5/15 5/20 12/3 12/18 17/17 18/13 18/16 18/22 25/19 29/4 33/22 34/4 38/14 38/17 40/1 44/4 53/12 53/13 56/18 65/10 82/21 91/4
**well-being [1]** 56/18
**went [6]** 15/20 32/19 47/15 66/10 71/18 77/17
**were [92]** 6/13 7/15 7/24 9/7 9/14 9/20 11/13 12/10 14/16 14/23 14/24 15/3 15/21 15/21 16/2 16/16 17/10 17/13 19/20 22/6 22/10 22/11 22/23 24/22 25/4 25/14 25/16 25/16 25/23 26/1 26/13 27/12 27/14 27/19 28/21 29/15 29/22 29/25 30/18 30/25 31/12 31/13 31/15 33/22 37/18 38/3 38/13 38/16 41/2 41/6 42/1 42/22 43/20 43/22 43/22 47/8 47/23 49/1 52/7 52/23 60/24 61/6 62/16 63/10 63/17 63/20 63/21 64/12 64/14 64/15 64/16 67/14 67/15 70/14 72/15 73/19 73/21 74/1 75/5 77/20 78/14 78/16 81/2 81/23 82/4 84/18 84/20 84/25 94/2 94/17 95/3 100/21
**were the [1]** 37/18
**weren't [7]** 15/24 30/1 30/7 30/11 31/10 63/16 81/5
**west [5]** 1/2 1/7 2/9 51/22 102/19
**what [95]** 4/13 5/3 5/10 6/23 7/1 7/4 9/21 10/7 10/13 11/2 11/10 12/11 13/17 13/20 14/20 14/21 15/20 16/18 16/19 17/4 17/12 17/12 18/2 20/2 20/12 20/15 21/17 21/23 22/17 23/13 23/14 23/21 23/24 25/7 25/21 25/23 27/15 27/24 29/7 29/15 30/23 31/16 36/2 36/8 38/6 40/10 41/15 43/10 44/2 44/16 44/17 46/3 47/10 49/13 50/18 51/22 53/5 53/5 55/16 57/8 58/6 58/11 59/2 65/16 67/8 67/9 67/11 68/13 69/3 69/24 70/2 70/9 70/16 72/8 72/16 74/8 77/15 78/5 78/19 79/13 79/18 80/14 80/14 80/20 81/6 84/7 84/8 87/20 88/4 89/12 89/23 90/4 96/18 101/3 101/13
**whatever [5]** 32/13 34/6 44/18 74/15 85/10
**whatsoever [1]** 73/4
**when [36]** 8/18 8/20 10/20 12/13 21/1 32/19 33/24 38/15 47/13 49/7 51/9 55/3 57/5 57/23 58/15 59/8 59/9 59/11 66/16 71/17 71/20 72/18 72/25 75/5 75/21 79/5 80/2 80/6 82/10 83/15 87/4 87/25 89/8 89/10 91/3 98/4
**whenever [2]** 47/23 92/17
**where [39]** 5/12 6/7 9/3 9/12 9/15 10/20 10/23 11/21 18/4 18/5 21/7 23/7 26/24 27/2 29/17 32/9 32/10 38/4 40/1 66/23 67/3 70/8 73/7 73/13 74/7 74/13 78/21 80/3 81/2 84/18 85/6 85/7 85/14 85/16 87/13 89/17 90/5 99/19 102/19
**whereby [1]** 64/5
**Wherever [1]** 10/16
**whether [9]** 26/16 27/9 27/10 27/15 27/21 30/25 31/8 43/5 43/14
**which [61]** 3/25 4/16 8/10 15/3 16/16 16/17 17/10 17/11 20/8 22/11 23/2 23/20 23/21 24/6 24/9 27/24 29/8 29/9 31/23 32/6 33/23 34/16 36/8 40/8 42/17 43/4 44/8 54/9 62/8 63/3 65/5 65/11 66/3 66/8 66/22 67/3 67/16 69/13 69/19 72/9 75/16 78/11 79/2 82/5 83/6 83/23 84/9 85/22 86/7 88/21 89/4 89/8 89/14 89/15 90/23 94/16 94/19 94/24 96/14 97/11 98/18
**which advocates [1]** 54/9
**while [4]** 54/18 55/23 63/18 97/11
**white [6]** 60/13 84/13 84/19 85/2 86/13 86/14
**who [68]** 3/12 7/7 8/8 12/10 15/21 16/12 16/17 16/17 17/16 25/11 25/15 28/7 28/9 35/1 35/13 36/11 37/23 38/25 41/11 41/18 42/6 42/22 43/21 44/22 44/25 46/9 49/20 50/8 50/10 51/10 51/11 51/12 53/18 53/21 54/12 55/18 56/12 56/19 60/24 61/6 62/3 64/12 64/14 64/15 68/16 68/18 68/19 72/14 72/14 76/20 79/1 79/17 80/17 81/24 82/16 83/16 84/13 84/19 84/21 84/21 85/1 85/8 86/1 86/2 88/21 89/20 90/20 94/3
**whoever [1]** 28/23
**whole [11]** 10/22 11/1 12/6 15/22 18/9 48/5 49/18 49/24 50/20 50/22 55/15
**whom [4]** 33/8 41/3 41/5 42/2
**whose [4]** 53/20 63/11 80/23 91/9
**why [33]** 5/20 7/5 7/8 8/17 8/23 8/23 8/24 13/15 13/25 14/11 15/17 18/12 19/23 25/19 29/17 34/1 34/9 34/11 35/2 37/12 37/14 38/10 44/22 45/16 52/1 58/5 61/8 61/10 62/23 67/7 71/15 90/1 90/2
**wide [1]** 19/22
**wife [3]** 90/19 90/20 99/8
**will [51]** 5/11 5/15 5/18 6/14 6/18 6/22 8/13 10/21 12/16 13/9 13/22 13/23 13/24 14/7 17/5 32/23 44/2 44/15 45/1 45/17 46/1 46/14 47/5 49/21 62/6 65/11 66/15 68/5 69/14 75/17 76/15 76/17 76/18 78/17 79/14 81/25 82/9 82/23 84/7 92/2 92/18 92/19 95/8 98/3 98/11 98/12 98/13 99/2 99/19 99/23 102/18
**willingness [1]** 54/21
**wiped [1]** 59/10
**wire [3]** 65/25 66/1 66/1
**wisdom [2]** 49/22 49/25
**within [12]** 12/3 12/7 16/21 21/23 23/7 33/1 33/23 43/13 43/20 97/9 99/1 99/2
**without [12]** 4/23 16/3 48/15 55/1 55/6 56/14 57/25 64/11 77/21 80/6 81/25 81/25
**witness [12]** 8/8 17/21 27/6 44/23 46/6 46/25 50/5 52/2 69/24 71/23 72/5 77/11
**witnessed [1]** 55/19
**witnesses [8]** 5/4 17/5 18/11 22/21 24/16 44/25 70/21 71/18
**Witnessing [1]** 58/17
**woman [2]** 17/6 80/22
**won't [1]** 83/25
**wonder [1]** 58/6
**word [1]** 20/5
**words [3]** 51/5 55/17 64/19
**work [15]** 47/15 49/9 52/18 53/7 54/13 56/21 59/5 74/22 75/1 75/1 75/9 84/16 96/4 98/11 98/12
**worked [3]** 74/21 78/13 79/21
**working [4]** 22/24 42/1 48/14 79/22
**works [2]** 10/7 57/23
**world [5]** 50/16 50/17 70/23 85/7 87/5
**world could [1]** 70/23
**worry [1]** 59/12
**worse [3]** 63/14 63/15 63/24
**worst [1]** 90/13
**worth [5]** 62/22 76/9 76/9 102/16 102/22
**worthwhile [1]** 73/8
**would [119]**
**would access [1]** 21/6
**would have [1]** 6/12
**wouldn't [9]** 23/21 29/19 29/19 30/13 30/20 69/2 69/3 80/19 88/22
**wound [1]** 64/15
**wrist [2]** 76/9 84/20
**written [2]** 22/25 100/8
**wrong [5]** 62/4 64/2 71/4 89/7 89/16
**wrote [1]** 26/11

**Y**

**year [34]** 7/13 11/2 11/10 12/9 12/9 15/22 21/20 21/21 21/21 21/22 28/14 32/5 34/8 34/9 34/11 36/5 57/1 57/1 57/25 59/9 65/5 68/16 68/21 76/10 81/21 82/4 82/5 86/4 86/18 91/1 94/7 94/11 94/16 95/10
**year's [1]** 21/19
**yearly [1]** 39/19
**years [60]** 10/25 47/12 47/21 50/11 51/4 51/14 51/20 52/17 53/3 55/22 60/7 60/18 63/6 63/13 64/23 65/4 67/9 69/12 69/13 70/1 70/1 70/15 70/22 71/8 71/25 74/19 74/21 75/22 76/7 76/14 77/14 79/9 79/9 81/23 81/24 82/2 82/9 82/10 82/19 82/21 83/20 83/22 84/1 84/2 84/5 84/10 85/10 85/13 86/10 86/11 86/22 86/25 87/3 87/18 87/25 88/8 90/25 97/4 97/5 97/24
**yes [16]** 4/3 4/10 25/11 31/18 33/4 45/11 46/4 46/9 47/20 67/2 92/15 93/5 98/12 99/7 99/12 102/14
**yesterday [1]** 4/17
**yet [6]** 4/17 32/16 58/24 68/20 69/12 77/1
**yielded [1]** 86/2
**yields [1]** 15/11
**York [1]** 1/15
**you [245]**
**you'd [2]** 36/5 81/16
**you're [2]** 11/6 25/7
**You've [1]** 33/2
**young [10]** 47/15 48/7 52/20 53/14 54/7 79/11 80/16 80/22 91/3 91/3
**younger [1]** 51/4
**your [120]**

**Z**

**zero [5]** 18/11 22/20 22/23 31/12 52/7